UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| DWIGHT JERECZEK and STANLEY ELLIOTT, individually and on behalf of all others similarly situated, | Case No.        3:25-cv-00223-SFR |
| Plaintiffs, | CLASS ACTION COMPLAINT |
| v. | <u>DEMAND FOR JURY TRIAL</u> |
| MBIA INC; AMBAC FINANCIAL GROUP, INC.; AMBAC ASSURANCE CORPORATION; MBIA INSURANCE CORPORATION;  NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION; | |
| Defendants. | |

**AMENDED COMPLAINT**

Plaintiffs Dwight Jereczek and Stanley Elliott ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Defendants MBIA Insurance Corporation (together with MBA Inc, "MBIA"),  Ambac Financial Group, Inc., Ambac Assurance Corporation (together with Ambac Financial Group, Inc., "Ambac") , National Public Finance Guarantee Corporation, for breach of contract and unjust enrichment seeking monetary damages, disgorgement, a declaratory judgment, and injunctive relief. The allegations herein other than those concerning Plaintiffs are based on information and belief and investigation of counsel.

**PARTIES**

1. Plaintiff Dwight Jereczek is a resident of California. Plaintiff Jereczek held COFINA Bonds insured by Defendants.

2.  Plaintiff Stanley Elliott is a resident of Florida. Plaintiff Elliott held COFINA Bonds insured by Defendants

3.  .Defendant Ambac Financial Group, Inc. is a Delaware corporation with its principal place of business at One World Trade Center 41st Floor New York, NY 10007

4.  Defendant MBIA Inc  is a Connecticut corporation with a listed Registered Agent address C T Corporation System, 357 East Center Street, Ste. 2 J, Manchester, CT, 06040-4471, United States is a parent company of MBIA Insurance Corporation ( together"MBIA") and National Public Finance Guarantee Corporation.

5.  MBIA Insurance Corporation  a place of business is  at 1 Manhattanville Rd #301, Purchase, NY 10577.

6.  Defendant Ambac Assurance Corporation is a Wisconsin corporation with its principal place of business at One World Trade Center 41st Floor New York, NY 10007

7.  Defendant Ambac Assurance Corporation ("Ambac Assurance") is a wholly owned subsidiary of Defendant Ambac Financial Group, Inc.

8.  Defendant Ambac Financial Group, Inc.  ("AFG") has a principal place of business at One World Trade Center 41st Floor New York, NY 10007 .

9.  Further, by AFG's own statement" AFG provides financial guarantee insurance policies through its principal operating subsidiary, Ambac Assurance Corporation ("Ambac Assurance" or "AAC")"

10. Defendant National Public Finance Guarantee Corporation ("National") is a New York

2

corporation with its principal place of business at 1 Manhattanville Road Suite 301 Purchase, NY 10577  National Public Finance Guarantee Corporation ("National") i. National is a wholly owned subsidiary of MBIA Inc.

11. MBIA Insurance Corporation is a subsidiary of Defendant MBIA Inc.

12. The claims of Elliott and Jereczek are typical of the claims of all other members of  the insured COFINA Bondholders class as described in this Complaint, and they have agreed to act as Representative Plaintiffs to assert the claims of all similarly situated bondholders.

13. The named Representative Plaintiffs bring this case as a class action under Rule 23  of Federal Rules  of Civil Procedure on behalf of all persons and entities that owned COFINA bonds between October 19, 2018, and February 12, 2019. Each claim has a common basis with every other claim, namely Defendants executed identical policies in which they agreed to pay the trustee for the benefit of Holders a portion of the principal and interest in the obligation

**JURISDICTION**

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because there is diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, .the aggregated claims of the individual class members must exceed the sum or value of $5,000,000, exclusive of interest and costs ands Defendant MBIA Inc is incorporated in Connecticut. None of the Defendants' principal place of business or citizenship are in California or Florida, of which Plaintiffs are citizens.

## STATEMENT OF FACTS

15.  Between 2007 and 2011 , the Puerto Rico Sales Tax Financing Corporation—commonly referred to by its Spanish acronym, COFINA, issued over $10 billion par of bonds The COFINA Bonds were issued with Official Statements (the "Bond Offerings" attached as "Exhibit B"), which contained information about the bond offering's terms, the issuer and insurers obligations, and bondholders' rights and privileges.

16. The bond insurance was issued by Defendants or their predecessors through contracts that were offered as part of the bond offering, referred to as Policies, with each of the COFINA bondholders. The Policies served as guarantees of Defendants' obligations to pay COFINA bondholders in the event of nonpayment for any reason default.  In other words, if COFINA failed to make its required payments in connection with the bonds, Defendants were required to stand in the shoes of COFINA and make the requisite principal and interest payments to bondholders. Defendants' obligations were noncancelable and irrevocable.

17. Plaintiffs and members of the Class purchased COFINA Bonds that were packaged with bond insurance.

18. The guaranty of the bonds by Defendants, multinational financial institutions, made the purchase of the COFINA bonds a low risk bet for investors.

19. Ambac and National's payment of scheduled principal and interest obligations for the benefit of bondholders in the event of COFINA's payment default.

20. In the event of a default the terms of the insurance prohibited the Plaintiffs from participating in any legal actions, settlements, or other legal processes regarding the bonds, these were to be explicitly left in the hand of the insurance companies who owned the plaintiffs utmost good faith.

21. The Ambac and National Policies are binding agreements that provide important financial protections to bondholders.

22. The Official Statement, or offering document supplied with the bonds, defines certain terms within the Policies.

23. Entity known today as Defendant MBIA Inc initially issued policies directly.

24. MBIA Inc then divided their activities between wholly-owned  subsidiaries National and  MBIA INSURANCE CORPORATION

25. The MBIA Policy provides that MBIA "unconditionally and irrevocably" guaranteed to owners (i.e., bondholders) the scheduled payment of principal of and interest on the MBIA Insured Bonds when due. Specifically, the MBIA Policy provides that MBIA guaranteed: (i) "the full and complete payment required to be made by or on behalf of the Issuer" (COFINA) to the Trustee (the Bank of New York) of "an amount equal to" the principal of and interest on the MBIA Insured Bonds "as such payments shall become due but shall not be so paid[,]" with an exception on the timing for an event of acceleration and (ii) "the reimbursement of any such payment which is subsequently recovered from any owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law." The amounts referred to in (i) and (ii) are defined as "Insured Amounts" under the MBIA Policy. ][1]

26. Under the MBIA Policy, if the required payment of an Insured Amount was not made, on the due date of the payment or within one business day after receipt of notice of nonpayment (whichever was later), MBIA was required to "make a deposit funds, in an account with the U.S. Bank Trust

---

[1] [page 6 of Exhibit A]

National Association, in New York, New York, or its successor, sufficient for the payment of any such Insured Amounts which are then due."[2]

27. Further, the MBIA Policy states "[I]n the event of an acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed hereby shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration, unless the Insurer elects, in its sole discretion, to pay in whole or in part any principal due by reason of such acceleration)."[3]

28. U.S. Bank Trust National Association was then required to disburse to bondholders or the Paying Agent payment of the Insured Amounts.

29. The MBIA Policy was "non-cancellable for any reason."[4]

30. The Ambac Assurance Policy similarly set forth Ambac's obligation to pay the principal and interest on the Ambac bonds. Specifically, the Ambac Assurance Policy provides that Ambac "agrees to pay to The Bank of New York, as trustee or its successor (the 'Insurance Trustee'), for the benefit of the Holders [i.e. Ambac bondholders], that portion of the principal of and interest on the above-described obligations [i.e., the Ambac bonds] which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Obligor [COFINA]." "Due for Payment," when referring to principal, "is when the scheduled maturity date or mandatory redemption date for the application of a required sinking fund installment has been reached." It "does not refer to an earlier date on which payment is due by reason of call for redemption (other than by application of required sinking fund installments), acceleration or other advancement of maturity. [5]

---

[2] [page 6 of Exhibit A]
[3] Id
[4] Id
[5] Id

31. When referring to interest in AMBAC Assurance Policy, "due for payment" means "when the scheduled date for payment of interest has been reached."

32. "Nonpayment" is defined to mean "the failure of the Obligor to have provided sufficient funds to the trustee or paying agent for payment in full of all principal of and interest on the Obligations which are Due for Payment." [6]

33. Under the Ambac Assurance Policy, Ambac was required to "make such payments to the Insurance Trustee within one (1) business day following written notification to Ambac of Nonpayment." Then, "[u]pon a Holder's presentation and surrender to the Insurance Trustee of such unpaid Obligations or related coupons, uncanceled and in bearer form and free of any adverse claim, the Insurance Trustee will disburse to the Holder the amount of principal and interest which is then Due for Payment but is unpaid." [7]

34. The Ambac Assurance Policy provides that it "is noncancelable." [8]

35. The AMBAC Assurance And MBIA policies are attached as "Exhibit A"

36. In 2017, COFINA failed to honor its defaulted obligations on its bond payments filed for Title III restructuring protection to impair the restructuring of its debt obligations under Title III of PROMESA.

37. The Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA), 48 U.S.C. 2101 et seq, was a 2016 act passed by Congress to oversee the Commonwealth's finances and restructure its debts and obligations including the COFINA bonds . (48 U.S.C. 2121(b)(1)). The law created a bankruptcy-like judicial proceeding system under Title III of the Act.

38. The instant action however involves contractual obligations between insurance companies and the insured bonds and the Commonwealth is not a party.

---

[6] page 7 of Exhibit A

[7] Id
[8] Id

39. Plan of Adjustment of COFINA bonds was confirmed on February 13 2019 and an effective date later that year.

40. Defendants orchestrated a scheme to improperly use their advantaged role in the a Title III process insert themselves into the bankruptcy process, creating new obligations through unilaterally altered contracts with the insured classes of COFINA bondholders.  Plaintiffs were without representation or having any input whatsoever (and specifically having no standing  per the insurance contract terms (as all matters regarding restructuring were left to the insurance companies to let the contracts)and subrogation agreement).

41.  COFINA insured bondholders unknowingly and with no reason to suspect they would have to know they had had their contracted insurance rights and obligations of instruments negotiated as part of the Bond Offering and insurance contract changed, resulting in insured bondholders receiving less than what they contracted bargained in the insurance policies for.

42.  This change in contract terms between the insurance companies and the insured were not in any way germane to the Title III process. The obligations of the insurance companies predated any filing in the Title III case.

43.  The bond issuer stopped payment on July 1,  2016.

44. The stopped payment that predated confirmation of the adjustment plan -was the default and nonpayment event as defined in Defendants' policy agreement

45. Defendants were then required to make payment under their respective policy terms within one business day of receiving notice of the default or nonpayment.

46. Here, Plaintiffs and members of the Class were entitled to receive cash from Defendants in the event of default under the Policies.

47. Instead, Defendants' respective breaches of the Policies caused financial harm to Plaintiffs and members of the Class by unilaterally replacing their low risk, highly marketable insured bonds,

for which Plaintiffs were entitled to receive cash from Defendants in the event of a default, with less valuable, riskier, and less marketable financial instruments that had varying yields.

48. On June 28, 2016, a group of shareholders sued Ambac Financial Group for securities fraud related to the Puerto Rico COFINA bond issues. On December 2016, MKS downgraded Ambac Financial Group from hold to sell.

49. On February 28, 2017 Claude LeBlanc, President and Chief Executive Officer of Ambac Financial Group, "Our fourth quarter results were impacted by headwinds including the effect of higher interest rates on the RMBS and student loan insured portfolios, and an increase in our public finance reserves, which was primarily related to the evolving situation in Puerto Rico. Despite these headwinds, results for the full year 2016 were positive and as a result of our strong income generation, Ambac is expected to receive $28.7 million in tolling payments from AAC in May 2017 under the company's tax-sharing agreement " [9]

50. In 2017, Moody's downgraded Ambac Financial Group from A- to B-1. In September of 2017, the District Court dismissed the shareholders' lawsuit against Ambac Financial Group, Inc.

51. The 2016 Ambac Financial Group Annual Report states at page 15 of the PDF, "Ambac Assurance and its subsidiaries have been working toward reducing uncertainties within its insured portfolio through active monitoring and management of key exposures such as Puerto Rico, asset-backed securities…"[10]

52. [11]The 2017 Ambac Financial Group Annual Report states at page 4 of the PDF, "Notwithstanding our many achievements during the year, Ambac and the financial guaranty sector as a whole experienced increased uncertainty from exposure to Puerto Rico, leading to downward pressure

---

[9]
https://ambac.com/newsroom/news/news-details/2017/Ambac-Announces-Fourth-Quarter-2016-Results/default.aspx

[10] Id
[11] Id

on share prices." It continues at page 5 of the PDF, "While our exposure to Puerto Rico remains open of our biggest challenges, we believe that we are better positioned to manage our risk based on actions we have taken. During the year, we increased our public finance reserves largely as a result of developments related to Puerto Rico. . . In 2018, we hope to see increased clarity around the issues surrounding Puerto Rico. Ambac will continue to actively pursue dialogue with local and federal officials and progress all aspects of our strategy with respect to mitigating losses on our Puerto Rico exposure." The above-mentioned increased reserves made it difficult for Ambac Financial Group to ensure future bonds, affecting its business future.

53.     The 2018 Ambac Financial Group Annual Report states at page 3 of the PDF, under Achievements, "Negotiated and executed a consensual agreement which served as the foundation for the COFINA Plan of Adjustment which became effective on February 12, 2019." It added at page 12 of the PDF, "Ambac Assurance and its subsidiaries have been working toward reducing uncertainties within their insured portfolios through active monitoring of key exposures such as municipal entities with stressed financial conditions (including Puerto Rico). . . " This phrase was repeated in the 2019 Ambac Financial Group Annual Report states at page 14 of the PDF. At page 3 of the PDF, under Performance Highlights, it states "Executed the COFINA Plan of Adjustment in the first quarter of 2019 resolving 78% of Ambac total exposure to Puerto Rico.

54. It is obvious from the above that Ambac Financial Group, Inc. was immersed and participated in the scheme that affected the Class.

55. These instruments had  inferior yields and complex call provisions that placed plaintiffs at material financial risk, and complex and costly tax implications, and left much of the benefits in the hands of the defendants.

56.  In Connecticut, statutes and case law suggest that bondholders can enforce rights related to bond agreements, including those involving bond insurance, either directly or through trustees,

depending on the terms of the trust indenture or agreement.In *Lemmon v. Strong*, 59 Conn. 448," the court held that a guaranty associated with a bond adheres to it in equity, and the right to enforce the guaranty is tied to the right to demand payment of the bond. This suggests that bondholders have an equitable interest in enforcing related agreements, such as bond insurance contracts, depending on the specific terms and circumstances .

57.  Sec. 7-130k.. provides that any holder of bonds or related instruments, as well as trustees under trust indentures, may protect and enforce their rights under the general statutes, trust indentures, or resolutions authorizing the issuance of such bonds.  Courts  in other jurisdictions have previously  found that a bondholder had a beneficial interest in the enforcement of the contract and thus had the right to sue the guarantor for failure to pay, even if the obligation was not undertaken directly or primarily for the benefit of the bondholder *Reconstruction Finance Corp. v. Bairstow,* 140 F.2d 353. Additionally, in D*unham v. Omaha* & C. B. S. R. Co., 106 F.2d 1 & C. B. S. R. Co., it was established that the right of a bondholder to sue on a bond in default continues to exist as a legal incident of the promise.

58. In Connecticut, a third-party beneficiary has standing to enforce a contract if the intent of the contracting parties was that the promisor should assume a direct obligation to the third party. This intent is determined from the terms of the contract, read in light of the circumstances surrounding its creation, including the motives and purposes of the parties. It is not necessary for the contract to explicitly state the intent to create a direct obligation, but such language is the clearest indicator of intent. See *Hilario's Truck Ctr., LLC v. Rinaldi,* 183 Conn. App. 597*, Dow & Condon, Inc.* v. *Brookfield Dev. Corp.*, 266 Conn. 572*, Gateway Co. v. DiNoia*, 232 Conn. 223.

59. Under the guise of a Plan of Adjustment (the "Plan"),  approved by the U.S. District Court for the District of Puerto Rico, Defendants would no longer pay COFINA bondholders the full amounts due and owing under the COFINA Bonds , but would pay, at the election of unwitting

bondholders: (i) a reduced, accelerated cash payout (which was less than the value they were entitled to under the Policies); or (ii) trust certificates for trusts that were less valuable than the insured bonds they originally purchased. and worth less than the cash they should have contractually received.

60. The Court notified the bondholders of this development , and if bondholders failed to respond to the notice, they were provided with the trust certificates.

61. However, many  bondholders had no ability to access and review the notice as they did not know of its existence.

62. Notice was improper as bondholders were barred from review and not given ample time to review it.

63. The insurance companies were contractually obligated to handle all matters in restructuring for the benefit of Plaintiffs and per contract eliminated all input and involvement from Plaintiffs.

64. Plaintiffs were then prevented from voting on the Plan of Adjustment as a Class. The Insurance companies voted on it on behalf of the Plaintiff bondholders whose bonds were insured.

65. The unilateral deals Defendants devised benefited only themselves at the expense of Plaintiffs and members of the Class, who were given no opportunity to dispute them.

66. In violation of the rights of Plaintiffs and members of the Class under their agreements with Defendants, Defendants paid Plaintiffs and members of the Class less consideration than they bargained for under the Ambac and National Policies.

67. The insurers knowingly structured the settlement to impair insured bondholders.

68. The insurers excluded bondholders from having any ability to participate in negotiations.

69. Insurers then pressured bondholders into poor choices about their claims.

70. Insurers inserted themselves into the process not to represent the best outcomes for bondholders but to obtain a release and shed their obligation.

71. Insurers acted in bad faith.

72. Bad  faith can manifest in several ways, including an unfounded refusal to pay policy proceeds, causing an unfounded delay in making payment, deceiving the insured, or exercising any unfair advantage to pressure an insured into a settlement of their claims. Bad faith claims in Connecticut are often tied to the implied covenant of good faith and fair dealing, which is inherent in all contracts and requires that neither party do anything to injure the right of the other to receive the benefits of the agreement.  *Landry v. Spitz, 102 Conn. App. 34, Medical Device Sols., LLC v. Aferzon, 207* Conn. App. 707, *Capstone Bldg. Corp. v. Am. Motorists Ins. Co*., 308 Conn. 760. New York laws take a similar position. *Villas at Winding Ridge v. State Farm Fire & Cas.* Co., 942 F.3d 824, Abstract & Title Guar. Co. v. Chi. Ins. Co., 489 F.3d 808.

73. In the context of insurance, bad faith claims may arise from an insurer's failure to act in good faith to effectuate a prompt, fair, and equitable settlement of claims where liability is reasonably clear, as required under the Connecticut Unfair Insurance Practices Act (CUIPA) and the Connecticut Unfair Trade Practices Act (CUTPA).

74.  Additionally, Insurers owed Plaintiffs the duty of utmost care.

75. Utmost good faith, also known as "uberrimae fidei," is a legal doctrine primarily applied in the context of maritime  insurance contract., The doctrine of uberrimae fidei, or utmost good faith, in insurance contracts requires the disclosure of all material facts by the parties involved. This duty arises from the confidential or fiduciary nature of the relationship inherent in insurance contracts. While this doctrine has fallen out of favor in other contexts, as parties are rarely in a situation similar to inability to inspect a ship at sea and therefore having to fully rely on each other's representations, as Plaintiffs were not given afforded them any role to investigate or inspect prior making an investment decision and instead had to fully rely on information from parties who have the knowledge. The importance of transparency and disclosure is still prominent particularly in

areas involving relationships of trust and confidence. . Specifically, the parties must provide full and fair disclosure of all material facts that could influence the decision-making process of the other party. This principle is recognized in Connecticut law as applying to certain types of contracts, including insurance, where a special trust and confidence is reposed between the parties *Asnat Realty, LLC v. United Illuminating Co.*, 204 Conn. App. 313, *Dimichele v. Perrella, 158 Conn. App. 7*26. Additionally, the obligation to disclose extends not only to facts known directly by the insured but also to facts known by the insured's agent, provided the agent has a duty to acquire and communicate such information and it is feasible for the agent to do so with reasonable diligence before the insurance contract is finalized. However, if circumstances prevent the agent from communicating such information, knowledge may not be imputed to the insured. This principle was illustrated in a case where an agent's inability to communicate knowledge of an accident due to being in police custody precluded imputing that knowledge to the insured *Mastergeorge v. Utica Mut. Ins.* Co., 6 Conn. Supp. 468. New York law takes a similar view. *New York Marine & Gen. Ins. Co. v. Cont'l Cement Co., LLC*, 761 F.3d 830, *Certain Underwriters at Lloyds v. Inlet Fisheries Inc., 518 F.3d 645, Fireman's Fund Ins. Co. v. Great Am. Ins. Co., 822 F.3d 620.*

76. On February 12, 2019, the POA, including certain related commutation transactions, and subsequent distributions, became effective, resulting in a reduction of Ambac Assurance's insured net par exposure to COFINA by approximately 77% or $620 million. Subsequent redemptions of obligations of the COFINA Class 2 Trust (as further described in the Financial Guarantees in Force section included in Part II, Item 7 in the Company's Annual Report on Form 10-K for the year ended December 31, 2019) brought COFINA net par outstanding down to $101 million as of December 31, 2019;

77. Connecticut law recognizes a number of circumstances under which a parent company may be liable for the actions of its subsidiary, including the "instrumentality rule".

78. AFG's annual K-10 filings identify the risks and obligations relating to COFINA and portfolio as AFG's own, despite the involvement of its subsidiary Ambac Assurance as the bond insurer. The filings discuss all Ambac companies as a singular entity, referring to them collectively as Company and Ambac. . Management reviews financial information, allocates resources and measures financial performance on a consolidated basis. As a result, the company has a single reportable segment.

79. The "instrumentality rule" as recognized by Connecticut, requires proof of three elements: (1) the parent company must have exercised complete domination over the subsidiary, not just in terms of stock ownership but also in finances, policy, and business practices, such that the subsidiary had no separate existence; (2) this control must have been used to commit fraud, violate a statutory duty, or perpetrate an unjust act; and (3) the control and breach of duty must have directly caused the harm or loss in question. Similarly, the "identity rule" applies when there is such a unity of interest and ownership between the parent and subsidiary that their separate identities no longer exist, and treating them as separate entities would result in injustice *Angelo Tomasso, Inc. v. Armor Constr. & Paving, Inc*., 187 Conn. 544, Zaist v. Olson, 154 Conn. 563.

80. For this reason, Ambac Assurance and AFG are collectively referred to as Ambac

81. Here, the alleged unjust act is the deprivation of bondholder rights.

82. Although Connecticut does not recognize civil conspiracy as an independent tort, .it does recognize the action is for damages caused by acts committed pursuant to the conspiracy, not the conspiracy itself.

83. In the instant case AFG and Ambac Assurance conspired with MBIA Defendants to deprive Plaintiffs of their rights as bondholders and to breach the contract.

## CLASS ACTION ALLEGATIONS

84. Plaintiffs brings this action for damages, restitution and injunctive relief on behalf of themselves and a class of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), with the Class defined to include:

> All bondholders who held COFINA Bonds insured by Defendants.

85. The class definition specifically excludes the following persons or entities: (a) any Defendants named herein; (b) any of the Defendants' parent companies, subsidiaries, and affiliates; (c) any Defendants' officers, directors, management, employees, subsidiaries, affiliates or agents; (d) all governmental entities; (e) the judges and chambers staff in this case, as well as any members of their immediate families; and (f) all jurors assigned to this case.

86. Plaintiffs do not know the exact number of Class members, but estimate that there are thousands of members geographically dispersed throughout the United States, such that joinder of all Class members in the prosecution of this action is impracticable.

87. Plaintiffs' claims are typical of the claims of fellow Class members because Plaintiffs held Ambac and National insured COFINA bonds. Plaintiffs and all Class members were damaged in the same manner by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

88. Numerous questions of law or fact common to the entire Class—including, but not limited to those identified below—arise from Defendants' unlawful conduct Whether Ambac breached the Ambac Assurance Policy;

    a.   Whether National breached the National Policy;

    b.   Whether Defendants' conduct caused the Plaintiffs and members of the Class to receive less than they bargained for under the Ambac and National Policies;

    c.   Whether Plaintiffs and the other members of the Class were injured by Defendants' conduct and, if so, the determination of the appropriate Class-wide measure of damages; and

    d.   Whether Plaintiff and other members of the Class are entitled to, among other things, a declaration, restitution and injunctive relief, and, if so, the nature and extent of such relief.

89. These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

90. Plaintiffs will fairly and adequately represent the interests of the Class because they held Ambac and National insured bonds  and have no conflicts with any other members of the Class. Furthermore, Plaintiffs have retained sophisticated and competent counsel who are experienced in prosecuting class actions, as well as other complex litigation.

91. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

92. This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

93. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## CLAIMS FOR RELIEF

### COUNT ONE
### Breach of Contract
### (Against Ambac)

94. Plaintiffs hereby repeat and incorporate by reference each preceding paragraph as though fully set forth herein.

95. The Ambac Assurance Policy is a valid and binding contract between Ambac and Ambac bondholders, including Plaintiffs and members of the Class.

96. Ambac Assurance is a mere instrumentality of Ambac Financial Group.

97. Ambac Financial Group continuously represents obligations, risks  and activities of Ambac Assurance as its own,despite it being a distinct corporate structure.

98. Further, Ambac Financial Group specifically presents itself as carrying out insurance enterprise through its principal subsidiary, Ambac Assurance.

99. Plaintiffs and members of the Class performed their duties under the Ambac Assurance Policy.

100.    Ambac breached the Ambac Assurance Policy by unilaterally altering the terms without consent of Plaintiffs and members of the Class and failing to abide by and perform its duties under the Ambac Assurance Policy.

101.    Additionally Defendants breached the implied covenant of good faith and fair dealing in their performance of contractual obligations.

102.    Plaintiffs and members of the Class suffered damages as a direct result of Ambac's breach by receiving less than what they bargained for under the Ambac Assurance Policy.

103.    Plaintiffs and members of the Class are entitled to damages, a declaration that Defendants' unilateral modification of its contractual obligations is void, injunctive relief, and attorneys' fees and costs.

### COUNT TWO

**Breach of Contract**
**(Against Defendant National)**

104.    Plaintiffs hereby repeat and incorporate by reference paragraphs 1-93

105.    The National Policies are valid and binding contracts between National and National

bondholders, including Plaintiffs and members of the Class.

106.    Plaintiffs and members of the Class performed their duties under the National Policies.

107.    National breached the National Policies by unilaterally altering the terms without consent of

Plaintiffs and members of the Class and failing to abide by and perform its duties under the

National Policies.

108.    Additionally Defendants breached the implied covenant of good faith and fair dealing in their

performance of contractual obligations.

109.    Plaintiffs and members of the Class suffered damages as a direct result of National's breach by

receiving less than what they bargained for under the National Policies.

110.    Plaintiffs and members of the Class are entitled to damages, a declaration that National's

unilateral modification of its contractual obligations is void, injunctive relief, and attorneys' fees

and costs.

**COUNT THREE**
**Unjust Enrichment**
**(In the Alternative)**
**(Against  Ambac)**

111.    Plaintiffs hereby repeat and incorporate by reference paragraph 1-93

112.    Ambac  financially benefited from its unlawful acts. Ambac did so at the expense of Plaintiff

and members of the Class, who received less than they were legally entitled to receive from

Ambac. Ambac did not pay Plaintiff and members of the Class for the benefit it received.

113.    It is unjust and inequitable for Ambac to have enriched itself in this manner at the expense of Plaintiffs and members of the Class, and the circumstances are such that equity and good conscience require Ambac to make restitution to Plaintiff and members of the Class.

114.    Ambac should be made to disgorge its ill-gotten gains to a constructive trust created for the benefit of Plaintiffs and members of the Class, from which Plaintiffs and members of the Class may obtain restitution.

115.    By reason of the foregoing, Plaintiff and members of the Class are entitled to relief under the unjust enrichment law.

**COUNT FOUR**
**Unjust Enrichment**
**(In the Alternative)**
**(Against Defendant National)**

116.    Plaintiffs hereby repeat and incorporate by reference paragraph 1-93.

117.    Defendant National financially benefited from its unlawful acts. National did so at the expense of Plaintiff and members of the Class, who received less than they were legally entitled to receive from National. National did not pay Plaintiff and members of the Class for the benefit it received.

118.    It is unjust and inequitable for National to have enriched itself in this manner at the expense of Plaintiffs and members of the Class, and the circumstances are such that equity and good conscience require National to make restitution to Plaintiff and members of the Class.

119.    National should be made to disgorge its ill-gotten gains to a constructive trust created for the benefit of Plaintiffs and members of the Class, from which Plaintiffs and members of the Class may obtain restitution.

120.    By reason of the foregoing, Plaintiff and members of the Class are entitled to relief under the unjust enrichment law.

 **COUNT FIVE**

**( Bad Faith Refusal To Pay First-Party Benefits Under An Insurance Contract)**

121.    All three States with possible connection to this action recognize an action for bad faith

refusal to pay first-Party benefits under an insurance contract. Under Connecticut common law, a

bad faith action is based on the implied covenant of good faith and fair dealing, which is inherent

in every insurance contract. To establish a claim for bad faith, the plaintiff must demonstrate that

the insurer unreasonably withheld payment of a claim and acted with a dishonest purpose, moral

obliquity, or ill will. The insurer's conduct must have injured the insured's right to receive benefits

reasonably expected under the contract. This standard is articulated in cases such as *Buckman v.*

*People Express, Inc.*, 205 Conn. 166, and *Grand Sheet Metal Products Co. v. Protection Mutual*

*Insurance Co.*\*, 34 Conn. Supp. 46 (1977)  *Capstone Bldg. Corp. v. Am. Motorists Ins. Co., 308*

*Conn. 760, Insurance Bad Faith (CT), Bad Faith Elements State Law Survey*.  Similarly, under

New York Law, elements of a cause of action for bad faith refusal to pay first-party benefits under

an insurance contract  are : (1) the existence of a mutually binding contract of insurance between

the plaintiff and the defendant; (2) a refusal by the insurer to pay benefits due under the contract;

(3) the refusal resulting from the insurer's bad faith or unreasonable action in breach of an implied

covenant of good faith and fair dealing; and (4) causing damage to the insured  *Twin City Fire Ins.*

*Co. v. Colonial Life & Accident Ins. Co., 375 F.3d 1097, Univ. Med. Assocs. of the Med. Univ. of*

*S.C. v. UNUMProvident Corp.*, 333 F. Supp. 2d 479, Mid-South Ins. Co. v. Doe, 274 F. Supp. 2d.

Similarly,erto Rico recognizes an action for bad faith refusal to pay first-party benefits under an

insurance contract. The legal framework governing insurance in Puerto Rico is primarily

established by the Insurance Code, supplemented by the Civil Code. Puerto Rican case law has

consistently emphasized the duty of insurers to act in good faith when dealing with insured

parties. For instance, the Puerto Rico Supreme Court has recognized that insurers must act with

diligence and good faith in processing claims to protect insureds from bad faith and delays.

*Municipal Ity v. Great Am. Ins. Co.,* 117 D.P.R. 632, *Comm'r of Ins. v. Antilles In*s. Co., 98 TSPR

39.

122.    About half of the states recognize the tort of bad faith where insurers can be held liable in tort

for bad faith performance of their duties to insureds. This tort has strong connections to the

implied duty of good faith and fair dealing in contracts. The federal Uniform Commercial Code

(UCC) defines "good faith" as honesty in fact and the observance of reasonable commercial

standards of fair dealing (UCC § 1-201(20)). Similarly, Connecticut's UCC defines "good faith"

as honesty in fact in the conduct or transaction concerned (CGS § 42a-1-201(19)). Good faith

"excludes a variety of types of conduct characterized as 'bad faith' because they violate

community standards of decency, fairness or reasonableness" (R.2d Contracts § 205).

123.    Bad faith based tortious actions in tort, as opposed to the contract alone, allow the Courts to

award punitive damages as they are believed to  to have a deterrence factor, giving companies

incentives not to act in bad faith.

124.    Plaintiffs hereby repeat and incorporate by reference paragraph 1-93

125.    The actions of Defendants were in bad faith.

126.    Connecticut recognizes the implied covenant of good faith and fair dealing as well as the tort

of bad faith (*Zieba v. Middlesex Mut. Assurance Co*., 549 F. Supp. 1318 (D. Conn. 1982), *Hawley

Enterprises, Inc. v. Reliance Ins.* Co., 621 F. Supp. 190 (D. Conn. 1985), aff'd, 788 F.2d 5 (2d Cir.

1986)).

127.    Connecticut also allows punitive damages to be awarded if common law requirements are met

or a specific statute permits.

128.    Punitive damages will be awarded if the evidence shows reckless indifference or disregard of others' rights, or an intentional or wanton violation of those rights *(Vandersluis v. Weil,* 407 A.2d 982 (Conn. 1978), *Seymour v. Carcia,* 589 A.2d 7 (Conn. App. 1991)). The standard of proof for a punitive damages award is the preponderance of the evidence (*Freeman v. Alamo Management Co.,* 607 A.2d 370 (Conn. 1992)).

129.    These actions caused Plaintiffs damages.

## COUNT SIX
### Breach of Contract
### (Against MBIA Defendants)

130.    Plaintiffs hereby repeat and incorporate by reference Paragraphs 1-86 fully set forth herein.

131.    The National Policies are valid and binding contracts between MBIA Defendants and bondholders, including Plaintiffs and members of the Class.

132.    As the different MBIA entities stem only from internal restructuring and organization within MBIA Inc itself and the company and then its different wholly-owned subsidiaries sold the same bonds at different times, the activities and obligations of these entities are discussed together as "MBIA" collectively.

133.    Plaintiffs and members of the Class performed their duties under the MBIA Policies.

134.    MBIA breached the MBIA Policies by unilaterally altering the terms without consent of Plaintiffs and members of the Class and failing to abide by and perform its duties under the MBIA Policies.

135.    Plaintiffs and members of the Class suffered damages as a direct result of MBIA breach by receiving less than what they bargained for under the MBIA Policies.

136.    Plaintiffs and members of the Class are entitled to damages, a declaration that National's unilateral modification of its contractual obligations is void, injunctive relief, and attorneys' fees and costs.

**COUNT SEVEN**
**Unjust Enrichment**
**(In the Alternative)**
**(Against MBIA Defendants)**

137.   Plaintiffs hereby repeat and incorporate by reference each  Paragraphs 1-93

138.    As the existence and involvement of different MBIA entities stem only from internal restructuring and organization within MBIA Inc itself. The company and  its different wholly-owned subsidiaries sold the same bonds at different times, the activities and obligations of these entities are discussed together as "MBIA" collectively.

139.   MBIA Defendants  financially benefited from its unlawful acts.  MBiA Defendants did so at the expense of Plaintiff and members of the Class, who received less than they were legally entitled to receive from MBIA companies. MBIA Defendantsdid not pay Plaintiff and members of the Class for the benefit it received.

140.   It is unjust and inequitable for MBIA Defendants to have enriched itself in this manner at the expense of Plaintiffs and members of the Class, and the circumstances are such that equity and good conscience require MBIA Defendants to make restitution to Plaintiff and members of the Class.

141.   MBIA Defendants should be made to disgorge its ill-gotten gains to a constructive trust created for the benefit of Plaintiffs and members of the Class, from which Plaintiffs and members of the Class may obtain restitution.

142.   By reason of the foregoing, Plaintiff and members of the Class are entitled to relief under the unjust enrichment law.

**COUNT EIGHT:**

**Breach of Implied Covenant of Good Faith and Fair Dealing**

**(Against Ambac)**

143.    The implied covenant of good faith and fair dealing is inherent in every contract. It presupposes that the terms and purpose of the contract are agreed upon by the parties.

144.    Connecticut law mandates  that for  the action to succeed the defendant must have engaged in acts that impeded the plaintiff's right to receive the benefits reasonably expected under the contract. This includes actions that are unfaithful to the purpose of the contract or that evade the spirit of the bargain.

145.    Further  defendant's actions must have been taken in bad faith.  This includes a refusal to fulfill contractual obligations motivated by an interested or sinister motive.

146.    Defendants reallege Paragraphs 1-93

147.    Plaintiffs' had a reasonable expectation that Defendants would honor the existing insurance policies in existence when the bonds were purchased.

148.    Ambac Assurance was contractually required to act for the the benefit  Plaintiffs whe

149.    Instead, Ambac engaged in a process to limit its exposure and seek releases from liability under the existing insurance contracts.

150.    Ambac did so in bad faith as a way to avoid its financial obligations.

151.    Failure to pay out the policy obligations caused damages to Plaintiffs

152.    Ambac further injured Plaintiffs by excluding them from the class voting procedures and having an active role in the negotiation and decision making process with regard to the bonds.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Class, respectfully request that this Court enter judgment on their behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

A.    This action may proceed as a class action, with Plaintiffs serving as the Class Representatives and their counsel serving as Class Counsel;

B.    Defendants breached their contractual obligations;

C.    Plaintiffs and the Class have been injured as a result of Defendants' breaches;

D.    Plaintiffs and the Class are entitled to recover damages and that a judgment in favor of Plaintiffs and the Class be entered against Defendants in an amount subject to proof at trial;

E.    Plaintiffs and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate;

F.    Defendants are required to disgorge their profits earned as a result of their wrongful conduct and order them to make restitution to Plaintiffs and members of the Class;

G.    Plaintiff and the Class are entitled to equitable relief suitable to remedy Defendants' past and ongoing conduct, including:

i.    A judicial determination declaring the rights of Plaintiffs and members of the Class, and the corresponding responsibilities of Defendants; and

ii.    Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other

26

persons acting or claiming to act on their behalf from violations of the law as alleged herein;

H.     Defendants are to be responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification of this action and their rights to the Class members;

I.     Defendants are to be responsible for punitive damages in tort;

J.     Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

K.     Plaintiffs and members of the Class receive such other or further relief as may be just and proper.

## L.  JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims asserted in this Complaint that are so triable.

Dated:May 5, 2025

  Respectfully submitted,

/s/ RALPH STRZALKOWSKI, ESQ
ct30234
NATION'S COUNSEL PLLC
rs@lawyeronwheels.org
352 262 9593
1500 K. Street NW
Suite 200
WASHINGTON, District of Columbia
20005

*Attorneys for Plaintiffs and the Proposed Class*



**Financial Guaranty Insurance Company**
25 Park Avenue
New York, NY 10017
✆ 212·312·3000
✆ 800·352·0001

## Municipal Bond
## New Issue Insurance Policy

| Issuer: | | Policy Number: | |
|---|---|---|---|
| | | Control Number: | 0010001 |
| Bonds: | | Premium: | |

Financial Guaranty Insurance Company ("Financial Guaranty"), a New York stock insurance company, in consideration of the payment of the premium and subject to the terms of this Policy, hereby unconditionally and irrevocably agrees to pay to U.S. Bank Trust National Association or its successor, as its agent (the "Fiscal Agent"), for the benefit of Bondholders, that portion of the principal and interest on the above-described debt obligations (the "Bonds") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

Financial Guaranty will make such payments to the Fiscal Agent on the date such principal or interest becomes Due for Payment or on the Business Day next following the day on which Financial Guaranty shall have received Notice of Nonpayment, whichever is later. The Fiscal Agent will disburse to the Bondholder the face amount of principal and interest which is then Due for Payment but is unpaid by reason of Nonpayment by the Issuer but only upon receipt by the Fiscal Agent, in form reasonably satisfactory to it, of (i) evidence of the Bondholder's right to receive payment of the principal or interest Due for Payment and (ii) evidence, including any appropriate instruments of assignment, that all of the Bondholder's rights to payment of such principal or interest Due for Payment shall thereupon vest in Financial Guaranty. Upon such disbursement, Financial Guaranty shall become the owner of the Bond, appurtenant coupon or right to payment of principal or interest on such Bond and shall be fully subrogated to all of the Bondholder's rights thereunder, including the Bondholder's right to payment thereof.

This Policy is non-cancellable for any reason. The premium on this Policy is not refundable for any reason, including the payment of the Bonds prior to their maturity. This Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Bond.

As used herein, the term "Bondholder" means, as to a particular Bond, the person other than the Issuer who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof. "Due for Payment" means, when referring to the principal of a Bond, the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity and means, when referring to interest on a Bond, the stated date for payment of interest. "Nonpayment" in respect of a Bond means the failure of the Issuer to have provided sufficient funds to the paying agent for payment in full of all

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

## Municipal Bond
## New Issue Insurance Policy

principal and interest Due for Payment on such Bond. "Notice" means telephonic or telegraphic notice, subsequently confirmed in writing, or written notice by registered or certified mail, from a Bondholder or a paying agent for the Bonds to Financial Guaranty. "Business Day" means any day other than a Saturday, Sunday or a day on which the Fiscal Agent is authorized by law to remain closed.

In Witness Whereof, Financial Guaranty has caused this Policy to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

President

Effective Date:                                Authorized Representative

U.S. Bank Trust National Association, acknowledges that it has agreed to perform the duties of Fiscal Agent under this Policy.

Authorized Officer

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.
Form 9000 (10/93)                                                    Page 2 of 2

F–2



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212-312-3000
T 800-352-0001

# Endorsement
## To Financial Guaranty Insurance Company
## Insurance Policy

| Policy Number: | Control Number: | 0010001 |
| --- | --- | --- |

It is further understood that the term "Nonpayment" in respect of a Bond includes any payment of principal or interest made to a Bondholder by or on behalf of the issuer of such Bond which has been recovered from such Bondholder pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

NOTHING HEREIN SHALL BE CONSTRUED TO WAIVE, ALTER, REDUCE OR AMEND COVERAGE IN ANY OTHER SECTION OF THE POLICY. IF FOUND CONTRARY TO THE POLICY LANGUAGE, THE TERMS OF THIS ENDORSEMENT SUPERSEDE THE POLICY LANGUAGE.

In Witness Whereof, Financial Guaranty has caused this Endorsement to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

**President**

**Effective Date:**                                        **Authorized Representative**

**Acknowledged as of the Effective Date written above:**

**Authorized Officer**
**U.S. Bank Trust National Association, as Fiscal Agent**

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.

F-3



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

## Endorsement

To Financial Guaranty Insurance Company
Insurance Policy

| Policy Number: | | Control Number: | 0010001 |
|---|---|---|---|

It is further understood that with respect to the Bonds maturing on _____, the amount insured under this Policy is that portion of the accreted value (as set forth in the bond documents under which the Bonds are issued) of said Bonds which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

NOTHING HEREIN SHALL BE CONSTRUED TO WAIVE, ALTER, REDUCE OR AMEND COVERAGE IN ANY OTHER SECTION OF THE POLICY. IF FOUND CONTRARY TO THE POLICY LANGUAGE, THE TERMS OF THIS ENDORSEMENT SUPERSEDE THE POLICY LANGUAGE.

In Witness Whereof, Financial Guaranty has caused this Endorsement to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

President

Effective Date:                                              Authorized Representative

Acknowledged as of the Effective Date written above:

Authorized Officer
U.S. Bank Trust National Association, as Fiscal Agent

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.
Form E-0014                                                                                        Page 1 of 1

F-4

**APPENDIX G**

## FINANCIAL GUARANTY INSURANCE POLICY

### MBIA Insurance Corporation
### Armonk, New York 10504

Policy No. [NUMBER]

MBIA Insurance Corporation (the "Insurer"), in consideration of the payment of the premium and subject to the terms of this policy, hereby unconditionally and irrevocably guarantees to any owner, as hereinafter defined, of the following described obligations, the full and complete payment required to be made by or on behalf of the Issuer to [PAYING AGENT/TRUSTEE] or its successor (the "Paying Agent") of an amount equal to (i) the principal of (either at the stated maturity or by any advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Obligations (as that term is defined below) as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed hereby shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration, unless the Insurer elects, in its sole discretion, to pay in whole or in part any principal due by reason of such acceleration);  and (ii) the reimbursement of any such payment which is subsequently recovered from any owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law.  The amounts referred to in clauses (i) and (ii) of the preceding sentence shall be referred to herein collectively as the "Insured Amounts." "Obligations" shall mean:

[PAR]
[LEGAL NAME OF ISSUE]

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by the Insurer from the Paying Agent or any owner of an Obligation the payment of an Insured Amount for which is then due, that such required payment has not been made, the Insurer on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with U.S. Bank Trust National Association, in New York, New York, or its successor, sufficient for the payment of any such Insured Amounts which are then due. Upon presentment and surrender of such Obligations or presentment of such other proof of ownership of the Obligations, together with any appropriate instruments of assignment to evidence the assignment of the Insured Amounts due on the Obligations as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for such owners of the Obligations in any legal proceeding related to payment of Insured Amounts on the Obligations, such instruments being in a form satisfactory to U.S. Bank Trust National Association, U.S. Bank Trust National Association shall disburse to such owners, or the Paying Agent payment of the Insured Amounts due on such Obligations, less any amount held by the Paying Agent for the payment of such Insured Amounts and legally available therefor.  This policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Obligation

As used herein, the term "owner" shall mean the registered owner of any Obligation as indicated in the books maintained by the Paying Agent, the Issuer, or any designee of the Issuer for such purpose.  The term owner shall not include the Issuer or any party whose agreement with the Issuer constitutes the underlying security for the Obligations.

Any service of process on the Insurer may be made to the Insurer at its offices located at 113 King Street, Armonk, New York 10504 and such service of process shall be valid and binding.

This policy is non-cancellable for any reason.  The premium on this policy is not refundable for any reason including the payment prior to maturity of the Obligations.

IN WITNESS WHEREOF, the Insurer has caused this policy to be executed in facsimile on its behalf by its duly authorized officers, this [DAY] day of [MONTH, YEAR].

COUNTERSIGNED:

_____
Resident Licensed Agent

_____
City, State

STD-RCS-7
01/05

**MBIA Insurance Corporation**

_____
President

Attest:

_____
Assistant Secretary

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX H**

# *Ambac*

Ambac Assurance Corporation
One State Street Plaza, 15th Floor
New York, New York 10004
Telephone: (212) 668-0340

## Financial Guaranty Insurance Policy

Obligor:

Policy Number:

Obligations:

Premium:

Ambac Assurance Corporation (Ambac), a Wisconsin stock insurance corporation, in consideration of the payment of the premium and subject to the terms of this Policy, hereby agrees to pay to The Bank of New York, as trustee, or its successor (the "Insurance Trustee"), for the benefit of the Holders, that portion of the principal of and interest on the above-described obligations (the "Obligations") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Obligor.

Ambac will make such payments to the Insurance Trustee within one (1) business day following written notification to Ambac of Nonpayment. Upon a Holder's presentation and surrender to the Insurance Trustee of such unpaid Obligations or related coupons, uncanceled and in bearer form and free of any adverse claim, the Insurance Trustee will disburse to the Holder the amount of principal and interest which is then Due for Payment but is unpaid. Upon such disbursement, Ambac shall become the owner of the surrendered Obligations and/or coupons and shall be fully subrogated to all of the Holder's rights to payment thereon.

In cases where the Obligations are issued in registered form, the Insurance Trustee shall disburse principal to a Holder only upon presentation and surrender to the Insurance Trustee of the unpaid Obligation, uncanceled and free of any adverse claim, together with an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee duly executed by the Holder or such Holder's duly authorized representative, so as to permit ownership of such Obligation to be registered in the name of Ambac or its nominee. The Insurance Trustee shall disburse interest to a Holder of a registered Obligation only upon presentation to the Insurance Trustee of proof that the claimant is the person entitled to the payment of interest on the Obligation and delivery to the Insurance Trustee of an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee, duly executed by the Holder or such Holder's duly authorized representative, transferring to Ambac all rights under such Obligation to receive the interest in respect of which the insurance disbursement was made. Ambac shall be subrogated to all of the Holders' rights to payment on registered Obligations to the extent of any insurance disbursements so made.

In the event that a trustee or paying agent for the Obligations has notice that any payment of principal of or interest on an Obligation which has become Due for Payment and which is made to a Holder by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from the Holder pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such Holder will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available.

As used herein, the term "Holder" means any person other than (i) the Obligor or (ii) any person whose obligations constitute the underlying security or source of payment for the Obligations who, at the time of Nonpayment, is the owner of an Obligation or of a coupon relating to an Obligation. As used herein, "Due for Payment", when referring to the principal of Obligations, is when the scheduled maturity date or mandatory redemption date for the application of a required sinking fund installment has been reached and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by application of required sinking fund installments), acceleration or other advancement of maturity; and, when referring to interest on the Obligations, is when the scheduled date for payment of interest has been reached. As used herein, "Nonpayment" means the failure of the Obligor to have provided sufficient funds to the trustee or paying agent for payment in full of all principal and interest on the Obligations which are Due for Payment.

This Policy is noncancelable. The premium on this Policy is not refundable for any reason, including payment of the Obligations prior to maturity. This Policy does not insure against loss of any prepayment or other acceleration payment which at any time may become due in respect of any Obligation, other than at the sole option of Ambac, nor against any risk other than Nonpayment.

In witness whereof, Ambac has caused this Policy to be affixed with a facsimile of its corporate seal and to be signed by its duly authorized officers in facsimile to become effective as its original seal and signatures and binding upon Ambac by virtue of the countersignature of its duly authorized representative.

President

Secretary

Effective Date:

Authorized Representative

THE BANK OF NEW YORK acknowledges that it has agreed
to perform the duties of Insurance Trustee under this Policy.

Form No.: 2B-0012 (1/01)

Authorized Officer of Insurance Trustee

H—1

# EXHIBIT B

NEW ISSUE – BOOK-ENTRY ONLY
See "Book-Entry Only System"

*In the opinion of Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, under the provisions of the Acts of Congress now in force, and under existing statutes and court decisions, (a) assuming continuing compliance with certain tax covenants as described herein, (i) interest on the Bonds is excluded from gross income for Federal income tax purposes pursuant to Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"), and (ii) interest on the Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations, and (b) the Bonds, and the interest thereon, are exempt from state, Commonwealth of Puerto Rico and local taxation. See "Tax Matters" herein.*

# PUERTO RICO SALES TAX FINANCING CORPORATION
## $2,667,603,572.60 Sales Tax Revenue Bonds, Series 2007A

**Dated:** Date of Delivery                                                    **Due:** August 1, as shown on the inside cover page

Puerto Rico Sales Tax Financing Corporation (the "Corporation") will issue its Sales Tax Revenue Bonds, Series 2007A (the "Bonds"), in order to provide funds to the Commonwealth of Puerto Rico (the "Commonwealth") to be applied to the repayment of certain of its debt obligations owed to Government Development Bank for Puerto Rico ("Government Development Bank") and Puerto Rico Public Finance Corporation. Concurrently with the issuance of the Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, Series 2007B (the "Series 2007B Bonds"). The Series 2007B Bonds are being offered for sale solely in Puerto Rico pursuant to a separate Official Statement.  The issuance of the Series 2007A Bonds is not contingent upon the issuance of the Series 2007B Bonds.

The Bonds, the Series 2007B Bonds, and any additional bonds issued under resolutions adopted by the Corporation (collectively, as amended and supplemented, the "Resolution"), will be payable from and secured by a security interest created by the Resolution in a specified portion of a new sales tax (such portion of the Commonwealth sales tax, the "Pledged Sales Tax"), imposed by a newly-enacted statute of the Commonwealth that grants to the Corporation ownership of the Pledged Sales Tax, such portion constituting the first receipts of such tax in each Fiscal Year in the specified amount. The Bank of New York will act as trustee (the "Trustee") under the Resolution.

The Bonds are issuable as registered bonds without coupons in denominations of $5,000 (of maturity amount in the case of the capital appreciation bonds), initially registered in the name of Cede & Co., as nominee for The Depository Trust Company. Purchasers of the Bonds will not receive certificates representing the Bonds. The Bonds are being issued as fixed rate bonds (the "Fixed Rate Bonds") in the form of current interest bonds (the "Current Interest Bonds") and capital appreciation bonds (the "Capital Appreciation Bonds"), and as LIBOR-based adjustable rate bonds (the "LIBOR Bonds") as set forth in the inside cover page.  Interest on the Current Interest Bonds will be payable semi-annually to maturity (or earlier redemption) on each February 1 and August 1, commencing on February 1, 2008. Interest on the Capital Appreciation Bonds will not be payable on a current basis but will compound semiannually on each February 1 and August 1, commencing on August 1, 2007, and will be payable at maturity or redemption. Interest on the LIBOR Bonds will be payable quarterly, commencing on November 1, 2007. The Bonds are subject to redemption prior to maturity as set forth herein, including redemption at par. The inside cover page of this Official Statement contains information concerning the maturity schedules, interest rates, prices and approximate yields of the Bonds.

The scheduled payment of principal and interest on certain of the Bonds will be guaranteed under bond insurance policies to be issued concurrently with the delivery of the Bonds by Financial Guaranty Insurance Company, MBIA Insurance Corporation, and Ambac Assurance Corporation, as indicated in the inside cover page of this Official Statement.

THE BONDS ARE PAYABLE BY THE CORPORATION SOLELY FROM THE PLEDGED PROPERTY HELD UNDER THE RESOLUTION CONSISTING PRIMARILY OF THE PLEDGED SALES TAX COLLECTED AND REMITTED TO THE TRUSTEE. THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR INSTRUMENTALITIES (OTHER THAN THE CORPORATION), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE CORPORATION) SHALL BE LIABLE FOR THE PAYMENT THEREOF.

The Bonds are offered by the Underwriters when, as and if issued by the Corporation and received by the Underwriters, subject to prior sale, to withdrawal or modification of the offer without notice, and to the approval of legality by Hawkins Delafield & Wood LLP, New York, New York, Bond Counsel to the Corporation. Certain legal matters will be passed upon by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico, as Special Counsel to Goldman, Sachs & Co., and for the Underwriters by their counsel, Fiddler González & Rodríguez, P.S.C., San Juan, Puerto Rico. It is expected that the Bonds will be delivered through The Depository Trust Company on or about July 31, 2007.

| | | |
|---|---|---|
| **Goldman, Sachs & Co.** | | **Lehman Brothers** |
| **AG Edwards** | **Banc of America Securities LLC** | **BBVAPR MSD** |
| **Bear, Stearns & Co., Inc.** | **Citi** | **First Albany** |
| **JPMorgan** | **Loop Capital** | **Merrill Lynch & Co.** |
| **Morgan Stanley** | **Oriental Financial Services** | **Popular Securities** |
| **RBC Capital Markets** | **Samuel A. Ramírez & Co.** | **Santander Securities** |
| **UBS Investment Bank** | | **Wachovia Bank, National Association** |

July 13, 2007

# Puerto Rico Sales Tax Financing Corporation
## $2,667,603,572.60 Sales Tax Revenue Bonds, Series 2007A

### $1,667,718,572.60 Capital Appreciation Bonds

$15,445,848.60[*] Capital Appreciation Bonds due August 1, 2040;  Approximate Yield:  4.96%
$114,697,901.80[*] Capital Appreciation Bonds due August 1, 2041;  Approximate Yield:  4.98%
$113,630,448.00[*] Capital Appreciation Bonds due August 1, 2042;  Approximate Yield:  4.99%
$112,132,508.00[†] Capital Appreciation Bonds due August 1, 2043;  Approximate Yield:  5.01%
$110,597,947.20[†] Capital Appreciation Bonds due August 1, 2044;  Approximate Yield:  5.03%
$109,430,361.25[†] Capital Appreciation Bonds due August 1, 2045;  Approximate Yield:  5.04%
$108,235,860.00[†] Capital Appreciation Bonds due August 1, 2046;  Approximate Yield:  5.05%
$107,014,744.15[‡] Capital Appreciation Bonds due August 1, 2047;  Approximate Yield:  5.06%
$701,475,105.60[‡] Capital Appreciation Bonds due August 1, 2054;  Approximate Yield:  5.14%
$175,057,848.00 Capital Appreciation Bonds due August 1, 2056;  Approximate Yield:  5.34%
Price of all Capital Appreciation Bonds 100%

### $563,885,000 5.25% Current Interest Fixed Rate Bonds due August 1, 2057; Yield: 4.90%[§]

### $436,000,000 LIBOR-Based Adjustable Rate Bonds due August 1, 2057; Price: 100%

The LIBOR Bonds will bear interest from their date of delivery, after an initial rate equal to 4.51775%, at a per annum rate for each period equal to 67% of the Three-Month LIBOR Rate for such period plus a per annum spread equal to 93 basis points (0.93%); provided, however, that the LIBOR-Based Interest Rate will never exceed the maximum rate permitted under Puerto Rico law (currently 12%).

---

[*] Insured by Financial Guaranty Insurance Corporation.
[†] Insured by MBIA Insurance Corporation.
[‡] Insured by Ambac Assurance Corporation.
[§] Yield to August 1, 2017 call date.

No dealer, broker, sales representative or other person has been authorized by Puerto Rico Sales Tax Financing Corporation, Government Development Bank or the Underwriters to give any information or to make any representations, other than those contained in this Official Statement in connection with the offering described herein, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. The information contained herein has been obtained from Puerto Rico Sales Tax Financing Corporation, Government Development Bank, The Depository Trust Company, Ambac Assurance Corporation ("Ambac"), Financial Guaranty Insurance Corporation ("FGIC"), MBIA Insurance Corporation ("MBIA"), and other sources which are believed to be reliable but is not guaranteed as to accuracy or completeness by, and is not to be construed as a representation by, the Underwriters. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of the Official Statement nor any sale made hereunder shall under any circumstances create any implication that there has been no change in the affairs of Puerto Rico Sales Tax Financing Corporation or Government Development Bank since the date hereof. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal and Commonwealth securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY OVER-ALLOT OR EFFECT TRANSACTIONS THAT STABILIZE OR MAINTAIN THE MARKET PRICE OF THE BONDS AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME. THE UNDERWRITERS MAY OFFER AND SELL THE BONDS TO CERTAIN DEALERS AND DEALER BANKS AND OTHERS AT A PRICE LOWER THAN THE PUBLIC OFFERING PRICE STATED ON THE INSIDE COVER PAGE AND SAID OFFERING PRICE MAY BE CHANGED FROM TIME TO TIME BY THE UNDERWRITERS.

Other than with respect to the information concerning Ambac, FGIC, and MBIA contained under the heading "BOND INSURANCE" of this Official Statement, none of the information in this Official Statement has been supplied or verified by Ambac, FGIC or MBIA.  Ambac, FGIC and MBIA make no representation or warranty, express or implied, as to (i) the accuracy or completeness of such information, (ii) the validity of the Bonds, or (iii) the tax exempt status of the interest on the Bonds.

### TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................1
THE CORPORATION ...........................................................2
BOND INSURANCE ............................................................3
   Financial Guaranty Insurance Company ....................3
   MBIA Insurance Corporation...................................5
   Ambac Assurance Corporation .................................8
   Provisions of the Resolution .................................10
THE BONDS .......................................................................10
   General ....................................................................10
   Redemption .............................................................12
BOOK-ENTRY ONLY SYSTEM.....................................14
ESTIMATED SOURCES AND USES OF FUNDS.............15
PLEDGED SALES TAX .....................................................15
   Commonwealth Sales Tax........................................15
   Sales Tax Revenue Projections and Actual Collections....16
   Pledged Sales Tax and FIA Fund.............................17
   Procedures for the Collection and Deposit of the Pledged
     Sales Tax to the FIA Fund ................................18
SECURITY FOR THE RESOLUTION BONDS .................18
   General ....................................................................18
   Property Pledged for the Payment of the Bonds ..............19
   Funds and Accounts under the Resolution .....................19
   Additional Bonds, Refunding Bonds and Other
     Obligations............................................................20
   Commonwealth's Authority to Cover Deficiencies ..........21
   Special Investment Considerations .......................21

**Page**

   Commonwealth Non-Impairment Covenant.....................22
TAX MATTERS ...................................................................22
   United States Tax Considerations.....................................22
RATINGS............................................................................25
LEGALITY FOR INVESTMENT .......................................25
UNDERWRITING ..............................................................25
LEGAL MATTERS .............................................................26
CONTINUING DISCLOSURE............................................26
GOVERNMENT DEVELOPMENT BANK FOR PUERTO
   RICO .................................................................28
MISCELLANEOUS .............................................................28

APPENDIX A – Commonwealth Economic Information ...A-1
APPENDIX B – Summary of Certain Definitions and
   Provisions of the Resolution .............................. B-1
APPENDIX C – Proposed Form of Approving Opinion of
   Bond Counsel to the Corporation ...................... C-1
APPENDIX D –Book-Entry System ...................................D-1
APPENDIX E – Table of Compounded Amounts for Capital
   Appreciation Bonds.............................................. E-1
APPENDIX F – Specimen of Financial Guaranty Insurance
   Corporation's Bond Insurance Policy .................F-1
APPENDIX G – Specimen of MBIA Insurance Corporation's
   Bond Insurance Policy ........................................G-1
APPENDIX H – Specimen of Ambac Assurance Corporation's
   Bond Insurance Policy .......................................H-1

i

[THIS PAGE INTENTIONALLY LEFT BLANK]

# Puerto Rico Sales Tax Financing Corporation
# $2,667,603,572.60 Sales Tax Revenue Bonds, Series 2007A

## INTRODUCTION

This Official Statement of Puerto Rico Sales Tax Financing Corporation (the "Corporation," or as known by the acronym of its Spanish name, "COFINA") sets forth certain information in connection with the issuance and sale by the Corporation of its Sales Tax Revenue Bonds, Series 2007A (the "Bonds"). Concurrently with the issuance of the Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, Series 2007B (the "Series 2007B Bonds"). The Series 2007B Bonds are being offered for sale solely in Puerto Rico pursuant to a separate Official Statement. The issuance of the Bonds is not contingent upon the issuance of the Series 2007B Bonds.

The Bonds will be issued pursuant to a Sales Tax Revenue Bond Resolution (the "General Resolution") and a First Supplemental Sales Tax Revenue Bond Resolution (together with the General Resolution, the "Resolution"), each adopted by the Board of Directors of the Corporation on July 13, 2007, pursuant to which The Bank of New York will act as trustee (the "Trustee").

The scheduled payment of the principal of and interest on the Capital Appreciation Bonds maturing on August 1, 2040 through 2042, as shown in the inside cover of this Official Statement (the "FGIC Insured Bonds"), when due, will be insured by a municipal insurance policy (the "FGIC Insurance Policy") issued by Financial Guaranty Insurance Corporation ("FGIC") simultaneously with the delivery of the FGIC Insured Bonds. The scheduled payment of the principal of and interest on the Capital Appreciation Bonds maturing on August 1, 2043 through 2046, as shown in the inside cover of this Official Statement (the "MBIA Insured Bonds"), when due, will be insured by a municipal insurance policy (the "MBIA Insurance Policy") issued by MBIA Insurance Corporation ("MBIA") simultaneously with the delivery of the MBIA Insured Bonds. The scheduled payment of the principal of and interest on the Capital Appreciation Bonds maturing on August 1, 2047 and 2054, as shown in the inside cover of this Official Statement (the "Ambac Insured Bonds," and together with the FGIC Insured Bonds and the MBIA Insured Bonds, the "Insured Bonds"), when due, will be insured by a municipal insurance policy (the "Ambac Insurance Policy," and together with the FGIC Insurance Policy and the MBIA Insurance Policy, the "Insurance Policies") issued by Ambac Assurance Corporation ("Ambac," and together with FGIC and MBIA, the "Bond Insurers") simultaneously with the delivery of the Ambac Insured Bonds.

The Corporation is an independent governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), newly-created under Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended by Act No. 291 approved December 26, 2006 and by Act No. 56 approved July 6, 2007 ("Act 91"), for the purpose of financing the payment, retirement or defeasance of certain debt obligations of the Commonwealth outstanding as of June 30, 2006, which are payable to Government Development Bank for Puerto Rico ("Government Development Bank") and Puerto Rico Public Finance Corporation ("PFC"). Such Commonwealth debt obligations, which are payable solely from Commonwealth budgetary appropriations, are generally referred to as the "Extraconstitutional Debt."

Legislation enacted by the Legislative Assembly of Puerto Rico in 2006 approved for the first time a sales and use tax, imposed at a 5.5% rate for the benefit of the Commonwealth (as well as an additional and separate 1.5% rate for the benefit of municipalities of the Commonwealth), on the sales or use of a broad range of goods and services in the Commonwealth (the tax generated by the 5.5% rate herein called the "Commonwealth Sales Tax"). Act 91 established the Dedicated Sales Tax Fund (as known by the acronym of its Spanish name, the "FIA Fund"), a special fund held and owned by the Corporation separate and apart from the Commonwealth's General Fund, and provided, among other things, that each Fiscal Year the first receipts of the Commonwealth Sales Tax, in the amount specified in Act 91, be deposited in the FIA Fund and applied to the payment and retirement of the Extraconstitutional Debt outstanding as of June 30, 2006. See *"Pledged Sales Tax and FIA Fund"* in "PLEDGED SALES TAX" below.

Pursuant to the authority conferred under Act 91, the Corporation will issue the Bonds and the Series 2007B Bonds, will apply the net proceeds thereof for the payment and retirement of a portion of the Extraconstitutional Debt outstanding as of June 30, 2006 owing to Government Development Bank and PFC, and will grant a security interest under the Resolution to the Pledged Sales Tax for the payment of the Bonds and the Series 2007B Bonds. The Bonds, the Series 2007B Bonds and all other bonds issued under the Resolution will be payable from, and secured by a security interest granted under the Resolution in, the Pledged Property, including the Pledged Sales Tax. The General Resolution allows for the issuance of additional bonds with payment priorities under the Resolution on a parity with, or subordinate to, the Bonds (such additional bonds, together with the Bonds and the Series 2007B Bonds, the "Resolution Bonds").

The requirements contained in the Resolution as conditions to the issuance of additional Resolution Bonds have been modified from those presented in the Preliminary Official Statement dated June 22, 2007. See "SECURITY FOR THE RESOLUTION BONDS" below.

THE BONDS ARE PAYABLE BY THE CORPORATION SOLELY FROM THE PLEDGED PROPERTY HELD UNDER THE RESOLUTION CONSISTING PRIMARILY OF THE PLEDGED SALES TAX. THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR INSTRUMENTALITIES (OTHER THAN THE CORPORATION), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE CORPORATION) SHALL BE LIABLE FOR THE PAYMENT THEREOF.

Brief descriptions of the Corporation, the security for the Resolution Bonds, the terms of the Bonds, and the provisions of the Resolution are included in this Official Statement. All references to the Resolution and other documents and agreements are qualified in their entirety by reference to such documents and agreements, copies of which are available for inspection at the offices of the Trustee.

This Official Statement contains certain "forward-looking statements" concerning the Corporation. These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Corporation. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

Capitalized terms not defined elsewhere in this Official Statement are defined in *Appendix B*.

## THE CORPORATION

The Corporation is a newly-created independent governmental instrumentality of the Commonwealth created by Act 91 for the purpose of financing the payment, retirement or defeasance of the Extraconstitutional Debt outstanding as of June 30, 2006. Act 91 vested the Corporation with all the powers conferred on Government Development Bank under its charter (other than the power to act as fiscal agent), including the power to issue bonds for its corporate purposes, to the extent required in order for the Corporation to carry out the purposes for which it was created. The Corporation is also known by an acronym of its Spanish name -- "COFINA." Act 91 provides that present and future collections of the Pledged Sales Tax be transferred to the Corporation in exchange for, and in consideration of, the Corporation's commitment to pay, or establish mechanisms to pay, all or part of the Extraconstitutional Debt outstanding as of June 30, 2006 with the net proceeds of the bonds issued by the Corporation and with other funds and resources available to the Corporation. Act 91 provides that the board of directors of the Corporation (the "Governing Board") shall consist of the members of the Board of Directors of Government Development Bank.

The following individuals are at present members of the Governing Board of the Corporation:

| Name | Occupation |
|------|------------|
| Alfredo Salazar-Conde | Acting President, Government Development Bank |
| Luis A. Avilés Pagán, Esq. | Attorney |
| Rafael F. Martínez Margarida | Certified Public Accountant |
| Hon. Jorge Silva-Puras | Governor's Chief of Staff |
| Ernesto A. Meléndez, Esq. | Attorney |
| Hon. Juan Carlos Méndez | Secretary, Department of the Treasury |
| José Guillermo Dávila | Executive Director, Office of Management and Budget |

The Corporation's offices are located at the offices of Government Development Bank at Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940.

## BOND INSURANCE

**Financial Guaranty Insurance Company**

The following information has been furnished by FGIC for use in this Official Statement. Reference is made to *Appendix F* for a specimen of the FGIC Insurance Policy. Concurrently with the issuance of the Bonds, FGIC will issue the FGIC Insurance Policy for the FGIC Insured Bonds. The FGIC Insurance Policy guarantees the scheduled payment of principal of and interest on the FGIC Insured Bonds when due, as set forth in the form of the FGIC Insurance Policy included as *Appendix F* to this Official Statement.

*Payments Under the Policy.* Concurrently with the issuance of the Bonds, FGIC will issue its FGIC Insurance Policy. The FGIC Insurance Policy unconditionally guarantees the payment of that portion of the principal or accreted value (if applicable) of and interest on the FGIC Insured Bonds which has become due for payment, but shall be unpaid by reason of nonpayment by the Corporation. FGIC will make such payments to U.S. Bank Trust National Association, or its successor as its agent (the "Fiscal Agent"), on the later of the date on which such principal, accreted value or interest (as applicable) is due or on the business day next following the day on which FGIC shall have received notice (in accordance with the terms of the FGIC Insurance Policy) from an owner of FGIC Insured Bonds or the trustee or paying agent, if any, of the nonpayment of such amount by the Corporation. The Fiscal Agent will disburse such amount due on any FGIC Insured Bond to its owner upon receipt by the Fiscal Agent of evidence satisfactory to the Fiscal Agent of the owner's right to receive payment of the principal, accreted value or interest (as applicable) due for payment and evidence, including any appropriate instruments of assignment, that all of such owner's rights to payment of such principal, accreted value or interest (as applicable) shall be vested in FGIC. The term "nonpayment" in respect of a FGIC Insured Bond includes any payment of principal, accreted value or interest (as applicable) made to an owner of a FGIC Insured Bond which has been recovered from such owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

Once issued, the FGIC Insurance Policy is non-cancellable by FGIC. The FGIC Insurance Policy covers failure to pay principal (or accreted value, if applicable) of the FGIC Insured Bonds on their stated maturity dates and their mandatory sinking fund redemption dates, and not on any other date on which the FGIC Insured Bonds may have been otherwise called for redemption, accelerated or advanced in maturity. The FGIC Insurance Policy also covers the failure to pay interest on the stated date for its payment. In the event that payment of the FGIC Insured Bonds is accelerated, FGIC will only be obligated to pay principal (or accreted value, if applicable) and interest in the originally scheduled amounts on the originally scheduled payment dates. Upon such payment, FGIC will become the owner of the FGIC Insured Bonds, appurtenant coupon or right to payment of principal or interest on such FGIC Insured Bonds and will be fully subrogated to all of the Bondowner's rights thereunder.

The FGIC Insurance Policy does not insure any risk other than nonpayment by the Corporation, as defined in the FGIC Insurance Policy. Specifically, the FGIC Insurance Policy does not cover: (i) payment on

3

acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity; (ii) payment of any redemption, prepayment or acceleration premium; or (iii) nonpayment of principal (or accreted value, if applicable) or interest caused by the insolvency or negligence or any other act or omission of the trustee or paying agent, if any.

As a condition of its commitment to insure FGIC Insured Bonds, FGIC may be granted certain rights under the FGIC Insured Bond documentation. The specific rights, if any, granted to FGIC in connection with its insurance of the FGIC Insured Bonds may be set forth in the description of the principal legal documents appearing elsewhere in this Official Statement, and reference should be made thereto.

The FGIC Insurance Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

FGIC is a New York stock insurance corporation that writes financial guaranty insurance in respect of public finance and structured finance obligations and other financial obligations, including credit default swaps. FGIC is licensed to engage in the financial guaranty insurance business in all 50 states, the District of Columbia, the Commonwealth, the U.S. Virgin Islands and the United Kingdom.

FGIC is a direct, wholly owned subsidiary of FGIC Corporation, a Delaware corporation. At March 31, 2007, the principal owners of FGIC Corporation and the approximate percentage of its outstanding common stock owned by each were as follows: The PMI Group, Inc. – 42%; affiliates of the Blackstone Group L.P. – 23%; and affiliates of the Cypress Group L.L.C. – 23%. Neither FGIC Corporation nor any of its stockholders or affiliates is obligated to pay any debts of FGIC or any claims under any insurance policy, including the FGIC Insurance Policy, issued by FGIC.

FGIC is subject to the insurance laws and regulations of the State of New York, where FGIC is domiciled, including New York's comprehensive financial guaranty insurance law. That law, among other things, limits the business of each financial guaranty insurer to financial guaranty insurance (and related lines); requires that each financial guaranty insurer maintain a minimum surplus to policyholders; establishes limits on the aggregate net amount of exposure that may be retained in respect of a particular issuer or revenue source (known as single risk limits) and on the aggregate net amount of exposure that may be retained in respect of particular types of risk as compared to the policyholders' surplus (known as aggregate risk limits); and establishes contingency, loss and unearned premium reserve requirements. In addition, FGIC is also subject to the applicable insurance laws and regulations of all other jurisdictions in which it is licensed to transact insurance business. The insurance laws and regulations, as well as the level of supervisory authority that may be exercised by the various insurance regulators, vary by jurisdiction.

At March 31, 2007, FGIC had net admitted assets of approximately $3.947 billion, total liabilities of approximately $2.828 billion, and total capital and policyholders' surplus of approximately $1.119 billion, determined in accordance with statutory accounting practices ("SAP") prescribed or permitted by insurance regulatory authorities.

The unaudited financial statements as of March 31, 2007, and the audited consolidated financial statements of FGIC and subsidiaries, on the basis of U.S. generally accepted accounting principles ("GAAP"), as of December 31, 2006 and December 31, 2005, which have been filed with the Nationally Recognized Municipal Securities Information Repositories ("NRMSIRs"), are hereby included by specific reference in this Official Statement. Any statement contained herein under the heading "BOND INSURANCE-*Financial Guaranty Insurance Company*," or in any documents included by specific reference herein, shall be modified or superseded to the extent required by any statement in any document subsequently filed by FGIC with such NRMSIRs, and shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement. All financial statements of FGIC (if any) included in documents filed by FGIC with the NRMSIRs subsequent to the date of this Official Statement and prior to the termination of the offering of the FGIC Insured

Bonds shall be deemed to be included by specific reference into this Official Statement and to be a part hereof from the respective dates of filing of such documents.

**The New York State Insurance Department recognizes only SAP for determining and reporting the financial condition and results of operations of an insurance company, for determining its solvency under the New York Insurance Law, and for determining whether its financial condition warrants the payment of a dividend to its stockholders. Although FGIC prepares both GAAP and SAP financial statements, no consideration is given by the New York State Insurance Department to financial statements prepared in accordance with GAAP in making such determinations. A discussion of the principal differences between SAP and GAAP is contained in the notes to FGIC's audited SAP financial statements.**

Copies of FGIC's most recently published GAAP and SAP financial statements are available upon request to: Financial Guaranty Insurance Company, 125 Park Avenue, New York, NY 10017, Attention: Corporate Communications Department. FGIC's telephone number is (212) 312-3000.

*Financial Guaranty's Credit Ratings.* The financial strength of FGIC is rated "AAA" by Standard & Poor's Ratings Services, a Division of The McGraw-Hill Companies, Inc. ("S&P"), "Aaa" by Moody's Investors Service, Inc. ("Moody's"), and "AAA" by Fitch Ratings ("Fitch"). Each rating of FGIC should be evaluated independently. The ratings reflect the respective ratings agencies' current assessments of the insurance financial strength of FGIC. Any further explanation of any rating may be obtained only from the applicable rating agency. These ratings are not recommendations to buy, sell or hold the FGIC Insured Bonds, and are subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of the FGIC Insured Bonds. FGIC does not guarantee the market price or investment value of the FGIC Insured Bonds nor does it guarantee that the ratings on the FGIC Insured Bonds will not be revised or withdrawn.

**Neither FGIC nor any of its affiliates accepts any responsibility for the accuracy or completeness of the Official Statement or any information or disclosure that is provided to potential purchasers of the FGIC Insured Bonds, or omitted from such disclosure, other than with respect to the accuracy of information with respect to FGIC or the FGIC Insurance Policy under the heading "BOND INSURANCE-*Financial Guaranty Insurance Company*." In addition, FGIC makes no representation regarding the FGIC Insured Bonds or the advisability of investing in the FGIC Insured Bonds.**

**MBIA Insurance Corporation**

The following information has been furnished by MBIA for the use in this Official Statement. Reference is made to *Appendix G* for a specimen of the MBIA Insurance Policy. Concurrently with the issuance of the Bonds, MBIA will issue the MBIA Insurance Policy for the MBIA Insured Bonds. The MBIA Insurance Policy guarantees the scheduled payment of principal of and interest on the MBIA Insured Bonds when due, as set forth in the form of the MBIA Insurance Policy included as *Appendix G* to this Official Statement.

MBIA does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted hrerefrom, other than with respect to the accuracy of the information regarding the MBIA Insurance Policy and MBIA set forth under this "BOND INSURANCE-*MBIA Insurance Corporation*" section. Additionally, MBIA makes no representation regarding the MBIA Insured Bonds or the advisability of investing in the MBIA Insured Bonds.

The MBIA Insurance Policy unconditionally and irrevocably guarantees the full and complete payment required to be made by or on behalf of the Corporation to the Trustee or its successor of an amount equal to (i) the principal of (either at the stated maturity or by an advancement of maturity pursuant to a mandatory sinking fund payment ) and interest on, the MBIA Insured Bonds as such payment shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or

optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed by the MBIA Insurance Policy shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration, unless MBIA elects in its sole discretion, to pay in whole or in part any principal due by reason of such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner of the MBIA Insured Bonds pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law (a "Preference").

The MBIA Insurance Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any MBIA Insured Bond. The MBIA Insurance Policy does not, under any circumstance, insure against loss relating to: (i) optional or mandatory redemptions (other than mandatory sinking fund redemptions); (ii) any payments to be made on an accelerated basis; (iii) payments of the purchase price of the MBIA Insured Bonds upon tender by an owner thereof; or (iv) any Preference relating to (i) through (iii) above. The MBIA Insurance Policy also does not insure against nonpayment or any other act or omission of the Trustee or any other paying agent, if any, for the MBIA Insured Bonds.

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by MBIA from the Trustee or any owner of a MBIA Insured Bond the payment of an insured amount for which is then due, that such required payment has not been made, MBIA on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with U.S. Bank Trust National Association, in New York, New York, or its successor, sufficient for the payment of any such insured amounts which are then due. Upon presentment and surrender of such MBIA Insured Bonds or presentment or such other proof of ownership of the MBIA Insured Bonds, together with any appropriate instruments of assignment to evidence the assignment of the insured amounts due on the MBIA Insured Bonds as are paid by MBIA, and appropriate instruments to effect the appointment of MBIA as agent for such owners of the MBIA Insured Bonds in any legal proceeding related to payment of insured amounts on the MBIA Insured Bonds, such instruments being in a form satisfactory to U.S. Bank Trust National Association, U.S. Bank Trust National Association shall disburse to such owners or the Trustee payment of the insured amounts due on such MBIA Insured Bonds, less any amount held by the Trustee for the payment of such insured amounts and legally available therefore.

*General.* MBIA is the principal operating subsidiary of MBIA Inc., a New York Stock Exchange listed company. MBIA Inc. is not obligated to pay the debts of or claims against MBIA. MBIA is domiciled in the State of New York and licensed to do business in and subject to regulation under the laws of all 50 states, the District of Columbia, the Commonwealth, the Commonwealth of the Northern Mariana Islands, the U.S. Virgin Islands and the Territory of Guam. MBIA, either directly or through subsidiaries, is licensed to do business in the Republic of France, the United Kingdom and the Kingdom of Spain and is subject to regulation under the laws of those jurisdictions. In February 2007, MBIA Corp. incorporated a new subsidiary, MBIA México, S.A. de C.V. ("MBIA México"), through which it intends to write financial guarantee insurance in México beginning in 2007. To date, MBIA México has had no operating activity.

The principal executive offices of MBIA are located at 113 King Street, Armonk, New York 10504 and the main telephone number at that address is (914) 273-4545.

*Regulation.* As a financial guaranty insurance company licensed to do business in the State of New York, MBIA is subject to the New York Insurance Law which, among other things, prescribes minimum capital requirements and contingency reserves against liabilities for MBIA, limits the classes and concentrations of investments that are made by MBIA and required the approval of policy rates and forms that are employed by MBIA. State law also regulates the amount of both the aggregate and individual risks that may be insured by MBIA, the payment of dividends by MBIA, changes in control with respect to MBIA, and transactions amount MBIA and its affiliates.

The MBIA Insurance Policy is not covered by the Property/Casualty Insurance Security Funds specified in Article 76 of the New York Insurance Law.

*Financial Strength Ratings of MBIA.*  Moody's rates the financial strength of MBIA "Aaa."  S&P rates the financial strength of MBIA "AAA."  Fitch rates the financial strength of MBIA "AAA."

Each rating of MBIA should be evaluated independently.  The ratings reflect the respective rating agency's current assessment of the creditworthiness of MBIA and its ability to pay claims on its policies of insurance.  Any further explanation as to the significance of the above ratings may be obtained only from the applicable rating agency.

The above ratings are not recommendations to buy, sell or hold the MBIA Insured Bonds, and such ratings may be subject to revision or withdrawal at any time by the rating agencies.  Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of the MBIA Insured Bonds.  MBIA does not guaranty the market price of the MBIA Insured Bonds nor does it guaranty that the ratings on the MBIA Insured Bonds will not be revised or withdrawn.

*MBIA Financial Information.*  As of December 31, 2006, MBIA had admitted assets of $10.9 billion (audited), total liabilities of $6.9 billion (audited), and total capital and surplus of $4.0 billion (audited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities.  As of March 31, 2007, MBIA had admitted assets of $11.2 billion (unaudited), total liabilities of $7.0 (unaudited), and total capital and surplus of $4.2 billion (unaudited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities.

For further information concerning MBIA, see the consolidated financial statements of MBIA and its subsidiaries as of December 31, 2006 and December 31, 2005 and for each of the three years in the period ended December 31, 2006, prepared in accordance with GAAP, included in the Annual Report on Form 10-K of MBIA Inc. for the year ended December 31, 2006 and the consolidated financial statements of MBIA and its subsidiaries as of March 31, 2007 and for the three month period ended March 31, 2007 and March 31, 2006 included in the Quarterly Report on Form 10-Q of MBIA Inc. for the quarter ended March 31, 2007, which are hereby incorporated by reference into this Official Statement and shall be deemed to be a part hereof.

Copies of the statutory financial statements filed by MBIA with the State of New York Insurance Department are available over the Internet at MBIA Inc.'s web site at http://www.mbia.com and at no cost, upon request to MBIA at its principal offices.

*Incorporation of Certain Documents by Reference.*  The following documents filed by MBIA Inc. with the Securities & Exchange Commission ("SEC") are incorporated by reference into this Official Statement:

(1)    MBIA Inc.'s Annual Report on Form 10-K for the year ended December 31, 2006;

(2)    MBIA Inc.'s Quarterly Report on Form 10-Q for the quarter ended March 31, 2007.

Any documents, including any financial statement of MBIA and its subsidiaries that are included therein or attached as exhibits thereto, filed by MBIA Inc. pursuant to Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") after the date of MBIA Inc.'s most recent Quarterly Report on Form 10-Q or Annual Report on Form 10-K, and prior to the termination of the offering of the MBIA Insured Bonds offered hereby shall be deemed to be incorporated by reference in this Official Statement and to be a part hereof from the respective dates of filing such documents.  Any statement contained in a document incorporated or deemed to be incorporated by reference herein, or contained in this Official Statement, shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any other subsequently filed documents which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement.  Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

MBIA Inc. files annual, quarterly and special reports, information statements and other information with the SEC under File No. 1-9583.  Copies of MBIA Inc.'s SEC filings (including (1) MBIA Inc.'s Annual Report on Form 10-K for the year ended December 31, 2006, and (2) MBIA Inc.'s Quarterly Report on Form 10-Q for the quarter ended March 31, 2007) are available (i) over the Internet at the SEC's web site at http://www.sec.gov; (ii) at the SEC's public reference room in Washington, D.C.; (iii) over the Internet at MBIA Inc.'s web site at http://www.mbia.com; and (iv) at no cost, upon request to MBIA at its principal executive offices.

**Ambac Assurance Corporation**

The following information has been furnished by Ambac for the use in this Official Statement. Reference is made to *Appendix H* for a specimen of the Ambac Insurance Policy.  Concurrently with the issuance of the Bonds, Ambac will issue the Ambac Insurance Policy for the Ambac Insured Bonds.  The Ambac Insurance Policy guarantees the scheduled payment of principal of and interest on the Ambac Insured Bonds when due, as set forth in the form of the Ambac Insurance Policy included as *Appendix H* to this Official Statement.

*Payment Pursuant to Financial Guaranty Insurance Policy.*  Ambac has made a commitment to issue the Ambac Insurance Policy relating to the Ambac Insured Bonds, effective as of the date of issuance of the Ambac Insured Bonds.  Under the terms of the Ambac Insurance Policy, Ambac will pay to The Bank of New York, in New York, New York, or any successor thereto (the "Insurance Trustee"), that portion of the principal of and interest on the Ambac Insured Bonds that shall become due for payment but shall be unpaid by reason of nonpayment by the Obligor (as such terms are defined in the Ambac Insurance Policy).  Ambac will make such payments to the Insurance Trustee on the later of the date on which such principal and/or interest becomes due for payment or within one business day following the date on which Ambac shall have received notice of nonpayment from the Trustee.  The insurance will extend for the term of the Ambac Insured Bonds and, once issued, cannot be canceled by Ambac.

The Ambac Insurance Policy will insure payment only on stated maturity dates and on mandatory sinking fund installment dates, in the case of principal, and on stated dates for payment, in the case of interest. If the Ambac Insured Bonds become subject to mandatory redemption and insufficient funds are available for redemption of all outstanding Ambac Insured Bonds, Ambac will remain obligated to pay the principal of and interest on outstanding Ambac Insured Bonds on the originally scheduled interest and principal payment dates, including mandatory sinking fund redemption dates.  In the event of any acceleration of the principal of the Ambac Insured Bonds, the insured payments will be made at such times and in such amounts as would have been made had there not been an acceleration, except to the extent that Ambac elects, in its sole discretion, to pay all or a portion of the accelerated principal and interest accrued thereon to the date of acceleration (to the extent unpaid by the Obligor).  Upon payment of all such accelerated principal and interest accrued to the acceleration date, Ambac's obligations under the Ambac Insurance Policy shall be fully discharged.

In the event the Trustee has notice that any payment of principal of or interest on an Ambac Insured Bond that has become due for payment and that is made to a owner by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from its registered owner pursuant to the United States Bankruptcy Code in accordance with a final, non-appealable order of a court of competent jurisdiction, such registered owner will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available.

The Ambac Insurance Policy does **not** insure any risk other than nonpayment (as set forth in the Ambac Insurance Policy).  Specifically, the Ambac Insurance Policy does **not** cover:

1.    payment on acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity;

2.    payment of any redemption, prepayment or acceleration premium; and

3.    nonpayment of principal or interest caused by the insolvency or negligence of the Trustee, Paying Agent or Bond Registrar, if any.

If it becomes necessary to call upon the Ambac Insurance Policy, payment of principal requires surrender of the Ambac Insured Bonds to the Insurance Trustee together with an appropriate instrument of assignment so as to permit ownership of such Ambac Insured Bonds to be registered in the name of Ambac to the extent of the payment under the Ambac Insurance Policy. Payment of interest pursuant to the Ambac Insurance Policy requires proof of holder entitlement to interest payments and an appropriate assignment of the owner's right to payment to Ambac.

Upon payment of the insurance benefits, Ambac will become the owner of the Ambac Insured Bonds, appurtenant coupon, if any, or right to payment of the principal of or interest on such Ambac Insured Bonds and will be fully subrogated to the surrendering owner's rights to payment.

*General.* Ambac is a Wisconsin-domiciled stock insurance corporation regulated by the Office of the Commissioner of Insurance of the State of Wisconsin, and is licensed to do business in 50 states, the District of Columbia, the Territory of Guam, the Commonwealth and the U.S. Virgin Islands, with admitted assets of approximately $10,194,000,000 (unaudited) and statutory capital of approximately $6,557,000,000 (unaudited) as of March 31, 2007. Statutory capital consists of Ambac's policyholders' surplus and statutory contingency reserve. S&P, Moody's and Fitch have each assigned a triple-A financial strength rating to Ambac.

Ambac has obtained a ruling from the Internal Revenue Service to the effect that the insuring of an obligation by Ambac will not affect the treatment for federal income tax purposes of interest on such obligation and that insurance proceeds representing maturing interest paid by Ambac under policy provisions substantially identical to those contained in the Ambac Insurance Policy shall be treated for federal income tax purposes in the same manner as if such payments were made by the Obligor.

*Available Information.* The parent company of Ambac, Ambac Financial Group, Inc., is subject to the informational requirements of the Exchange Act, and in accordance therewith files reports, proxy statements and other information with the SEC. These reports, proxy statements and other information can be read and copied at the SEC's public reference room at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. The SEC maintains an internet site at http://www.sec.gov that contains reports, proxy and information statements and other information regarding companies that file electronically with the SEC, including Ambac Financial Group, Inc. These reports, proxy statements and other information can also be read at the offices of the New York Stock Exchange, Inc., 20 Broad Street, New York, New York 10005.

Copies of Ambac's financial statements prepared in accordance with statutory accounting standards are available from Ambac. The address of Ambac's administrative offices is One State Street Plaza, 19th Floor, New York, New York 10004, and its telephone number is (212) 668-0340.

*Incorporation of Certain Documents by Reference.* The following documents filed by Ambac Financial Group, Inc. with the SEC (File No. 1-10777) are incorporated by reference in this Official Statement:

Ambac Financial Group, Inc.'s Annual Report on Form 10-K for the fiscal year ended December 31, 2006 and filed on March 1, 2007;

Ambac Financial Group, Inc.'s Current Report on Form 8-K dated and filed on April 25, 2007; and

Ambac Financial Group, Inc.'s Quarterly Report on Form 10-Q for the fiscal quarterly period ended March 31, 2007 and filed on May 10, 2007.

All documents subsequently filed by Ambac Financial Group, Inc. pursuant to the requirements of the Exchange Act after the date of this Official Statement will be available for inspection in the same manner as described above in *"Available Information."*

## Provisions of the Resolution

Each of the Bond Insurers named under this caption "BOND INSURANCE" imposes requirements that are contained in the First Supplemental Resolution that provide that the related Bond Insurer shall be deemed to be the Owner of the Series 2007A Bonds that such Bond Insurer insures for purposes of certain matters and consents under the Resolution, including rights with respect to the naming of successor Trustee, rights upon an Event of Default and rights with respect to amendments to the Resolution, and otherwise imposes restrictions contained in the First Supplemental Resolution on eligible investment securities and defeasance securities.

## THE BONDS

### General

*Fixed Rate Bonds*

The fixed rate bonds (the "Fixed Rate Bonds") will be dated their date of delivery, and will be issued as current interest bonds (the "Current Interest Bonds") and capital appreciation bonds (the "Capital Appreciation Bonds"), in the principal amounts, bearing interest at the rates, or compounding at the approximate yields (in the case of Capital Appreciation Bonds), and maturing (subject to the rights of redemption described below) on the dates, all as shown on the inside cover page of this Official Statement.

Interest on the Bonds will accrue, or compound (in the case of Capital Appreciation Bonds), from their date of delivery. Interest on the Current Interest Bonds will be payable semiannually to maturity (or earlier redemption) on each February 1 and August 1, commencing on February 1, 2008, and such interest shall be computed on a basis of a 360-day year consisting of twelve 30-day months. Interest on the Capital Appreciation Bonds, computed on a basis of a 360-day year consisting of twelve 30-day months, will not be paid on a current basis, but will be added to the principal in the form of Compounded Amount on each February 1 and August 1, commencing on August 1, 2007 (each a "Compounding Date"), and will be treated as if accruing in equal daily amounts between Compounding Dates, until payable at maturity or upon redemption.

For purposes of this Official Statement, references to "principal" shall mean, in the case of the Capital Appreciation Bonds, the Compounded Amount thereof.

*LIBOR Bonds*

The Bonds due August 1, 2057 bearing interest at a LIBOR-based adjustable rate (the "LIBOR Bonds") will be dated their date of delivery.

Interest on the LIBOR Bonds will be payable on each August 1, November 1, February 1 and May 1, commencing on November 1, 2007, and if such day is not a Business Day, then the next succeeding Business Day (the "Interest Payment Date"), and such interest shall be computed on a basis of a 365 or 366-day year, as applicable, for the number of days in such LIBOR-Based Interest Rate Period.

The LIBOR-Based Interest Rate (other than the rate for the first period) will be the rate of interest per annum determined by the Trustee to be equal to 67% of Three-Month LIBOR plus 93 basis points (0.93%); provided, further that in all cases, the LIBOR-Based Interest Rate will never exceed the maximum rate permitted under Puerto Rico law (currently 12%).

During each period with respect to the LIBOR Bonds during which a LIBOR-Based Interest Rate is in effect (the "LIBOR-Based Interest Rate Period"), commencing on and including each Interest Payment Date (or the date of issuance of the LIBOR Bonds for the period prior to the first Interest Payment Date) to but not including the following Interest Payment Date, the LIBOR Bonds will bear interest at the LIBOR-Based Interest Rate.

"Three-Month LIBOR," with respect to the LIBOR Bonds, shall mean the rate for deposits in U.S. dollars with a three-month maturity that appears on Reuters Screen LIBOR 01 Page (or such other page as may replace that page on that service, or such other service as may be nominated by the British Bankers Association, for the purpose of displaying London interbank offered rates for U.S. dollar deposits) as of 11:00 a.m., London time, on the LIBOR Rate Determination Date, except that, if such rate does not appear on such page, the Three-Month LIBOR Rate means a rate determined on the basis of the rates at which deposits in U.S. dollars for a three-month maturity and in a principal amount of at least U.S. $1,000,000 are offered at approximately 11:00 a.m., London time, on the LIBOR Rate Determination Date, to prime banks in the London interbank market by four major banks in the London interbank market (herein referred to as the "Reference Banks") selected by a market agent appointed by the Trustee upon written direction of the Corporation to identify such Reference Banks (initially, Goldman, Sachs & Co. or such other market agent as may be selected by the Corporation, the "Market Agent"). The Market Agent will request the principal London office of each of such Reference Banks to provide a quotation of its rate. If at least two such quotations are provided, the Three-Month LIBOR Rate will be the arithmetic mean of such quotations. If fewer than two quotations are provided, the Three-Month LIBOR Rate will be the arithmetic mean of the rates quoted by three (if three quotations are not provided, two or one, as applicable) major banks in New York City, selected by the Market Agent, at approximately 11:00 a.m., New York City time, on the LIBOR Rate Determination Date for loans in U.S. dollars to leading European banks in a principal amount of at least U.S. $1,000,000 having a three-month maturity. If none of the banks in New York City selected by the Market Agent is then quoting rates for such loans, then the Three-Month LIBOR Rate for the ensuing interest period will mean the Three-Month LIBOR Rate then in effect in the immediately preceding LIBOR-Based Interest Accrual Period.

The Market Agent will calculate the LIBOR-Based Interest Rate applicable to each Interest Payment Date and will notify the Trustee and the Corporation of the LIBOR-Based Interest Rate so calculated in writing, or by electronic communication promptly confirmed in writing, by no later than close of business on the second Business Day preceding the Interest Payment Date. All calculations of the LIBOR-Based Interest Rate by the Market Agent will be final and conclusive and binding on the Trustee, the Owners of the LIBOR Bonds and the Corporation, absent manifest error. If the Market Agent fails to provide a notice of the LIBOR-Based Interest Rate as described in this paragraph, then the Trustee will calculate the LIBOR-Based Interest Rate for such Interest Payment Date and notify the Corporation of the LIBOR-Based Interest Rate so calculated as if it were the Market Agent by no later than close of business on the first Business Day preceding the Interest Payment Date.

The determination of the LIBOR-Based Interest Rate will be made on the day that is two London Banking Days preceding each Interest Payment Date (each, a "LIBOR Rate Determination Date"). As soon as possible after 11:00 a.m., New York City time, on each LIBOR Rate Determination Date, but in no event later than 11:00 a.m., New York City time, on the Business Day immediately following each LIBOR Rate Determination Date, the Trustee will notify the owners of the LIBOR Bonds of the LIBOR-Based Interest Rate for the next LIBOR-Based Interest Accrual Period. For purposes of this Official Statement, "London Banking Day" shall mean any day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits) in the City of London, United Kingdom.

In connection with the issuance of the LIBOR Bonds, the Corporation is expected to enter into interest rate exchange agreements (the "Swap Agreements"), with Goldman Sachs Capital Markets, L.P., an affiliate of Goldman, Sachs & Co., and Lehman Brothers Special Financing Inc. (each, a "Swap Provider"), each in a notional amount equal to $218,000,000, and together aggregating the principal amount of the LIBOR Bonds. In general, the Swap Agreements provide that, subject to the terms thereof, the Corporation will pay to the Swap

Provider a fixed interest rate and the Swap Provider will pay to the Corporation a floating interest rate exactly equal to the LIBOR-Based Interest Rate payable on the LIBOR Bonds. The purpose of the Swap Agreements is generally to convert the Corporation's floating rate obligations with respect to the LIBOR Bonds to fixed rate obligations.

Under certain circumstances, the Swap Agreements are subject to termination prior to their scheduled termination date and prior to the maturity of the LIBOR Bonds.  In the event of a required early termination of either of the Swap Agreements, there can be no assurance that (i) the Corporation will receive any termination payment payable to it by the Swap Provider, (ii) the Corporation will have sufficient amounts to pay a termination payment payable by it to the Swap Provider, and (iii) the Corporation will be able to obtain a replacement swap agreement with comparable terms.  Payment due upon early termination may be substantial. Neither the owners of the LIBOR Bonds nor any other person acting on behalf of such owners shall have any rights under the swap agreements or against the Swap Provider.

The Corporation will be obligated to pay interest on and the principal of the LIBOR Bonds regardless of whether the Swap Providers perform their obligations under the Swap Agreements.

The obligation of the Corporation to make regularly scheduled swap payments under the Swap Agreements will be secured by a grant of a security interest in the Pledged Property, on a parity with the Bonds. The obligation of the Corporation to make any termination payment under the Swap Agreements will be secured by a grant of a security interest in the Pledge Property subordinate to the Bonds and other Resolution Bonds.

*Rounding*

All percentages resulting from any calculation of the interest rate on the LIBOR Bonds will be rounded to the nearest fifth decimal place (one-hundred thousandth of a percentage point), rounding upwards if the sixth decimal place is five or greater (e.g., 9.876555% (or .09876555) would be rounded up to 9.87656% (or .0987656) and 9.876554% (or .09876554) would be rounded down to 9.87655% (or .0987655)).  All dollar amounts used in or resulting from such calculation on the LIBOR Bonds will be rounded to the nearest cent (with one-half cent being rounded upward).

*Form of Bonds*

The Bonds are issuable as fully registered bonds without coupons in denominations of $5,000 and integral multiples thereof (of maturity amount in the case of the Capital Appreciation Bonds).  The Bonds will be registered under The Depository Trust Company's Book-Entry Only system described below.  Certificated Bonds will not be available for distribution to the investing public.  Transfers of ownership, and payment on the Bonds will be effected by The Depository Trust Company ("DTC") and its Participants pursuant to rules and procedures established by DTC and its Participants.  See "BOOK-ENTRY ONLY SYSTEM."

Upon satisfaction of certain conditions contained in the Resolution, the Corporation may issue additional bonds secured on a parity with the Bonds or on a subordinate basis.  See *"Additional Bonds, Refunding Bonds and Other Obligations"* under "SECURITY FOR THE RESOLUTION BONDS."

**Redemption**

*Optional Redemption of Current Interest Bonds.*  The Current Interest Bonds and LIBOR Bonds are subject to redemption at the option of the Corporation from any source, including without limitation the proceeds of refunding bonds or other financing provided by the Corporation, in whole or in part, at any time on or after August 1, 2017, at a redemption price equal to 100% of the principal amount of the Bonds to be redeemed, plus accrued interest to the date fixed for redemption.

*Make-whole Optional Redemption of the Capital Appreciation Bonds.* The Capital Appreciation Bonds are subject to redemption prior to maturity, in whole or in part, at the option of the Corporation from any source, including without limitation the proceeds of refunding bonds or other financing provided by the Corporation, at any time on or after August 1, 2012, at a redemption price equal to the greater of: (i) 100% of the Compounded Amount, and (ii) the sum of the present values of the remaining scheduled payments of debt service on the Bonds to be redeemed, discounted, on a semiannual basis, assuming a 360-day year consisting of twelve 30-day months, at the Applicable Tax-Exempt Municipal Bond Rate.

The "Applicable Tax-Exempt Municipal Bond Rate" for any Capital Appreciation Bond to be redeemed will be the Comparable AAA General Obligations yield curve rate for the remaining weighted average maturity date of such Bond as published by Municipal Market Data. If no such yield curve rate is established for the applicable year, the Comparable AAA General Obligations yield curve rate for the two published maturities most closely corresponding to the applicable year will be determined, and the Applicable Tax-Exempt Municipal Bond Rate will be interpolated or extrapolated from those yield curve rates on a straight-line basis. This rate is made available daily by Municipal Market Data and is available to its subscribers through its internet address: www.tm3.com.

In calculating the Applicable Tax-Exempt Municipal Bond Rate, should Municipal Market Data no longer publish the Comparable AAA General Obligations yield curve rate, the Applicable Tax-Exempt Municipal Bond Rate will equal the Consensus Scale yield curve rate for the applicable year. The Consensus Scale yield curve rate is made available daily by Municipal Market Advisors and is available to its subscribers through its internet address: www.theconsensus.com.

In the further event Municipal Market Advisors no longer publishes the Consensus Scale, the Applicable Tax-Exempt Municipal Bond Rate will be determined by Goldman, Sachs & Co., as the quotation agent, based upon the rate per annum equal to the yield to maturity (based upon semiannual compounding) of those tax-exempt general obligation bonds rated in the highest rating category by Moody's and S&P with a maturity date closest to the remaining weighted maturity date of the Bonds having characteristics (other than the ratings) most comparable to those of the Bonds in the judgment of the quotation agent. The quotation agent's determination of the Applicable Tax-Exempt Municipal Bond Rate is final and binding in the absence of manifest error.

The Applicable Tax-Exempt Municipal Bond Rate shall be calculated on the fifth business day preceding the redemption date.

*Mandatory Sinking Fund Redemption.* The Capital Appreciation Bonds maturing on August 1, 2054 and August 1, 2056 shall be redeemed in part, by lot within a maturity, through application of Sinking Fund Installments as provided in the Resolution, in each case at a Redemption Price equal to the principal amount of the respective Bond or portion thereof to be redeemed, together with interest accrued to the date fixed for redemption. Subject to the provisions of the Resolution permitting amounts to be credited toward part or all of any Sinking Fund Installment, with respect to the Bonds due on each of the dates specified below, there shall be due, and the Corporation shall in any and all events be required to pay, on each Sinking Fund Installment date set forth in the following respective table the amount set opposite such date, and said amount shall constitute a Sinking Fund Installment for the retirement of the respective Bonds (the principal amount set opposite the maturity date in said table shall be payable on such maturity date and shall not constitute a Sinking Fund Installment):

**Sinking Fund Installments for Capital Appreciation Bonds Maturing**

| Mandatory Redemption Date | August 1, 2054 | | August 1, 2056 | |
|---|---|---|---|---|
| | Original Principal Amount | Compounded Amount | Original Principal Amount | Compounded Amount |
| 08/01/2048 | $102,859,098.30 | $ 823,990,091.40 | | |
| 08/01/2049 | 101,982,687.10 | 859,508,225.80 | | |
| 08/01/2050 | 101,102,593.50 | 896,448,120.75 | | |
| 08/01/2051 | 100,217,436.60 | 934,865,609.70 | | |
| 08/01/2052 | 99,329,057.60 | 974,818,780.80 | | |
| 08/01/2053 | 98,438,837.40 | 1,016,370,837.90 | | |
| 08/01/2054[*] | 97,545,395.10 | 1,059,585,000.00 | | |
| 08/01/2055 | | | $88,021,458.00 | $1,104,529,581.30 |
| 08/01/2056[*] | | | 87,036,390.00 | 1,151,275,000.00 |

---
[*] Final maturity.

*Notice of Redemption.* In the event any Bonds are called for redemption, the Corporation shall give the Trustee notice ("Notice") at least thirty (30) days prior to the date fixed for redemption (or such shorter period which is acceptable to the Trustee), and the Trustee shall give Notice, in the name of the Corporation, at least sixteen (16) days prior to the date fixed for redemption to DTC, or if the Book-Entry Only System is discontinued for any Series of Bonds as described above, to the registered owners of the Bonds or portions thereof to be redeemed (with copies to the Trustee); *provided, however*, that failure to give such Notice to DTC or to any registered owner, or any defect therein, shall not affect the validity of any proceedings for the redemption of any of the Bonds or portions thereof for which proper notice was given. If a Notice of redemption shall be unconditional, or if the conditions of a conditional Notice shall have been satisfied, then upon presentation and surrender of the Bonds or portions thereof so called for redemption at the place or places of payment, such Bonds or such portion shall be redeemed.

The Notice shall (a) specify the (i) Bonds or portions thereof to be redeemed, (ii) redemption date, (iii) redemption price, (iv) place or places where amounts due upon such redemption will be payable (which shall be the principal office of the Trustee), and if less than all of the Bonds are to be redeemed, the CUSIP identification numbers, the numbers of the Bonds, and the portions of the Bonds to be redeemed, (b) state any condition permitted in, or not expressly prohibited by, the Resolution to such redemption, and (c) state that on the redemption date, and upon the satisfaction of any such condition, the Bonds or portions thereof to be redeemed shall cease to bear interest (in the case of the Capital Appreciation Bonds, the Compounded Amount thereof shall cease to increase).

If notice of redemption is given and if sufficient funds are on deposit with the Trustee to provide for the payment of the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds) and premium, if any, and interest on the Bonds (or portions thereof) to be redeemed, then the Bonds (or portions thereof) so called for redemption will, on the redemption date, cease to bear interest (in the case of the Capital Appreciation Bonds, the Compounded Amount thereof shall cease to increase), and shall no longer be deemed outstanding under or be entitled to any benefit or security under the Resolution.

## BOOK-ENTRY ONLY SYSTEM

The information contained in *Appendix D* to this Official Statement concerning DTC and DTC's book-entry only system has been obtained from sources that the Corporation and the Underwriters believe to be reliable, but neither the Corporation nor the Underwriters take responsibility for the accuracy thereof.

The Corporation cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Bonds; (ii) confirmation of ownership interest in the Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

None of the Corporation nor the Trustee or any agent of the Corporation or the Trustee will have any responsibility or obligations to DTC, the DTC Participants, or the Beneficial Owners with respect to: (i) the accuracy of any records maintained by DTC or any DTC Participants; (ii) the payment by DTC or any DTC Participants of any amount due to any Beneficial Owner in respect of principal and interest payments (including redemption payments) on the Bonds; (iii) the delivery by DTC or any DTC Participants of any notice to any Beneficial Owner that is required or permitted to be given to owners under the terms of the Bonds; or (iv) any consent given or other action taken by DTC as registered owner of the Bonds.  See *Appendix D-Book-Entry System*.

## ESTIMATED SOURCES AND USES OF FUNDS

The estimated sources and uses of funds are expected to be as follows:

**Sources**

| | |
|---|---|
| Principal Amount of the Bonds | $2,667,603,572.60 |
| Additional Sources of Funds | 4,400,000.00 |
| Original Issue Premium | 15,456,087.85 |
| **Total Sources** | $2,687,459,660.45 |

**Uses**

| | |
|---|---|
| Payment of Extraconstitutional Debt | $2,594,848,882.83 |
| Underwriters' Discount and Other Costs of Issuance[1] | 92,610,777.62 |
| **Total Uses** | $2,687,459,660.45 |

---

[1] Includes insurance premiums aggregating $70,329,182, legal, printing, and other financing expenses.

## PLEDGED SALES TAX

### Commonwealth Sales Tax

By virtue of Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006 (the "Tax Reform Legislation"), the Legislative Assembly of Puerto Rico approved for the first time a Commonwealth sales tax at a rate of 5.5%, which is imposed on the sale of a wide range of goods and delivery of various services, as well as a separate sales tax to be imposed by the municipalities. The enactment of the Commonwealth Sales Tax in the amount of 5.5% on the sale price of the item or services subject to tax was confirmed by the Supreme Court of Puerto Rico by decision rendered on November 10, 2006.

Items subject to Commonwealth Sales Tax consist of "tangible personal property," "taxable services," and "admission fees." The Secretary of the Treasury has the authority to establish by regulation the conditions for exemption from the tax. The tax applies in general to the following items: (a) clothing and accessories, (b) furniture and appliances, (c) electronics, (d) any tangible good not otherwise exempted, (e) phone service, cable TV, (f) alcoholic beverages and tobacco, (g) prepared foods (including fast foods and other restaurants), (h) personal services, such as laundry, barber and beauty shops, and (i) all non-prescription medicines and nutritional supplements. Among other exemptions, the following items are exempt from the tax:  (i) taxable

items sold for use and consumption outside Puerto Rico, even if the sale occurs in Puerto Rico (i.e., exportation), (ii) taxable items "in transit" (i.e., brought to Puerto Rico in connection with productions of films, constructions, trade shows or other ends, which are re-exported from Puerto Rico by the same person who imported them), (iii) healthcare services and prescription medicines, (iv) housing units, (v) non-prepared food, (vi) crude oil and its derivatives, including gasoline, (vii) motor vehicles, (viii) services provided by designated professionals, (ix) financial services, (x) services provided by the Commonwealth, including electricity and water, (xi) purchases of special items or devices for persons with certain disabilities, (xii) purchase of raw materials and machinery and equipment used for the manufacturing of finished goods or products, (xiii) items sold in airports and marine ports to persons traveling outside the jurisdictional limits of Puerto Rico, (xiv) foods and prepared foods served in hospitals and other health care facilities and in schools, (xv) prescription medicines, (xvi) admissions to athletic or other events sponsored by schools, universities or colleges, (xvii) purchase of foods or taxable items made under the Nutritional Assistance Program or similar program, and (xviii) rental of real property for commercial purposes as student housing and by an individual for his/her main residence.

Merchants are required to collect the Commonwealth Sales Tax from the consumer; otherwise the consumer is required to pay the tax. Any person who transacts business in Puerto Rico as a merchant must request and receive a Merchants' Registration Certificate issued by the Secretary of the Treasury which appoints the merchant as a Commonwealth Sales Tax collection agent. Failure to request a Merchants' Registration Certificate subjects the merchant to fines. The Secretary of the Treasury may require that the merchant post a cash deposit, bond or other item of value as a condition to obtaining or retaining a Merchants' Registration Certificate. The Commonwealth Sales Tax is required to be remitted to the Secretary of the Treasury no later than the 20th day of the calendar month following the month in which the taxable transaction occurred, unless otherwise provided in regulations adopted by the Secretary of the Treasury. Each merchant is required to file a Sales and Use Tax Monthly Return to the Secretary of the Treasury no later than the 20th day of each month. Certain large merchants are required to file their return electronically. Annually, every merchant dedicated to a business or industry that was a merchant at any time during its taxable year must file a Sales and Use Tax Annual Return no later than the 15th day of the third month following the end of its taxable year. As of May 30, 2007, 310,000 merchants were registered at the Treasury Department.

**Sales Tax Revenue Projections and Actual Collections**

The Commonwealth Sales Tax went into effect on November 15, 2006. For Fiscal Year 2006-2007, the Treasury Department projected that it would collect $703 million in Commonwealth Sales Tax revenues for the seven and one half month period from November 15, 2006 through June 30, 2007 (an average of $93.7 million per month).

Total Commonwealth Sales Tax collections from November 15, 2006 through May 2007 was $617.9 million (an average of $95.1 million per month), representing a projected increase of $6.2 million from the Commonwealth Sales Tax revenue projections for the same period. As of June 2007, the collections from the top 20 taxpayers represent, in average, 23% of total revenues from the Commonwealth Sales Tax. These taxpayers are from the following business sectors: retail and general merchandise stores, telecommunications, restaurant chains and supermarkets.

Commonwealth Sales Tax revenue projections for Fiscal Year 2007-2008 equal $1.1 billion, or an average of $93.1 million per month, which represents $2.0 million less per month than average monthly collections in the period from November 15, 2006 through May 2007. Estimates for Fiscal Year 2007-2008 represent the collections expected to be received after August 1, 2007 for July collections.

The Commonwealth Sales Tax revenue projections referred to above were made based on the Consumption Tax Model (the "CTM") developed by a leading national management and technology consulting firm, as adjusted to account for the Commonwealth's economic outlook for Fiscal Year 2007 as presented by the Planning Board on February 2007. See *Appendix A – Commonwealth Economic Information*. The CTM is an

input-output-based model that created a snapshot of the circular flow of incomes and expenditures in the economy of Puerto Rico and provided a detailed data-consistency framework for analyzing revenue and distributional impacts of consumption tax policies. In addition, the CTM not only encompassed transactions between industries, but also provided a highly disaggregated description of the flows of goods, services and incomes between all relevant economic sectors. Transactions involving goods and services were differentiated by end use, such as private consumption, government consumption, intermediate use, investment, exports and imports. The most important assumptions imbedded in the CTM were, among others, the demand and supply components of gross national product based on actual national income accounts for the Commonwealth as of Fiscal Year 2002.

**Pledged Sales Tax and FIA Fund**

The portion of the Commonwealth Sales Tax that is pledged under the Resolution as security for the payment of all bonds outstanding under the Resolution (the "Pledged Sales Tax"), principally consists of the first collections of the Commonwealth Sales Tax in each Fiscal Year up to the greater of (i) the product of the amount of the sales tax collected during the Fiscal Year multiplied by a fraction, the numerator of which is 1% and the denominator of which is the Commonwealth Sales Tax rate (at present, 5.5%: the amount resulting from such multiplication is sometimes referred to herein as the "1% formula"), and (ii) for Fiscal Years beginning July 1, 2007, a minimum amount, referred to in the Resolution and herein as the "Pledged Sales Tax Base Amount."

Regardless of the level of sales tax collections based on the 1% share, Act 91 requires that all of the 5.5% Commonwealth Sales Tax be applied to satisfy and fund the Pledged Sales Tax Base Amount before any amounts are transferred to the Commonwealth General Fund.

The Pledged Sales Tax Base Amount for the Fiscal Year beginning July 1, 2007, is $185,000,000. Pursuant to Act 91, the Pledged Sales Tax Base Amount increases each Fiscal Year thereafter at a statutory rate of 4%. In addition, Act 91 provides that if the amounts described in the first paragraph of this subsection were insufficient to pay principal of or interest on bonds or other debt obligations of the Corporation or to make any other payment related to obligations incurred with respect to bonds or other debt obligations, including interest rate swap agreements, such insufficiency shall be paid to the Corporation for deposit in the FIA Fund as additional Pledged Sales Tax from the first receipts of the Commonwealth Sales Tax collected in subsequent Fiscal Years which is in excess of the amounts described in the first paragraph of this subsection received during such Fiscal Year.  See also *"Funds and Accounts Under the Resolution"* under "SECURITY FOR THE RESOLUTION BONDS."

Act 91 creates the FIA Fund and requires that the Pledged Sales Tax be deposited into the FIA Fund. Under the provisions of Act 91, the FIA Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to pay and retire, directly or indirectly, all or part of the Extraconstitutional Debt outstanding as of June 30, 2006. The FIA Fund is administered by the Government Development Bank and the Secretary of the Treasury.

During Fiscal Year 2007-2008 and subsequent Fiscal Years, the first collections of the Commonwealth Sales Tax, up to the Pledged Sales Tax Base Amount, are required to be deposited as received into the FIA Fund (or other fund maintained for that purpose under the Resolution). On a monthly basis, the Secretary of the Treasury is required to determine, based on actual Commonwealth Sales Tax collections, whether the amount of Commonwealth Sales Tax required to be transferred to the FIA Fund on the basis of the 1% formula, exceeds the applicable Pledged Sales Tax Base Amount and, if so, is required to deposit into the FIA Fund all Commonwealth Sales Tax collections received after such determination in an amount equal to such excess. On or prior to October 1 of each Fiscal Year, the Secretary of the Treasury is required to determine whether the amount of Commonwealth Sales Tax required to be transferred to the FIA Fund on the basis of the 1% formula during the prior Fiscal Year exceeded the applicable Pledged Sales Tax Base Amount and, if so, Act 91 requires

that all Commonwealth Sales Tax collections of the prior Fiscal Year representing such excess be transferred to the FIA Fund (to the extent not previously transferred).

**Procedures for the Collection and Deposit of the Pledged Sales Tax to the FIA Fund**

The procedures implemented by the Treasury Department in order to comply with the funding requirements of Act 91 are the following:

- The merchant or retailer files the return and pays the Commonwealth Sales Tax collected on a monthly basis to First Data Corp., a provider of electronic commerce and payment solutions for businesses and consumers ("First Data"), Banco Popular de Puerto Rico, a leading commercial banking institution in the Commonwealth and the Caribbean ("Banco Popular") or any other collector of the Commonwealth Sales Tax designated by the Secretary of the Treasury (the "Authorized Collectors").

- If the merchant files the return and pays the Commonwealth Sales Tax collected to First Data, after the receipt thereof, First Data sends, on a daily basis, (i) the Commonwealth Sales Tax collected by the merchant or retailer directly to a bridge account at Banco Popular in the name of the Treasury Department, as paying/receiving agent, and (ii) the 1.5% municipal sales tax to the municipalities[1].

- If the merchant pays the Commonwealth Sales Tax collected to any other Authorized Collector (other than First Data), such Authorized Collectors are required to transfer such payment on a daily basis to a bridge account at Banco Popular in the name of the Treasury Department, as paying/receiving agent.

- Once the moneys are deposited in the bridge account at Banco Popular, Banco Popular then transfers on a daily basis (with a 2 day delay) to the Trustee all Commonwealth Sales Tax collections (See *"Funds and Accounts Under the Resolution"* under "SECURITY FOR THE REOLUTION BONDS") until the Pledged Sales Tax Base Amount has been deposited in the Revenue Account and, thereafter, to the Treasury Department all subsequent Commonwealth Sales Tax collections until such time as the Treasury Department has received its share (4.5% of the 5.5%) of the collections received to date in the Fiscal Year. Thereafter, Banco Popular divides additional receipts of the Commonwealth Sales Tax between the Revenue Account and the Treasury on the basis of the 1%/4.5% split.

## SECURITY FOR THE RESOLUTION BONDS

**General**

Pursuant to the Resolution, the Bonds and all other Resolution Bonds are limited obligations of the Corporation payable solely from, and secured by a grant of a security interest in the Pledged Property. The Resolution prohibits the issuance of any bonds or notes with a payment priority under the Resolution that is senior to the Bonds. The Resolution permits the issuance of bonds or notes with a payment priority under the Resolution that is on a parity with the Bonds or subordinate to the Bonds.

---

[1] On June 29, 2007, the Legislative Assembly approved House of Representatives Bill No. 3190 to require the municipalities to impose and collect the municipal sales tax at a rate of 1.5% (1% to be collected by the municipalities directly or through a third party and 0.5% to be collected by the Secretary of the Treasury and to be deposited in certain special funds or accounts at GDB for the benefit of the municipalities). This bill has not been signed by the Governor.

**Property Pledged for the Payment of the Bonds**

Pledged Property consists of (i) all Revenues, and all right, title and interest of the Corporation in and to the Revenues and all rights to receive the same, (ii) the Funds and Accounts (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution, (iii) any and all other rights and property of every kind and nature from time to time pledged by the Corporation to the Trustee under the Resolution as and for additional security for the Bonds and Parity Obligations, and (iv) any an all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (i) through (iii) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing. Revenues consist of (i) all Pledged Sales Tax collections received by the Corporation or the Trustee, (ii) with respect to any particular Resolution Bond, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Resolution Bond, but only for purpose of such payment, (iii) any amounts received by the Corporation pursuant to a Qualified Hedge, if any, after giving effect to any netting of amounts payable by the parties thereunder, (iv) income and interest earned and gains realized in excess of losses suffered by any Fund or Account (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee, and (v) any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund or Account (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee.

The Corporation covenants that it will not issue any bonds, notes or other evidences of indebtedness secured by a pledge of or lien upon the Pledged Property, and shall not otherwise create any lien or charge on the Pledged Property, other than as permitted by the Resolution.

**Funds and Accounts under the Resolution**

The Resolution provides for the creation of the "Repayment Project Fund" and, therein: a Costs of Issuance Account, a Capitalized Interest Account, a Bond Proceeds Account, a Revenue Account, a Debt Service Account, a Debt Service Reserve Account, a Redemption Account, and a Rebate Account, each to be held by the Trustee. All such Accounts, other than the Costs of Issuance Account and the Rebate Account, are subject to the lien and pledge created under the Resolution.

Under the Resolution, all Revenues received shall be deposited into the Revenue Account except for certain investment earnings and income which flow to the Rebate Account; *provided, however*, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Resolution Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and transferred as of the last Business Day of each calendar month as follows and in the following order or priority: (i) to the payment of regularly scheduled fees of the Trustee, and the payment of Operating Expenses (not to exceed the Operating Cap), (ii) to the Debt Service Account established for the Senior Bonds and Parity Obligations, all amounts until the amounts on deposit in such Debt Service Account shall equal the Accrued Payment Obligation related to the Senior Bonds and Parity Obligations, (iii) to the Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds, (iv) to the Debt Service Accounts established for Subordinate Bonds and Subordinate Obligations, all amounts until the amounts on deposit in such Debt Service Accounts shall equal the Accrued Payment Obligation related to the Subordinate Bonds and Subordinate Obligations, (v) to the Debt Service Reserve Accounts established for the Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Subordinate Bonds, and (vi) the balance, if any, shall be applied as follows upon written direction of the

Corporation to the Trustee: provided that an amount at least equal to the Accrued Payment Obligation for all Senior Bonds, Subordinate Bonds, Parity Obligations and Subordinate Obligations for the ensuing twelve-month period (fifteen-month period for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than semi-annually) shall be on deposit in the Debt Service Accounts pursuant to paragraph (ii) and (iv) above, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs (ii) and (iv) above, until such amounts shall be fully paid or otherwise provided for from this or any other source, then (y) at the direction of the Corporation (i) retained in the Revenue Account, (ii) transferred to the Redemption Account, or (iii) used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account or (IV) any combination of the foregoing, and then (z) for release to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Bondowners. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

**Additional Bonds, Refunding Bonds and Other Obligations**

The Resolution permits the issuance of bonds in addition to the Senior Bonds (a) to finance the payment or retirement of Extraconstitutional Debt outstanding on June 30, 2006, or (b) to refund or otherwise prepay any bonds issued under the Resolution.

The Resolution permits the issuance of additional Bonds as Senior Bonds (i.e., with payment priorities on a parity with those of the Bonds) or as Subordinate Bonds (i.e., with payment priorities subordinate to those of the Bonds).

Additional Senior Bonds may not be issued and additional Parity Obligations may not be incurred under the Resolution unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting:

A.    (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued Payment Obligation due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in such Fiscal Year, (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the four percent (4%) minimum adjustment thereto provided in Act 91 and applicable to each Fiscal Year beginning July 1, 2008, and (iv) the Accrued Payment Obligation that will be due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in each subsequent Fiscal Year, and showing that the amount in clause (i) at least equals the amount in clause (ii) and the amount for each subsequent Fiscal Year in clause (iii) at least equals the amount for such Fiscal Year in clause (iv).

B.    (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be

increased for each subsequent Fiscal Year by 4%, and (ii) the total Accrued Payment Obligation scheduled for all Outstanding Senior Bonds and amounts due on all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year, and showing, for each such Fiscal Year, that the related amount shown in (B)(i) is at least 3 times the related amount shown in (B)(ii).

In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held under the Resolution and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget.  Pursuant to the authority of Act 91, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of Act 91 and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of Act 91.  Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

Subordinate Bonds may be issued in varying Classes with varying subordinate payment priorities under the Resolution without compliance with any particular debt service test under the Resolution. If any such Subordinate Bonds are issued, the Resolution provides for the creation of individual Debt Service Accounts and Debt Service Reserve Accounts for each such Class, in addition to the Debt Service Account for the Bonds, and the flow of funds from the Revenue Account described above will be made in the order of Senior Bonds first, and then Subordinate Bonds based on their respective payment priorities under the Resolution.

Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due, during any period that Senior Bonds or Parity Obligations are outstanding under the Resolution.

**Commonwealth's Authority to Cover Deficiencies**

If the sales tax collections received by the FIA Fund in a Fiscal Year are less than the applicable Pledged Sales Tax Base Amount, Act 91 authorizes the Secretary of the Treasury to fund the shortfall from any available funds (including funds derived from borrowings from Government Development Bank) and requires the Director of the Office of Management and Budget of the Commonwealth, if such funding is made, to include in the Commonwealth's budget for the current or the next Fiscal Year the appropriations necessary to cover the deficiency. Such deficiencies may be funded from available resources of the Commonwealth and, therefore, may be subject to the limitations provided under Section 8 of Article VI of the Constitution of Puerto Rico discussed below.  **This Official Statement is not intended to provide information regarding the financial condition or financial prospects of the Commonwealth or its General Fund.**

**Special Investment Considerations**

*Legal Considerations.* Section 8 of Article VI of the Constitution of Puerto Rico provides that if, in any Fiscal Year, the Commonwealth's "available resources including surplus" are insufficient to meet the appropriations made for that Fiscal Year, interest on the public debt (which for purposes of the Constitution includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities) must be paid first and other disbursements are to be made in accordance with priorities established by law. The Statement of Motives of Act No. 56 of July 6, 2007, which amended Act 91, states that it is the intent of the Legislative

Assembly that the moneys deposited in the FIA Fund (i) belong to the Corporation and (ii) do not constitute available resources of the Commonwealth for any purpose, including for the purposes set forth in Section 8 of Article VI of the Constitution. In addition, Act 91 states that the FIA Fund is to be transferred to, and shall be the property of, the Corporation and provides further that the Pledged Sales Tax will (i) not constitute resources available to the Commonwealth, (ii) not be available for use by the Secretary of the Treasury, and (iii) be deposited in the FIA Fund upon receipt and will not be deposited into the Commonwealth's General Fund.

Act 91 has not been challenged in any court of law and the Supreme Court of Puerto Rico has not expressed itself as to (i) the constitutionality of the transfer of the Pledged Sales Tax to the Corporation as provided in Act 91; or (ii) whether the Pledged Sales Tax constitutes available resources of the Commonwealth for purposes of Section 8 of Article VI of the Constitution.

Upon issuance of the Bonds, the Secretary of Justice of the Commonwealth of Puerto Rico (who acts as attorney general for the Commonwealth) will opine that (i) Act 91 is a valid enactment of law by the Commonwealth, (ii) the Pledged Sales Tax will not constitute "available resources" of the Commonwealth for any purpose, including for purposes of Section 8 of Article VI of the Constitution, and (iii) the Pledged Sales Tax cannot be applied to cover debt service of the Commonwealth's general obligation bonds or guaranteed debt under the circumstances contemplated by Section 8 of Article VI of the Constitution.

*Other Considerations*.  Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended. Therefore, the Legislative Assembly of the Commonwealth may amend, modify or repeal Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006 (the "Tax Reform Legislation"), which created the Commonwealth Sales Tax, and which is imposed on the sale of a wide range of goods and delivery of various services.

## Commonwealth Non-Impairment Covenant

Pursuant to Act 91, the Commonwealth agrees and commits with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Bonds that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with Bondowners until said Bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or commitment of the Corporation.

## TAX MATTERS

## United States Tax Considerations

*Opinion of Bond Counsel to the Corporation*

In the opinion of Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, under the provisions of the Acts of Congress now in force, and under existing statutes and court decisions, assuming continuing compliance with certain tax covenants described herein, (i) interest on the Bonds is excluded from gross income for Federal income tax purposes pursuant to Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"), and (ii) interest on the Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations.  In rendering its opinion, Bond Counsel to the Corporation has relied on certain representations, certifications of fact, and statements of reasonable expectations made by the Corporation, the Commonwealth, the Government Development Bank, and others, in connection with the Bonds, and Bond Counsel to the Corporation has assumed compliance by the Corporation, the Commonwealth,

and the Government Development Bank with certain ongoing covenants to comply with applicable requirements of the Code to assure the exclusion of interest on the Bonds from gross income under Section 103 of the Code.

In addition, in the opinion of Bond Counsel to the Corporation, under existing statutes, the Bonds and the interest thereon are exempt from state, Commonwealth and local taxation.

For the proposed form of approving opinion of Bond Counsel to the Corporation, see *Appendix C* hereto.

Bond Counsel to the Corporation expresses no opinion regarding any other Federal, state, Commonwealth or local tax consequences with respect to the Bonds. Bond Counsel to the Corporation renders its opinion under existing statutes and court decisions as of the issue date, and assumes no obligation to update its opinion after the issue date to reflect any future action, fact or circumstance, or change in law or interpretation, or otherwise. Bond Counsel to the Corporation expresses no opinion on the effect of any action hereafter taken or not taken in reliance upon an opinion of other counsel on the exclusion of interest on the Bonds from gross income for Federal income tax purposes or under state, Commonwealth and local tax law.

*Certain Ongoing Federal Tax Requirements and Covenants*

The Code establishes certain ongoing requirements that must be met subsequent to the issuance and delivery of the Bonds in order that interest on the Bonds be and remain excluded from gross income under Section 103 of the Code. These requirements include, but are not limited to, requirements relating to use and expenditure of gross proceeds of the Bonds, yield and other restrictions on investments of gross proceeds, and the arbitrage rebate requirement that certain excess earnings on gross proceeds be rebated to the Federal government. Noncompliance with such requirements may cause interest on the Bonds to become included in gross income for Federal income tax purposes retroactive to their issue date, irrespective of the date on which such noncompliance occurs or is discovered. The Corporation, the Commonwealth, and the Government Development Bank have covenanted to comply with certain applicable requirements of the Code to assure the exclusion of interest on the Bonds from gross income under Section 103 of the Code.

*Certain Collateral Federal Tax Consequences*

The following is a brief discussion of certain collateral Federal income tax matters with respect to the Bonds. It does not purport to address all aspects of Federal taxation that may be relevant to a particular Bondowner. Prospective investors, particularly those who may be subject to special rules, are advised to consult their own tax advisors regarding the Federal tax consequences of owning and disposing of the Bonds.

Prospective owners of the Bonds should be aware that the ownership of such obligations may result in collateral Federal income tax consequences to various categories of persons, such as corporations (including S corporations and foreign corporations), financial institutions, property and casualty and life insurance companies, individual recipients of Social Security and railroad retirement benefits, individuals otherwise eligible for the earned income tax credit, and taxpayers deemed to have incurred or continued indebtedness to purchase or carry obligations the interest on which is excluded from gross income for Federal income tax purposes. Interest on the Bonds may be taken into account in determining the tax liability of foreign corporations subject to the branch profits tax imposed by Section 884 of the Code.

*Original Issue Discount*

"Original issue discount" ("OID") is the excess of the sum of all amounts payable at the stated maturity of a Bond (excluding certain "qualified stated interest" that is unconditionally payable at least annually at prescribed rates) over the issue price of that maturity. In general, the "issue price" of a maturity means the first price at which a substantial amount of the Bonds of that maturity was sold (excluding sales to bond houses, brokers, or similar persons acting in the capacity as underwriters, placement agents, or wholesalers). In general, the issue price for each maturity of the Bonds is expected to be the initial public offering price set forth on the

inside cover page of the Official Statement. Bond Counsel further is of the opinion that, for any Bond having OID (a "Discount Bond"), OID that has accrued and is properly allocable to the owners of the Discount Bond under Section 1288 of the Code is excludable from gross income for Federal income tax purposes to the same extent as other interest on the Bonds.

In general, under Section 1288 of the Code, OID on a Discount Bond accrues under a constant yield method, based on periodic compounding of interest over prescribed accrual periods using a compounding rate determined by reference to the yield on that Discount Bond. An owner's adjusted basis in a Discount Bond is increased by accrued OID for purposes of determining gain or loss on sale, exchange, or other disposition of such Discount Bond. Accrued OID may be taken into account as an increase in the amount of tax-exempt income received or deemed to have been received for purposes of determining various other tax consequences of owning a Discount Bond even though there will not be a corresponding cash payment.

Owners of Discount Bonds should consult their own tax advisors with respect to the treatment of original issue discount for Federal income tax purposes, including various special rules relating thereto, and the state and local tax consequences of acquiring, holding, and disposing of Discount Bonds.

*Bond Premium*

In general, if an owner acquires a Bond for a purchase price (excluding accrued interest) or otherwise at a tax basis that reflects a premium over the sum of all amounts payable on the Bond after the acquisition date (excluding certain "qualified stated interest" that is unconditionally payable at least annually at prescribed rates), that premium constitutes "bond premium" on that Bond (a "Premium Bond"). In general, under Section 171 of the Code, an owner of a Premium Bond must amortize the bond premium over the remaining term of the Premium Bond, based on the owner's yield over the remaining term of the Premium Bond following constant yield principles. (In certain cases involving a Premium Bond callable prior to its stated maturity date, the amortization period and yield may be required to be determined on the basis of an earlier call date that results in the lowest yield on such bond.) An owner of a Premium Bond must amortize the bond premium by offsetting the qualified stated interest allocable to each interest accrual period under the owner's regular method of accounting against the bond premium allocable to that period. In the case of a tax-exempt Premium Bond, if the bond premium allocable to an accrual period exceeds the qualified stated interest allocable to that accrual period, the excess is a nondeductible loss. Under certain circumstances, the owner of a Premium Bond may realize a taxable gain upon disposition of the Premium Bond even though it is sold or redeemed for an amount less than or equal to the owner's original acquisition cost. Owners of Premium Bonds should consult their own tax advisors regarding the treatment of bond premium for Federal income tax purposes, including various special rules relating thereto, and state and local tax consequences, in connection with the acquisition, ownership, amortization of bond premium on, sale, exchange or other disposition of the Premium Bonds.

*Information Reporting and Backup Withholding*

Information reporting requirements apply to interest on tax-exempt obligations, including the Bonds. In general, such requirements are satisfied if the interest recipient completes, and provides the payor with, a Form W-9, "Request for Taxpayer Identification Number and Certification," or unless the recipient is one of a limited class of exempt recipients, including corporations. A recipient not otherwise exempt from information reporting who fails to satisfy the information reporting requirements will be subject to "backup withholding," which means that the payor is required to deduct and withhold a tax from the interest payment, calculated in the manner set forth in the Code. For the foregoing purpose, a "payor" generally refers to the person or entity from whom a recipient receives its payments of interest or who collects such payments on behalf of the recipient.

If an owner purchasing a Bond through a brokerage account has executed a Form W-9 in connection with the establishment of such account, as generally can be expected, no backup withholding should occur. In any event, backup withholding does not affect the excludability of the interest on the Bonds from gross income for Federal income tax purposes. Any amounts withheld pursuant to backup withholding would be allowed as a

refund or a credit against the owner's Federal income tax once the required information is furnished to the Internal Revenue Service (the "IRS").

*Possible Government Action*

Legislation affecting municipal bonds is regularly under consideration by the United States Congress. In addition, the IRS has established an expanded audit program for tax-exempt bonds. There can be no assurance that legislation enacted or proposed or an IRS audit after the date of issuance of the Bonds involving either the Bonds or other tax-exempt bonds will not have an adverse effect on the tax-exempt status, the market price or the marketability of the Bonds.

## RATINGS

The Bonds have received ratings of "A1" from Moody's, "A+" from S&P and "A+" from Fitch. Moody's, S&P and Fitch have assigned ratings of "Aaa," "AAA" and "AAA," respectively to the FGIC Insured Bonds, MBIA Insured Bonds and Ambac Insured Bonds based upon the coverage of the applicable Insurance Policies. These ratings only reflect the respective opinions of such rating agencies. Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that any such rating will continue in effect for any period or that any such rating will not be revised or withdrawn entirely by either such rating agency if, in its judgment, circumstances so warrant. Any such downgrade revision or withdrawal of such rating or ratings may have an adverse effect on the market prices of the Bonds. A securities rating is not a recommendation to buy, sell, or hold securities. Each security rating should be evaluated independently of any other security rating.

## LEGALITY FOR INVESTMENT

The Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase from the Corporation the Bonds described on the inside cover page of this Official Statement at an aggregate purchase price of $2,665,702,597.47 (representing a purchase price equal to the principal amount of the Bonds at issuance, plus a premium of $15,456,087.85, less underwriters' discount in an amount equal to $17,357,062.98), and to reoffer such Bonds at the public offering prices or yields derived from such prices set forth on the inside cover page hereof. Such Bonds may be offered and sold to certain dealers (including dealers depositing such Bonds into investment trusts) at prices lower or yields higher than such public offering prices or yields, and such prices or yields may be changed, from time to time, by the Underwriters. The Underwriters' obligations are subject to certain conditions precedent, and they will be obligated to purchase all such Bonds if any Bonds are purchased.

BBVAPR Division de Valores Municipales ("BBVA") and RBC Dain Rauscher, Inc., doing business under the name RBC Capital Markets ("RBC"), have entered into an agreement to jointly pursue underwritings with the Commonwealth and its issuers. In furtherance of the agreement, BBVA and RBC will form a joint account and will allocate the agreed participations in any bond offering to one another.

Popular Securities, Inc. ("Popular") has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley & Co. Incorporated ("Morgan Stanley"), under which the parties shall provide services and advise to each other related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the JV

Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

Santander Securities Corporation ("SSC") and Banc of America Securities LLC ("BAS") have entered into an agreement to jointly pursue municipal securities underwriting opportunities with the Commonwealth, its agencies, municipalities and governmental conduit issuers in the Commonwealth. Under the terms of the agreement, SSC and BAS will be entitled to receive a portion of each other's revenues from the underwriting of the Bonds in consideration for their professional services.

Oriental Financial Services Corporation ("OFS") and Bear, Stearns & Co., Inc. ("Bear Stearns") have entered into an agreement to jointly pursue municipal securities underwriting opportunities with the Commonwealth, its agencies, municipalities and governmental conduit issuers in the Commonwealth. Under the terms of the agreement, OFS and Bear Stearns will be entitled to receive a portion of each other's revenues form the underwriting of the Bonds in consideration for their professional services.

Eurobank and A.G. Edwards ("AG") have entered into an agreement to jointly pursue municipal securities underwriting opportunities with the Commonwealth, its agencies, municipalities and governmental conduit issuers in the Commonwealth. Under the terms of the agreement, Eurobank and AG will be entitled to receive a portion of each other's revenues form the underwriting of the Bonds in consideration for their professional services.

## LEGAL MATTERS

All legal matters incident to the authorization, issuance, sale and delivery of the Bonds are subject to the approval of Hawkins Delafield & Wood LLP, New York, New York, Bond Counsel to the Corporation. The issuance of the Bonds is conditioned upon the delivery on the date of issuance of the approving opinion of Bond Counsel to the Corporation substantially in the form attached to this Official Statement as *Appendix C* and the opinion of Fiddler González & Rodríguez, P.S.C. as Special Tax Counsel substantially in the form attached to this Official Statement as *Appendix D*. Certain legal matters will be passed upon by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico, as Special Counsel to Goldman Sachs & Co., and for the Underwriters by their counsel, Fiddler González & Rodríguez, P.S.C., San Juan, Puerto Rico.

## CONTINUING DISCLOSURE

In order to assist the Underwriters in complying with Rule 15c2-12, as amended (the "Rule"), promulgated by the SEC under the Exchange Act, the Corporation and the Trustee will enter into a written agreement (the "Disclosure Agreement") for the benefit of the owners of all Resolution Bonds, including the Bonds, to provide continuing disclosure. The Corporation will undertake for the benefit of the owners of the Resolution Bonds to provide to each Nationally Recognized Municipal Securities Information Repository ("NRMSIR" and each a "Repository") or with the Municipal Securities Rulemaking Board ("MSRB"), and, if and when one is established, the Commonwealth Information Depository, on an annual basis within 305 days after the end of each Fiscal Year, commencing with the Fiscal Year ending June 30, 2008, the Annual Information as described in more detail below.

The "Annual Information" shall consist of (a) the information regarding actual receipts of the Pledged Sales Tax received by the Corporation from the paying/receiving agent, (b) the annual audited financial statements of the Corporation, and together with (c) such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information.

The Corporation will further agree to file, in a timely manner, with each Repository or with the MSRB, and with the Commonwealth Information Depository, if any, notice of any of the following events with respect to the Resolution Bonds, if, in the judgment of the Corporation or its agent, such event is material: (1) principal and interest payment delinquencies; (2) non-payment related defaults; (3) unscheduled draws on debt service

reserves reflecting financial difficulties; (4) unscheduled draws on credit enhancements reflecting financial difficulties; (5) substitution of credit or liquidity providers, or their failure to perform; (6) adverse tax opinions or events affecting the tax-exempt status of the Resolution Bonds; (7) modifications to the rights of the security owners (including Beneficial Owners) of the Resolution Bonds; (8) bond calls; (9) defeasances; (10) release, substitution, or sale of property securing repayment of the Resolution Bonds; and (11) rating changes. In addition, the Corporation will undertake, for the benefit of the owners of the Resolution Bonds, to provide to each such Repository or the MSRB, and to the Commonwealth Information Depository, if any, in a timely manner, notice of any failure by the Corporation to provide the Annual Information by the date required in the Corporation's undertaking described above.

Events (4) and (5) above are included pursuant to a letter from the SEC staff to the National Association of Bond Lawyers, dated September 19, 1995. With respect to the following events:

Event (4) and (5). The Corporation does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Resolution Bonds, unless the Corporation applies for or participates in obtaining the enhancement.

Event (6). For information on the tax status of the Resolution Bonds, see "TAX MATTERS."

Event (8). The Corporation does not undertake to provide notice of a mandatory scheduled redemption not otherwise contingent upon the occurrence of an event if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under *"Redemption"* under "THE BONDS" above, (ii) the only open issue is which Resolution Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Bondowners as required under the terms of the Resolution Bonds, (iv) public notice of the redemption is given pursuant to the Exchange Act Release Number 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or bond purchases.

The Corporation may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Corporation, such other event is material with respect to the Resolution Bonds, but the Corporation does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

On September 7, 2004, the Commission released an interpretive letter (the "Letter") approving the use of www.DisclosureUSA.org ("DisclosureUSA"), created by the Municipal Advisory Council of Texas ("Texas MAC"), as a means by which continuing disclosure filings may be made under the Rule, subject to certain qualifications set forth in the Letter. The Corporation may choose to satisfy its obligations to file the information required by the Rule with the repositories by transmitting such filings (the "Filings"), either directly or indirectly through a designated agent, to DisclosureUSA for submission to each NRMSIR and Commonwealth Information Depository (without also separately submitting the Filings to the NRMSIRs and Commonwealth Information Depository by some other means). The Corporation intends to monitor the performance of Texas MAC with regard to the submission of the Filings to the NRMSIRs and Commonwealth Information Depository. In the event that Texas MAC fails, with respect to the Filings, to perform the functions or undertake the responsibilities referenced in the Letter, or if for any reason the SEC modifies or revokes its interpretation described in the Letter, such that transmission of the Filings to DisclosureUSA would no longer satisfy the Corporation's obligation under the Disclosure Agreement, the Corporation will separately submit the Filings to the NRMSIRs and Commonwealth Information Depository.

As of the date of this Official Statement, there is no Commonwealth Information Depository, and the nationally recognized municipal securities information repositories are: Bloomberg Municipal Repository, 100 Business Park Drive, Skillman, New Jersey 08558; Standard & Poor's Securities Evaluations, Inc., 55 Water Street, 45th Floor, New York, New York 10041; Interactive Data Pricing and Reference Data, Inc., Attn: NRMSIR, 100 William Street, 15th Floor, New York, New York 10038; and DPC Data Inc., One Executive Drive, Fort Lee, New Jersey 07024.

The Corporation acknowledges that its undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners of the Resolution Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific enforcement of the Corporation's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Corporation written notice of any request to cure such breach, and the Corporation shall have refused to comply within a reasonable time. All Proceedings shall be instituted only as specified in the Disclosure Agreement in any Commonwealth court located in the Municipality of San Juan, Puerto Rico, for the equal benefit of all beneficial owners of the outstanding Resolution Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of the Covenant at issue.

The Covenants may only be amended if:

(1) the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Corporation, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Resolution Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners, as determined by parties unaffiliated with the Corporation; or

(2) all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Corporation elects that the Covenant shall be deemed amended accordingly.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above. The Covenants have been made in order to assist the Underwriters to comply with the Rule.

### GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As provided by Act No. 272 of the Legislature of the Commonwealth, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Corporation in connection with the Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank. Government Development Bank is an intended recipient of the payment or retirement of Extraconstitutional Debt with the proceeds of the Bonds.

### MISCELLANEOUS

The summaries and explanations of the Resolution, the various acts, the Bonds and the other financing documents contained herein do not purport to be complete statements of any or all of the provisions of such documents and are made subject to all the detailed provisions thereof, to which reference is hereby made for further information. Copies of the foregoing documents are available from the Corporation, upon written request directed to:  Puerto Rico Sales Tax Financing Corporation, c/o Government Development Bank for Puerto Rico, Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940, Attention:  President.

The Corporation has engaged Mesirow Financial, Inc., Chicago, Illinois, as Financial Advisor (the "Financial Advisor") in connection with the Corporation's issuance and sale of the Bonds. Under the terms of the engagement, the Financial Advisor is not obligated to undertake any independent verification of or assume any responsibility for the accuracy, completeness, or fairness of the information contained in this Official Statement.

Appended to and constituting a part of this Official Statement is certain economic information relating to the Commonwealth and the sales of goods in the Commonwealth (*Appendix A*), the summary of certain definitions and provisions of the Resolution (*Appendix B*), the proposed form of approving opinion of Bond Counsel (*Appendix C*), the summary of the book-entry system for the Bonds (*Appendix D*), the table of Compounded Amounts for the Capital Appreciation Bonds (*Appendix E*), the specimen of the FGIC Insurance Policy (*Appendix F*), the specimen of the MBIA Insurance Policy *(Appendix G)*, and the specimen of the Ambac Insurance Policy *(Appendix H)*.

The information included in this Official Statement or incorporated herein by reference, except for information pertaining to DTC and the information appearing in "UNDERWRITING," was supplied by certain officials of the Corporation or certain Commonwealth agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was obtained from materials published by DTC.

This Official Statement will be filed with each NRMSIR and with the MSRB.

**PUERTO RICO SALES TAX FINANCING CORPORATION**

By: _____/s/ Samuel Sierra Rivera_____
        Samuel Sierra Rivera
        Executive Director

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX A**

**COMMONWEALTH OF PUERTO RICO
ECONOMIC INFORMATION**

**INTRODUCTION**

**Geographic Location and Demography**

 Puerto Rico, the fourth largest of the Caribbean islands, is located approximately 1,600 miles southeast of New York City.  It is approximately 100 miles long and 35 miles wide.

 According to the United States Census Bureau, the population of Puerto Rico was 3,808,610 in 2000 (3,927,776 as of July 1, 2006 according to a Census Bureau estimate), compared to 3,522,000 in 1990.  As of 2000, the population of San Juan, the island's capital and largest city, was 434,375.

**Relationship with the United States**

 Puerto Rico was discovered by Columbus in 1493 and shortly thereafter the island was conquered and settled by the Spaniards.  It remained a Spanish possession for four centuries.

 Puerto Rico came under United States sovereignty pursuant to the Treaty of Paris, signed on December 10, 1898, which ended the Spanish-American War.  Puerto Ricans have been citizens of the United States since 1917.  In 1950, after a long evolution toward greater self-government for Puerto Rico, the Congress of the United States enacted Public Law 600, which is "in the nature of a compact" and which became effective upon its acceptance by the electorate of Puerto Rico.  It provides that those sections of existing law which defined the political, economic, and fiscal relationship between Puerto Rico and the United States would remain in full force.  It also authorized the people of Puerto Rico to draft and adopt their own Constitution.  The Constitution was drafted by a popularly elected constitutional convention, overwhelmingly approved in a special referendum by the people of Puerto Rico and approved by the United States Congress and the President of the United States, becoming effective upon proclamation of the Governor of Puerto Rico on July 25, 1952.  Puerto Rico's relationship with the United States is referred to herein as commonwealth status.

 The United States and the Commonwealth of Puerto Rico (the "Commonwealth") share a common defense, market, and currency.  The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states.  It differs from the states, however, in its relationship with the federal government.  The people of Puerto Rico are citizens of the United States but do not vote in national elections.  They are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives but no vote.  Most federal taxes, except those such as Social Security taxes which are imposed by mutual consent, are not levied in Puerto Rico.  No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries.

 The official languages of Puerto Rico are Spanish and English.

**Governmental Structure**

 The Constitution of the Commonwealth provides for the separation of powers of the executive, legislative, and judicial branches of government.  The Governor is elected every four years.  The Legislative Assembly consists of a Senate and a House of Representatives, the members of which are elected for four-year terms.  The highest court within the local jurisdiction is the Supreme Court of Puerto Rico.  Puerto Rico constitutes a District in the federal judiciary and has its own United States District Court.  Decisions of this court may be appealed to the United States Court of Appeals for the First Circuit and from there to the Supreme Court of the United States.

Governmental responsibilities assumed by the central government of the Commonwealth are similar in nature to those of the various state governments.  In addition, the central government assumes responsibility for local police and fire protection, education, public health and welfare programs, and economic development.

**Principal Officials Responsible for Fiscal Matters**

Aníbal Acevedo Vilá was sworn in as Governor of Puerto Rico on January 2, 2005.  He is a graduate of the University of Puerto Rico, where he obtained a Bachelor's degree in Political Science and a Juris Doctor degree.  He obtained an LL.M. from Harvard Law School and served as law clerk for Puerto Rico Supreme Court Judge Federico Hernández Denton and for U.S. First Circuit Court of Appeals Judge Levin Campbell.  He also served in the public sector as legislative adviser to the Governor of Puerto Rico.  From 1993 to 2001, he served as an elected member of the Puerto Rico House of Representatives.  From 2001 until assuming his position as Governor, he served as the elected Resident Commissioner of the Commonwealth in the U.S. House of Representatives.

Juan C. Méndez Torres, Secretary of the Department of the Treasury (the "Treasury"), took office in January 2005.  He is a certified public accountant and a graduate of the University of Puerto Rico, where he obtained a Bachelor's degree in Accounting and a Juris Doctor degree.  He obtained an LL.M. in tax law from Georgetown University Law Center.  From 2002 to mid-2004, he worked as a technical advisor to the Secretary of the Treasury.  Prior to 2002, he worked as a tax attorney at a large law firm in Puerto Rico.

CPA José Guillermo Dávila Matos was appointed Executive Director of the Commonwealth of Puerto Rico Office and Management and Budget in August 2006.  Before that, he served for two years as Executive Vice President for Administration, Controllership and Operations at GDB.  Prior to entering public service, Dávila-Matos worked in the private sector for close to 20 years in various upper management positions.  He is a Certified Public Accountant and earned a Bachelor's degree in Business Administration with a major in accounting from the University of Puerto Rico, Río Piedras.  He is also a member of the American Institute of Certified Public Accountants.

Alfredo Salazar Conde became Acting President of Government Development Bank for Puerto Rico ("GDB") effective on August 19, 2005.  Mr. Salazar is a private investor with over 30 years of experience in commercial banking.  Mr. Salazar served as President of GDB from 1975 to 1976 and as Executive Director of Puerto Rico Industrial Development Company during 1990.  Mr. Salazar has a Bachelor's degree in economics from Villanova University and pursued post graduate studies in finance at New York University and Harvard Business School.

**Political Trends**

For many years there have been two major views in Puerto Rico with respect to Puerto Rico's relationship with the United States:  one favoring commonwealth status, represented by the Popular Democratic Party, and the other favoring statehood, represented by the New Progressive Party.  The following table shows the percentages of the total votes received by the gubernatorial candidates of the various parties in the last five elections.  While the electoral choices of Puerto Rico's voters are not based solely on party preferences regarding Puerto Rico's relationship with the United States, candidates who support a continuing relationship between Puerto Rico and the United States have prevailed in elections for many years.

|                                 | 1988  | 1992  | 1996  | 2000  | 2004  |
|---------------------------------|-------|-------|-------|-------|-------|
| Popular Democratic Party        | 48.7% | 45.9% | 44.5% | 48.6% | 48.4% |
| New Progressive Party           | 45.8% | 49.9% | 51.1% | 45.7% | 48.2% |
| Puerto Rico Independence Party  | 5.4%  | 4.2%  | 3.8%  | 5.2%  | 2.7%  |
| Others                          | 0.1%  | -     | 0.6%  | 0.5%  | 0.6%  |

With the results of the 2004 election, control of the executive branch continued under the Popular Democratic Party while the legislative branch is now controlled by the New Progressive Party. The composition of the Senate and House of Representatives by political party is as follows:

|  | Senate | House |
|---|---|---|
| Popular Democratic Party | 9 | 18 |
| New Progressive Party | 17 | 32 |
| Puerto Rico Independence Party | 1 | 1 |
| Total | 27 | 51 |

The next general election (gubernatorial, municipal, and legislative) in Puerto Rico will be held in November 2008. Voter participation in Puerto Rico is substantially higher than in the United States, averaging 82% since 1972.

## COMMONWEALTH SALES TAX

### Factors Affecting Sales Tax Revenues

The economic indicators which correlate most closely with the level of sales of goods and services in the Commonwealth are Gross National Product ("GNP"), personal consumption and personal income. These factors, in turn, are affected by other variables such as: the price of oil, employment rates, among others. These factors are the indicators utilized by the Commonwealth to make projections of Commonwealth Sales Tax revenues.

The following table shows the Commonwealth Sales Tax actual collections from November 15, 2006 to May 2007.

### Commonwealth Sales Tax Collections
(in millions)

|  | November[1] | December | January | February | March | April | May | Total |
|---|---|---|---|---|---|---|---|---|
| **General Fund** | $41 | $90 | $78 | $71 | $ 79 | $70 | $77 | $506 |
| **FIA** | 9 | 20 | 17 | 16 | 18 | 16 | 17 | 113 |
| **Total** | $50 | $110 | $95 | $87 | $97 | $86 | $94 | $619 |

_____
(1)  Commonwealth Sales Tax was effective on November 15, 2006.

As of today, the collections from the top 20 taxpayers represent, in average, 23% of total revenues from the Commonwealth Sales Tax. These taxpayers are from the following business sectors: retail and general merchandise stores, telecommunications, restaurant chains and supermarkets.

### THE ECONOMY

The information below provides certain general economic data about the Commonwealth, particularly data relating to those indicators of economic activity which may correlate most closely with the level of consumption of goods and services on the Commonwealth and, thus, the level of Commonwealth Sales Tax revenues. This summary does not purport to discuss all of the variables which may impact the level of Commonwealth Sales Tax revenues. The data in this section is provided as a general indication of prior levels of consumption and of the economic activity that is generally understood to drive consumption but is not intended to provide a basis for predicting the future performance of taxable retail sales or of the Commonwealth Sales Tax.

**General**

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than the price of oil) are determined by the policies and performance of the economy of the United States. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures.

*Forecast for Fiscal Year 2007*

The Planning Board's current real gross national product forecast for Fiscal Year 2007, which was released in February 2007, projected a decline of 1.4%, in real dollars, equivalent to an increase by 2.0% in current dollars. Personal income is expected to decline by 1.2%, in real dollars, equivalent to an increase by 3.1% in current dollars. The Planning Board expects real growth to return in Fiscal Year 2008, albeit at only 0.8%, or 5.1% in current dollars. The major factors affecting the economy at this point are, among others, the still relatively high oil prices, the slowdown of the U.S. economic activity and the continuing economic uncertainty generated by the Commonwealth's fiscal crisis, and the effects on economic activity of the implementation of the new sales tax. Consumers may take time to adjust their behavior to the new sales tax system.

According to the Department of Labor and Human Resources Household Employment Survey (the "Household Survey"), total employment for the first nine months of Fiscal Year 2007 averaged 1,268,300, an increase of 0.1% compared to 1,266,600 for the same period in Fiscal Year 2006. The seasonally adjusted unemployment rate for first nine months of Fiscal Year 2007 was 10.5%, a decrease from 11.2% for the same period in Fiscal Year 2006.

*Fiscal Year 2006*

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for Fiscal Year 2006 indicate that real gross national product increased 0.7% (5.8% in current dollars) over 2005. Nominal gross national product was $56.7 billion in Fiscal Year 2006 ($45.1 billion in 2000 prices), compared to $53.6 billion in Fiscal Year 2005 ($44.8 billion in 2000 prices). Aggregate personal income increased from $48.3 billion in Fiscal Year 2005 ($43.6 billion in 2000 prices) to $50.9 billion in Fiscal Year 2006 ($44.0 billion in 2000 prices), and personal income per capita increased marginally from $12,365 in Fiscal Year 2005 ($11,179 in 2000 prices), to $12,997 in Fiscal Year 2006 ($11,218 in 2000 prices).

According to the Household Survey, total employment for Fiscal Year 2006 averaged 1,253,000, an increase of 1.2% compared to 1,237,600 for Fiscal Year 2005. An important component of total employment is self-employment. The unemployment rate for Fiscal Year 2006 was 11.7%, an increase from 10.6% for Fiscal Year 2005, due to the partial government shutdown in May 2006. As in the past, the economy of Puerto Rico followed the general performance and trends of the United States economy, although at a lower rate of growth.

Prior to Fiscal Year 2006, Puerto Rico enjoyed more than two decades of almost continuous economic expansion. Virtually every sector of the economy participated in this expansion, and record levels of employment were achieved. Factors contributing to this expansion included government-sponsored economic development programs, increases in the level of federal transfer payments, and the relatively low cost of borrowing for private and public capital projects. In some years, these factors were aided by a significant expansion in construction investment driven by infrastructure projects, private investment, primarily in housing, and relatively low oil prices. During Fiscal Years 2003 to 2005, the economy expanded at a moderate annual rate of 2.2%. Recently, however, as several key economic figures began to indicate a contraction of economic activity, the Planning Board lowered its forecast of growth in real gross national product from 2.2% to 0.7% for Fiscal Year 2006. Among the variables contributing to the Planning Board's downward revision in the forecast were the current effect of persistent high levels of oil prices, the upward trend in short-term interest rates, the depreciation of the dollar (which affects the value of imports from foreign countries, accounting for

approximately 50% of total imports to Puerto Rico), and the deceleration of public investment (which served, together with other factors, to reduce activity in construction and other sectors). The persistent high level of the price of oil and its derivatives (such as gasoline) has served to reduce the income available for other purchases and, thereby, negatively affected domestic demand. Due to the Commonwealth's dependence on oil for power generation and gasoline in spite of its recent improvements in power production diversification, the high level of oil prices is expected to account for an increased outflow of approximately $2 billion in Fiscal Year 2006. The upward trend in short-term interest rates has also directly affected construction activity, which has been a major contributor to economic growth in recent years, and accentuated the fiscal difficulties of the Commonwealth's government with respect to the Fiscal Year 2006 budget deficit.  For Fiscal Year 2007, the Planning Board's February 2007 projection forecasts a real gross national product decline of 1.4% (nominal growth of 2.0%), followed by slight real growth of 0.8% for Fiscal Year 2008 (nominal growth of 5.1%).

**Personal Income**

Personal income, both aggregate and per capita, increased consistently in each Fiscal Year from 2002 to 2006. In Fiscal Year 2006, aggregate personal income was $50.9 billion ($44.0 billion in 2000 prices) and personal income per capita was $12,997 ($11,218 in 2000 prices).[1] Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total federal payments to Puerto Rico, which amount to around $15 billion annually and include transfers to local government entities and expenditures of federal agencies in Puerto Rico, in addition to federal transfer payments to individuals, are lower on a per capita basis in Puerto Rico than in any state of the United States. Contrary to the popular perception that a significant amount of federal transfers to individuals constitutes grants, 80% of the transfer payments to individuals in Fiscal Year 2006 ($8.0 billion), represented entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and U.S. Civil Service retirement pensions. Grants represent the remainder of the federal transfers to individuals, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant (higher education) Scholarships.

The following table shows the personal income for the five Fiscal Years ended June 30, 2006.

---

[1] Different price deflators are used for gross national product and personal income statistics.  The year 2000 is used as a basis for comparison because that is the year used by the U.S. Department of Commerce

**Commonwealth of Puerto Rico**
**Personal Income**
**(in millions of dollars)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[*] |
| Employees' compensation | | | | | |
| Business | $17,167.6 | $17,593.8 | $18,710.9 | $19,420.1 | $20,174.2 |
| Government | 6,302.8 | 6,947.6 | 7,388.5 | 8,150.5 | 8,424.2 |
| Household and nonprofit institutions | 634.4 | 656.3 | 711.0 | 704.8 | 655.8 |
| Other | 975.5 | 985.1 | 958.6 | 1,085.3 | 1,093.2 |
| Total Employees' compensation | $25,080.4 | $26,182.8 | $27,768.9 | $29,360.7 | $30,347.4 |
| | | | | | |
| Less: Contributions for social insurance | | | | | |
| Employees | 1,776.6 | 1,907.7 | 2,068.2 | 2,181.0 | 2,265.2 |
| Employers | 2,516.5 | 2,777.3 | 2,884.9 | 3,061.6 | 3,187.7 |
| Total Contributions for social insurance | $4,293.1 | $4,684.9 | $4,953.0 | $5,242.6 | $5,452.9 |
| | | | | | |
| Proprietors' income | | | | | |
| Income of unincorporated enterprises | 2,301.9 | 2,397.8 | 2,633.9 | 2,736.9 | 2,757.7 |
| Dividends of domestic corporations | 201.8 | 229.6 | 249.4 | 249.8 | 249.3 |
| Miscellaneous income and dividends received from abroad | 16.4 | 13.7 | 13.0 | 12.6 | 12.4 |
| Rental income of persons | 3,182.5 | 3,352.8 | 3,663.1 | 3,901.8 | 4,168.1 |
| Personal interest income | 1,913.1 | 2,409.7 | 2,127.7 | 2,705.0 | 3,837.0 |
| Total Proprietors' income | $7,615.7 | $8,403.6 | $8,687.2 | $9,606.1 | $11,024.6 |
| | | | | | |
| Transfer payments | 13,635.6 | 14,314.1 | 14,062.8 | 14,543.4 | 15,029.9 |
| Commonwealth government and municipalities | 3,147.4 | 3,119.3 | 3,290.3 | 3,324.2 | 3,403.0 |
| Federal government | 8,691.4 | 9,391.5 | 8,903.0 | 9,243.7 | 9,640.3 |
| U.S. state governments | 17.1 | 19.1 | 16.4 | 14.9 | 13.5 |
| Business | 1,094.9 | 1,091.4 | 1,116.1 | 1,140.4 | 1,164.7 |
| Other nonresidents | 684.8 | 692.9 | 737.0 | 820.3 | 808.4 |
| Total Personal Income | $42,038.6 | $44,215.6 | $45,565.9 | $48,267.6 | $50,949.0 |

_____
(*) Preliminary figures.
Source: Puerto Rico Planning Board, Program of Economic and Social Planning, Subprogram of Economic Analysis

**Personal Consumption**

During Fiscal Year 2006, at current prices, personal consumption amounted to $49.6 billion, increasing by $3.3 billion or 7.1% from the amount of $46.3 billion for Fiscal Year 2005.  At constant prices, personal consumption increased 2.2% from Fiscal Year 2005. Said increase was based on the increase in consumption of durable and non-durable goods by 3.9%. The consumption of services also increased 0.1%.

The following table shows personal consumption expenditures by product for the five Fiscal Years ended June 30, 2006.

**Commonwealth of Puerto Rico**
**Personal Consumption Expenditures by Product**
**(in millions of dollars)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Food | $ 5,568.8 | $ 5,984.0 | $ 6,061.2 | $ 6,573.9 | $ 6,960.5 |
| Alcoholic beverages and tobacco products | 1,435.2 | 1,513.4 | 1,540.8 | 1,435.5 | 1,802.5 |
| Clothing and accessories | 2,653.9 | 2,693.6 | 2,851.9 | 2,957.1 | 3,082.6 |
| Personal care | 774.9 | 752.8 | 782.2 | 815.5 | 919.2 |
| Housing | 5,642.5 | 6,093.1 | 6,549.4 | 7,012.3 | 7,499.7 |
| Household operations | 4,353.3 | 4,569.1 | 4,773.4 | 5,268.2 | 5,929.2 |
| Medical care and funeral expenses | 6,768.8 | 6,960.4 | 7,162.5 | 7,527.7 | 7,935.3 |
| Business services | 2,683.3 | 2,881.5 | 2,962.7 | 3,055.8 | 3,111.8 |
| Transportation | 4,762.4 | 4,870.4 | 5,283.7 | 6,136.4 | 6,404.5 |
| Recreation | 3,313.0 | 3,800.1 | 4,401.9 | 4,531.6 | 4,801.7 |
| Education | 1,311.0 | 1,345.3 | 1,589.3 | 1,627.8 | 1,687.3 |
| Religious and nonprofit organizations, not elsewhere classified | 375.5 | 418.8 | 473.3 | 482.3 | 505.2 |
| Foreign travel | 1,160.2 | 1,274.2 | 1,450.1 | 1,539.3 | 1,638.8 |
| Miscellaneous purchases | 558.5 | 520.0 | 565.7 | 605.8 | 704.1 |
| Total consumption expenditures in Puerto Rico by residents and nonresidents | $41,361.3 | $43,676.8 | $46,448.6 | $49,569.2 | $52,982.5 |
| Less: Expenditures in Puerto Rico by nonresidents | 2,516.4 | 2,703.3 | 3,052.6 | 3,269.4 | 3,403.1 |
| Total Personal Consumption Expenditures | $38,844.9 | $40,973.4 | $43,396.0 | $46,299.8 | $49,579.4 |

_____
(1) Preliminary figures.
  Source: Puerto Rico Planning Board, Program of Economic and Social Planning,
       Subprogram of Economic Analysis.

**Gross National Product**

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher wage, high technology industries, such as pharmaceuticals, biotechnology, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. The services sector, including finance, insurance, real estate, wholesale and retail trade, and tourism, also plays a major role in the economy. It ranks second to manufacturing in contribution to the gross domestic product and leads all sectors in providing employment.

The following table shows the gross national product for the five Fiscal Years ended June 30, 2006.

**Commonwealth of Puerto Rico**
**Gross National Product**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Gross national product – $ millions[2] | $45,071 | $47,479 | $50,709 | $53,601 | $56,688 |
| Real gross national product – $ millions (2000 prices) | 41,900 | 42,795 | 43,967 | 44,814 | 45,111 |
| Annual percentage increase in real gross national product (2000 prices) | (0.3%) | 2.1% | 2.7% | 1.9% | 0.7% |
| U.S. annual percentage increase in real gross national product (2000 prices) | 0.6% | 1.9% | 4.0% | 3.0% | 3.4% |

_____
(1)    Preliminary.
(2)    In current dollars.

*Sources:*  Puerto Rico Planning Board and Global Insight Inc.


    The following graph compares the growth rate of real gross national product for the Puerto Rico and United States economies since Fiscal Year 1990, and the forecast of the growth rate for Fiscal Years 2007 and 2008.  In nominal terms, gross national product is forecasted to increase by 2.0% and 5.1% in Fiscal Years 2007 and 2008. respectively.

# Real GNP Growth Rate



| |
|---|
| *    Puerto Rico Planning Board. |
| **    Global Insight 04/07. |

## Puerto Rico Nominal GNP Growth Rate



**Economic Performance by Sector**

*General*

From Fiscal Year 2002 to Fiscal Year 2006, the manufacturing and services sectors generated the largest portion of gross domestic product. The three sectors of the economy that provide the most employment are manufacturing, services and government.

The following table presents annual statistics of gross domestic product by sector and gross national product for the five Fiscal Years ended June 30, 2002 through 2006.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Sector and Gross National Product**
**(in millions at current prices)**

| | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Manufacturing | $31,243 | $31,532 | $33,267 | $34,363 | 36,556 |
| Services[2] | 26,913 | 28,919 | 30,476 | 32,299 | 33,613 |
| Government[3] | 6,303 | 6,948 | 7,389 | 8,151 | 8,424 |
| Transportation, communication and public utilities | 4,948 | 5,178 | 5,343 | 5,353 | 5,508 |
| Agriculture, forestry and fisheries | 277 | 333 | 414 | 360 | 333 |
| Construction[4] | 1,648 | 1,772 | 1,905 | 1,874 | 1,821 |
| Statistical discrepancy | 292 | 146 | 415 | 251 | 209 |
| Total gross domestic product[5] | $71,624 | $74,827 | $79,209 | $82,650 | $86,464 |
| Less:  net payment abroad | (26,552) | (27,348) | (28,501) | (29,049) | (29,776) |
| Total gross national product[5] | $45,071 | $47,479 | $50,709 | $53,601 | $56,689 |

---

(1)   Preliminary.
(2)   Includes wholesale and retail trade, finance, insurance and real estate, tourism, and other services.
(3)   Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain other public corporations, like the Electric Power Authority and the Aqueduct and Sewer Authority whose activities are included under Services in the table.
(4)   Includes mining.
(5)   Totals may not add due to rounding.

*Source:*  Planning Board

The data for employment by sector or industries presented here, like in the United States, are based on the payroll employment survey (the "Payroll Survey"), which is designed to measure employment by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

The following table presents annual statistics of average employment based on the North American Industry Classification System (NAICS) for Fiscal Years 2002 to 2006.

**Commonwealth of Puerto Rico**
**Non-Farm, Payroll Employment by Economic Sector[1]**
**(persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006[2]** |
| Natural Resources and Construction | 72,142 | 68,525 | 69,297 | 68,221 | 67,442 |
| Manufacturing | | | | | |
|    Durable Goods | 50,500 | 49,634 | 49,776 | 48,066 | 46,492 |
|    Non-Durable Goods | 74,300 | 69,121 | 68,660 | 69,256 | 66,367 |
|   Sub Total | 124,800 | 118,755 | 118,436 | 117,322 | 112,859 |
| | | | | | |
| Trade, Transportation, Warehouse & Utilities | | | | | |
|    Wholesale Trade | 32,200 | 32,181 | 33,299 | 33,710 | 33,992 |
|    Retail Trade | 130,675 | 130,180 | 132,008 | 136,189 | 137,800 |
|    Transportation, Warehouse & Utilities | 18,017 | 17,352 | 17,054 | 17,615 | 17,433 |
|   Sub Total | 180,892 | 179,713 | 182,361 | 187,514 | 189,225 |
| | | | | | |
| Information | 22,483 | 21,619 | 21,907 | 22,598 | 22,600 |
| Finance | 44,975 | 44,648 | 46,852 | 48,621 | 49,767 |
| Professional & Business | 97,408 | 98,498 | 101,899 | 103,767 | 106,400 |
| Educational & Health | 86,400 | 92,409 | 98,101 | 99,963 | 103,583 |
| Leisure & Hospitality | 65,783 | 67,912 | 70,310 | 72,586 | 74,767 |
| Other Services | 16,992 | 18,808 | 20,671 | 21,257 | 21,267 |
| Government | 288,675 | 297,722 | 303,431 | 307,835 | 302,025 |
|   Total Non-Farm | 1,000,550 | 1,008,609 | 1,033,265 | 1,049,684 | 1,049,935 |

(1) The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.

(2) Preliminary.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

*Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product. The Planning Board figures show that in Fiscal Year 2006 manufacturing generated $36.6 billion, or 42.3%, of gross domestic product. During Fiscal Year 2006, payroll employment for the manufacturing sector was 112,859, a decrease of 3.8% compared with Fiscal Year 2005, with most of the job losses occurring in labor-intensive industries. Most of the island's manufacturing output is shipped to the United States mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. The United States minimum wage laws are applicable in Puerto Rico. As of December 2006, the average hourly manufacturing wage rate in Puerto Rico was 68.9% of the average mainland United States rate.

Manufacturing in Puerto Rico is now more diversified than during the earlier phases of its industrial development and includes several industries less prone to business cycles. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by large investments over the last decade in the pharmaceutical, scientific instruments, computers and electrical products industries in Puerto Rico. One of the factors encouraging the development of the manufacturing sector has been the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the U.S. Code, phased out these federal tax incentives during a ten-year period that recently ended. See "Tax Incentives – Incentives under the U.S. Code".

The following table sets forth gross domestic product by manufacturing sector for the five Fiscal Years ended June 30, 2002 through June 30, 2006.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Manufacturing Sector**
**(in millions at current prices)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Pharmaceuticals | $18,681 | $18,998 | $19,814 | $20,253 | $20,820 |
| Machinery and metal products: | | | | | |
|   Machinery, except electrical | 3,845 | 3,507 | 3,372 | 3,397 | 3,378 |
|   Electrical machinery | 1,757 | 1,771 | 1,818 | 1,926 | 2,237 |
|   Professional and scientific instruments | 2,191 | 2,981 | 3,540 | 3,802 | 4,494 |
|   Other machinery and metal products | 312 | 288 | 274 | 284 | 291 |
| Food products | 2,092 | 1,903 | 2,202 | 2,290 | 2,489 |
| Other chemical and allied products | 578 | 502 | 591 | 644 | 679 |
| Apparel | 530 | 353 | 344 | 364 | 337 |
| Other[2] | 1,258 | 1,231 | 1,312 | 1,403 | 1,831 |
| Total gross domestic product of manufacturing sector[3] | $31,243 | $31,532 | $33,267 | $34,363 | $36,556 |

(1)   Preliminary.
(2)   Includes petroleum products; petrochemicals; tobacco products; stone, clay and glass products; textiles and others.
(3)   Totals may not add due to rounding.

*Source:* Planning Board

The following table presents annual statistics of average manufacturing employment by industry based on the North American Industry Classification System (NAICS) for Fiscal Years 2002 to 2006.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Manufacturing Employment by Industry Group\***
**(persons age 16 years and over)**

| Industry Group | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| **Durable Goods** | | | | | |
| Nonmetallic Mineral Products Manufacturing | 4,525 | 4,444 | 4,706 | 4,471 | 4,108 |
| Cement and Concrete Products Manufacturing | 3,617 | 3,543 | 3,867 | 3,750 | 3,542 |
| Fabricated Metal Products | 6,517 | 6,198 | 6,490 | 6,427 | 5,808 |
| Computer and Electronic | 11,742 | 11,623 | 10,581 | 10,673 | 10,808 |
| Electrical Equipment | 7,233 | 7,415 | 7,744 | 7,645 | 6,858 |
| Electrical Equipment Manufacturing | 4,125 | 4,399 | 4,935 | 4,971 | 4,708 |
| Miscellaneous Manufacturing | 12,033 | 12,308 | 12,070 | 11,157 | 11,225 |
| Medical Equipment and Supplies Manufacturing | 10,858 | 11,336 | 11,059 | 10,473 | 10,492 |
| Other Durable Goods Manufacturing | 8,450 | 7,646 | 8,185 | 7,693 | 7,685 |
| Total – Durable Goods | 50,500 | 49,634 | 49,776 | 48,066 | 46,492 |
| | | | | | |
| **Non-Durable Goods** | | | | | |
| Food Manufacturing | 14,842 | 13,628 | 13,244 | 13,050 | 12,667 |
| Beverage and Tobacco Products Manufacturing | 3,508 | 3,159 | 3,038 | 3,175 | 3,425 |
| Apparel Manufacturing | 12,000 | 8,988 | 8,522 | 8,873 | 8,400 |
| Cut and Sew Apparel Manufacturing | 11,233 | 8,969 | 8,518 | 8,846 | 8,183 |
| Chemical Manufacturing | 31,067 | 31,183 | 31,385 | 32,885 | 32,335 |
| Pharmaceutical and Medicine Manufacturing | 26,358 | 26,645 | 27,187 | 28,572 | 28,017 |
| Plastics and Rubber Products | 3,492 | 3,340 | 3,210 | 2,744 | 2,350 |
| Plastics Product Manufacturing | 3,183 | 3,030 | 2,917 | 2,266 | 2,158 |
| Other Non-Durable Goods Manufacturing | 9,391 | 8,823 | 9,261 | 8,529 | 7,200 |
| Total – Non-Durable Goods | 74,300 | 69,121 | 68,660 | 69,256 | 66,377 |
| | | | | | |
| Total Manufacturing Employment | 124,800 | 118,755 | 118,436 | 117,322 | 112,859 |

\*    Totals may not add due to rounding.
(1)    Preliminary.

*Source:*  Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 11,941 from Fiscal Year 2002 to Fiscal Year 2006. Manufacturing employment had been declining during the past decade, but the decline accelerated during Fiscal Years 2002 and 2003, falling -10.6% and -4.8%, respectively. After that, manufacturing employment seemed to stabilize around 118,000 jobs, but the deceleration reappeared in Fiscal Year 2006 with the sector experiencing another significant drop of -3.8%. For the first six months of Fiscal Year 2007 the employment decline accelerated further to -6.2%. During the last two years the economy has lost around 5,500 jobs in the manufacturing sector. There are several reasons which explain this sector's job shrinkage: the end of the phase-out of Section 936, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly labor and electricity), and the increased use of job outsourcing. Puerto Rico's manufacturing sector is facing increased international competition, and new ideas and initiatives are necessary to improve this sector.

*Services*

Puerto Rico has experienced significant growth in the services sector, which includes finance, insurance, real estate, wholesale and retail trade, tourism and other services, in terms of both income and employment over the past decade, showing a favorable trend as compared with certain other industrialized economies. During the period between Fiscal Years 2002 and 2006, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 4.5%, while payroll employment in this sector increased at an average annual rate of 2.5%. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 17% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. For example, for Fiscal Year 2006, the number of self-employed individuals was 182,914, out of which 46.8% were in the services sector and 15.1% were in the construction sector. The development of the services sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing, construction and agriculture. The services sector in Puerto Rico has a diversified base.

The following table sets forth gross domestic product for the services sector for Fiscal Years 2002 to 2006.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Service Sector\***
**(in millions at current prices)**

| | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Wholesale and retail trade | $ 8,623 | $ 9,150 | $ 9,802 | $ 10,260 | $10,716 |
| Finance, insurance and real estate | 11,212 | 12,508 | 13,029 | 14,016 | 14,733 |
| Other services[2] | 7,078 | 7,261 | 7,646 | 8,023 | 8,164 |
| Total | $26,913 | $28,919 | $30,476 | $32,299 | $33,613 |

---
\*    Totals may not add due to rounding.
(1)   Preliminary.
(2)   Includes tourism.

According to the Establishment Survey, for the first six months of Fiscal Year 2007 the net employment gain for this sector was 2,200 jobs, compared to same period in the previous year. Service, finance, insurance and real estate employment added 6,800 jobs, while trade lost 4,600 jobs; for a net growth rate of 1%.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The services sector ranks second to manufacturing in its contribution to gross domestic product, and it is the sector with the greatest employment. In Fiscal Year 2006, services generated $33.6 billion of gross domestic product, or 38.9% of the total. Services employment grew from 514,933 in Fiscal Year 2002 to 567,609 in Fiscal Year 2006 (representing 54.1% of total, non-farm, payroll employment). This represents a cumulative increase of 10.2% during such period. Wholesale and retail trade, finance, insurance and real estate experienced significant growth in Fiscal Years 2002 to 2006, as measured by gross domestic product. From Fiscal Year 2002 to 2006, gross domestic product increased in wholesale and retail trade from $8.6 billion to $10.7 billion, and in finance, insurance, and real estate from $11.2 billion to $14.7 billion. There are sixteen commercial banks and trust companies currently operating in Puerto Rico. Total assets of these institutions as of December 31, 2006 were $106.6 billion. As of December 31, 2006, there were approximately thirty-five international banking entities operating in Puerto Rico licensed to conduct offshore banking transactions with total assets of $76.3 billion.

The following table sets forth employment figures for the services sector for Fiscal Years 2002 to 2006.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Services Sector\***
**(thousands of persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[(1)] |
| Wholesale Trade | 32,200 | 32,181 | 33,299 | 33,710 | 33,992 |
| Retail Trade | 130,675 | 130,180 | 132,008 | 136,189 | 137,800 |
| Transportation, Warehouse & Utilities | 18,017 | 17,352 | 17,054 | 17,615 | 17,433 |
| Trade, Transportation, Warehouse & Utilities | 180,892 | 179,713 | 182,361 | 187,514 | 189,225 |
| Information | 22,483 | 21,619 | 21,907 | 22,598 | 22,600 |
| Finance | 44,975 | 44,648 | 46,852 | 48,621 | 49,767 |
| Professional and Business | 97,408 | 98,498 | 101,899 | 103,767 | 106,400 |
| Educational & Health | 86,400 | 92,409 | 98,101 | 99,963 | 103,583 |
| Leisure & Hospitality | 65,783 | 67,912 | 70,310 | 72,586 | 74,767 |
| Other Services | 16,992 | 18,808 | 20,671 | 21,257 | 21,267 |
| Total | 514,933 | 523,607 | 542,101 | 556,306 | 567,609 |

---

\*   Totals may not add due to rounding.

(1)  Preliminary.

*Source:*   Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

*Hotels and Related Services – Tourism*

During Fiscal Year 2006, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists staying in more than one hotel during their visit, was 1,913,400, an increase of 3.4% over the number of persons registered during the same period in Fiscal Year 2005. The number of non-resident tourists registered in tourist hotels during Fiscal Year 2006 increased 4.6% compared to Fiscal Year 2005. Hotel rooms available during Fiscal Year 2006 increased 3.9% compared to Fiscal Year 2005. The average number of rooms rented in tourist hotels increased 3.9% during Fiscal Year 2006 compared to Fiscal Year 2005. The average occupancy rate in tourist hotels during Fiscal Years 2005 and 2006 was 70.8%.

During the first six months of Fiscal Year 2007, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists staying in more than one hotel during their visit, was 859,300, a decrease of 5.7% over the number of persons registered during the same period in Fiscal Year 2006. The average occupancy rate in tourist hotels during the first six months of Fiscal Year 2007 was 67%, compared to 66.6% during the same period in Fiscal Year 2006. The average number of rooms rented in tourist hotels decreased 5.8% during the first six months of Fiscal Year 2007 compared with the same period during Fiscal Year 2006. The average number of rooms available in tourist hotels decreased 7.7% during the first six months of Fiscal Year 2007 compared to the same period in Fiscal Year 2006 as the completion of regular maintenance and rehabilitation of rooms (that normally results in a certain number of rooms being unavailable at any time) is taking longer to complete this year than in prior years.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five Fiscal Years ended June 30, 2006.

**Commonwealth of Puerto Rico**
**Tourism Data[1]**
**Number of Visitors**

| Fiscal Years Ended June 30 | Tourist Hotels[2] | Cruise Ship | Other[3] | Total | Total Visitors' Expenditures (in millions) |
|---|---|---|---|---|---|
| 2002 ........................................ | 1,147,800 | 1,277,000 | 1,939,300 | 4,364,100 | $2,486.4 |
| 2003 ........................................ | 1,239,200 | 1,163,900 | 1,999,200 | 4,402,300 | 2,676.6 |
| 2004 ........................................ | 1,307,000 | 1,348,200 | 2,234,000 | 4,889,200 | 3,024.0 |
| 2005 ........................................ | 1,361,640 | 1,386,925 | 2,324,275 | 5,072,840 | 3,238.6 |
| 2006 ........................................ | 1,424,200 | 1,300,100 | 2,297,800 | 5,022,100 | 3,369.3 |

_____

(1)   Only includes information about non-resident tourists registering in tourist hotels. They are counted once even if registered in more than one hotel.
(2)   Includes visitors in guesthouses.
(3)   Includes visitors in homes of relatives, friends, and in hotel apartments.

*Sources:*   Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Convention Center District Authority, has completed the development of the largest convention center in the Caribbean, and the centerpiece of a 100-acre, private development, to include hotels, restaurants, cinemas, office space and housing. The convention center district is being developed at a total cost of $1.3 billion to improve Puerto Rico's competitive position in the convention and group travel segments. The convention center opened on November 17, 2005.

The Convention Center District Authority also owns a multi-purpose coliseum located in San Juan, Puerto Rico. The coliseum, known as the Jose Miguel Agrelot Coliseum, was inaugurated in 2004 and has been host to various successful artistic and other events.

*Government*

The government sector of Puerto Rico plays an important role in the economy. In Fiscal Year 2006, the government accounted for $8.4 billion of Puerto Rico's gross domestic product, or 9.7% of the total. The government is also a significant employer, providing jobs for 302,025 workers, or 28.8% of total, non-farm, payroll employment in Fiscal Year 2006.

On February 25, 1998, legislation was enacted permitting the unionization of employees of the central government (excluding municipal employees). Under this law, government employees are given collective bargaining rights subject to a number of limitations. Among those limitations are: employees are prohibited from striking; salary increases are contingent on the availability of budgeted revenues; employees cannot be required to become union members and pay union dues; and collective bargaining negotiations cannot occur in an election year. During Fiscal Year 2006, the Commonwealth and its instrumentalities began to negotiate the economic and non-economic terms of at least forty collective bargaining agreements. The results of these negotiations could have a material budgetary impact on the Commonwealth.

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

Luis Muñoz Marín International Airport is currently served by 25 United States and international airlines. At present, there is daily direct service between San Juan and Atlanta, Boston, Chicago, Dallas, Miami, New York, Philadelphia, and numerous other destinations within the United States. There is also regularly scheduled service between Aguadilla and Ponce and New York and between Puerto Rico and other Caribbean

islands and certain Latin American and European cities. A major United States airline uses San Juan as a hub for its intra-Caribbean airline service. Several smaller airports serve intra-island traffic.

The Island's major cities are connected by a modern highway system, which, as of December 31, 2006, totaled approximately 4,621 miles. The highway system comprises 391 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53 and PR-20 toll highways, 230 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic and 3,041 miles of tertiary highways and roads serving local, intra-regional traffic.

The first phase of a new mass transit system, known as Tren Urbano, has been completed. Tren Urbano serves a portion of metropolitan San Juan and is expected eventually to serve the municipalities of Carolina and Caguas as well. It currently has ridership of about 33,000 per day.

The Port of the Americas Authority ("PAA") is responsible for the development and operation of the Port of the Americas, a deep draft port on the south coast of Puerto Rico. The first phase of the Port of the Americas was completed in Fiscal Year 2004. This initial phase included the improvement of piers 4, 5 and 6 of the Port and the acquisition of heavy equipment at a cost of $40 million. During calendar year 2005, the PAA began the second phase of the Port, which phase is expected to be completed by the end of calendar year 2007. Completion of this second phase will provide capacity to handle up to 250,000 Twenty-Foot Equivalent Units ("TEU"). This second phase includes (i) dredging the entrance channel and adjacent areas of the Port to a depth of 50 feet; (ii) reconstructing the container terminals; (iii) commencing certain required environmental risk mitigation procedures; and (iv) preparing final construction schematics. With respect to these tasks, dredging is 60% complete, the final design contract has been awarded, acquisition of environmental risk mitigation land is underway, and the contract for reconstruction of the container terminal was awarded in April, 2006. The Port is expected to be capable of providing capacity for up to 700,000 TEUs when the third phase is completed.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity. During the period from Fiscal Year 2002 through Fiscal Year 2006, however, real construction investment decreased 1.1%. This decline was small compared to the high level of construction activity in prior Fiscal Years. The total value of construction permits increased 2.5% during the same five Fiscal Year period.

Public investment has been an important component of construction investment. During Fiscal Year 2006, approximately 42% of the total investment in construction was related to public projects. For Fiscal Year 2006 compared to Fiscal Year 2005, the total value of construction permits decreased 4.3% and total sales of cement, including imports, decreased 1.0%. Average payroll employment in the construction sector during Fiscal Year 2006 was 67,059, a decrease of 1.7% from Fiscal Year 2005. Through the first three quarters of Fiscal Year 2007, construction employment increased to a seasonally adjusted 67,500, but cement sales (including imports) continued their decline falling 7.1% compared to the same period in Fiscal Year 2006.

Total construction investment for Fiscal Year 2006 decreased (in real terms) by 5.8% (following a 7% real decline in Fiscal Year 2005) due principally to the drop in construction related public projects. For Fiscal Years 2007 and 2008, the Planning Board forecasts further construction investment decreases (in real terms) of 3.5% and 3.4%, respectively. Public investment will be primarily in housing, new schools (and school reconstruction programs), water projects, and other public infrastructure projects. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties.

During the first seven months of Fiscal Year 2007, the number and the total value of construction permits decreased 5.2% and 22.8%, respectively, compared to the same period in Fiscal Year 2006.

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. During Fiscal Year 2006, gross income from agriculture was $805.6 million, an increase 1.5% compared with Fiscal Year 2005. Agriculture gross income consists of the total value of production in the principal agricultural sectors, which include traditional crops, livestock and poultry, grains, vegetables, fruits, ornamental plants and other products. During Fiscal Year 2006, starchy vegetables, coffee, poultry, fruits and ornamental plants contributed a higher percentage of the sector's income than in the previous Fiscal Year.

The Commonwealth supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 provides a 90% income tax exemption for income derived from agricultural operations, an investment tax credit equal to 50% of the investment in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses. Subsequent legislation imposed an aggregate annual limit of $15 million on the investment tax credits available under Act No. 225.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

**Employment and Unemployment**

Total average annual employment (as measured by the Household Survey) has increased. From Fiscal Year 2002 to Fiscal Year 2006, annual employment increased 8.8% to 1,253,000.

The number of persons employed in Puerto Rico during Fiscal Year 2006 averaged 1,253,000, a 1.2% increase from 1,237,600 in Fiscal Year 2005. Unemployment, although at relatively low historical levels, is about twice the United States average. The average unemployment rate increased from 10.6% in Fiscal Year 2005 to 11.7% in Fiscal Year 2006.

The following table presents annual statistics of employment and unemployment for Fiscal Year 2002 through Fiscal Year 2006 and monthly statistics, seasonally adjusted, for the first nine months of Fiscal Year 2007. These employment figures are based on the Household Survey, which includes self-employed individuals, instead of the non-farm, the Payroll Survey, which does not. The number of self-employed individuals represents around 17% of civilian employment in Puerto Rico, more than double the level in the United States.

**Commonwealth of Puerto Rico**
**Employment and Unemployment[1]**
**(persons age 16 and over)**
**(in thousands)**

| Fiscal Years Ended June 30 | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2002 | 1,309 | 1,152 | 158 | 12.0% |
| 2003 | 1,352 | 1,188 | 164 | 12.1 |
| 2004 | 1,360 | 1,206 | 155 | 11.4 |
| 2005 | 1,385 | 1,238 | 147 | 10.6 |
| 2006 | 1,420 | 1,253 | 167 | 11.7 |
| **Fiscal Year 2007** | | (Seasonally Adjusted) | | |
| July | 1,392 | 1,234 | 158 | 11.4% |
| August | 1,399 | 1,252 | 146 | 10.5 |
| September | 1,417 | 1,262 | 155 | 10.9 |
| October | 1,407 | 1,274 | 134 | 9.5 |
| November | 1,411 | 1,270 | 141 | 10.0 |
| December | 1,409 | 1,257 | 152 | 10.8 |
| January | 1,431 | 1,287 | 144 | 10.0 |
| February | 1,459 | 1,289 | 170 | 11.6 |
| March | 1,428 | 1,290 | 138 | 9.6 |

(1)   Totals may not add due to rounding.
(2)   Unemployed as percentage of labor force.

*Source:*  Department of Labor and Human Resources – Household Survey

**Higher Education**

During the five decades from 1950 to 2000, Puerto Rico made significant advances in the field of education, particularly at the college and graduate school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher wage, higher technology industries became more prominent in Puerto Rico. More recently, employment in the services sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing proportion of college attendance by such population. During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, and the college-age population has declined since 2000.

The following table presents comparative trend data for Puerto Rico and the United States with respect to college-age population and the percentage of such population attending institutions of higher learning.

**Commonwealth of Puerto Rico**
**Trend in College Enrollment**

| | Commonwealth of Puerto Rico | | | | Mainland United States | | |
|---|---|---|---|---|---|---|---|
| Academic Year | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,105 | 32.7% | | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,147 | 37.4% | | 26,961,000[2] | 13,621,000 | 50.5% |
| 2000 | 428,892[2] | 176,015 | 41.0% | | 27,143,455[2] | 15,313,000 | 56.4% |
| 2001 | 426,194[3] | 185,015 | 43.4% | | 27,971,000[3] | 15,928,000 | 56.9% |
| 2002 | 423,852[3] | 190,776 | 45.0% | | 28,463,000[3] | 16,612,000 | 58.4% |
| 2003 | 420,295[3] | 199,842 | 47.5% | | 28,947,000[3] | 16,900,000 | 58.4% |
| 2004 | 416,020[3] | 207,074 | 49.8% | | 29,245,000[3] | 17,272,000 | 59.1% |
| 2005 | 411,580[3] | 208,032 | 50.5% | | 29,307,000[3] | 17,428,000 | 59.5% |

[1]  Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
[2]  Based on census population as of April 1 of the stated year.
[3]  Estimated population (reference date July 1 of the stated year).

*Sources:* United States Census Bureau (Mainland United States Population), United States National Center for Education Statistics, Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2005-2006 was approximately 63,973 students. The Commonwealth is legally bound to appropriate annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources for each of the two Fiscal Years immediately preceding the current Fiscal Year.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2005-2006 of approximately 145,574 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Enrollment at other postsecondary education programs, including technical and vocational programs, amounted to an additional 33,629 students at approximately 76 institutions. This figure represents enrollment at federal Title IV eligible, non-degree granting institutions reporting data to the National Center for Education Statistics (Integrated Postsecondary Education Data System).

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by USDE-recognized accrediting entities.

**Tax Incentives**

*Puerto Rico Tax Incentives*

One of the benefits enjoyed by the Commonwealth is that corporations operating in Puerto Rico (other than corporations organized in the United States with a local branch) and individuals residing in Puerto Rico generally are not subject to federal income taxes on income derived in Puerto Rico. This enables the Commonwealth to utilize local tax legislation as a tool for stimulating economic development, and it has done so for many years.

In order to enjoy the benefits provided by the 1998 Tax Incentives Act, a business must apply for such benefits prior to December 31, 2007. It has been proposed that new tax incentives legislation be enacted to replace the 1998 Tax Incentives Act and that pending the enactment of such legislation, the aforementioned deadline be extended for two years. There is no assurance that such legislation will be enacted before December 31, 2007 or that the deadline will be extended.

In this regard, the Commonwealth enacted legislation extending certain benefits of its most recent tax incentives law, Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to all eligible businesses operating under previous tax incentives laws. These benefits include a 200% deduction for research and development expenses and worker training expenses, the ability to deduct, as a current expense, investments in machinery and equipment, and the ability to claim a tax credit equal to 25% of the purchase price of a product manufactured in the Commonwealth (in excess of a base amount) or 35% of the purchase price of a locally-manufactured, recycled product.

The 1998 Tax Incentives Act was also amended to allow a credit against their Puerto Rico income tax liability for investors that acquire the majority of the stock, partnership interests or operational assets of an exempted business that is in the process of closing operations in Puerto Rico. A credit against Puerto Rico income tax liability is also provided to investors that contribute cash to such exempted business for the construction or improvement of its physical plant and the purchase of machinery and equipment. The amount of the credit is equal to 50% of the cash invested for such purposes, not to exceed $5,000,000 per exempted business. The credits are subject to approval by the Secretary of the Treasury, and the maximum amount of such credits for any Fiscal Year is $15,000,000.

In addition, legislation was enacted (i) amending the 1998 Tax Incentives Act to permit income tax rates lower than 2% for companies that establish operations in Puerto Rico in "core pioneer industries" which utilize innovative technology in their operations not used in Puerto Rico prior to January 1, 2000; (ii) granting tax credits with respect to eligible investments made in the construction or substantial rehabilitation of housing units to be rented to low income families; (iii) granting income tax exemption to financial institutions for the fees and interest income received in connection with loans or guarantees of loans made to finance tourism development projects; (iv) granting an exemption to qualified associations administering timesharing rights or vacation clubs and to owners' associations in areas designated as tourism enhancement districts; (v) granting tax exemption for investments in infrastructure made by housing developers; (vi) granting tax credits to Puerto Rico businesses that acquire products manufactured in Puerto Rico for exportation; and (vii) granting tax credits for rehabilitating urban centers through the development of housing projects, community areas, commercial areas, parks and recreational spaces, construction and renovation of structures, and the development of undeveloped or under-developed sites.

In December 2006, two laws were approved that provide additional tax incentives to foster economic development in Puerto Rico. Act No. 289 of December 26, 2006 amended the 1994 Puerto Rico tax code in order to facilitate the creation of local Real Estate Investment Trusts (REITs). A REIT is a corporation, usually publicly traded, that manages a portfolio of real estate to earn profits for shareholders. Under Act No. 289, a special tax rate of 10% applies to the income from this type of investment. The creation of REITs will encourage investment in residential, commercial and industrial properties and hotels, and will contribute to the development of a local capital market.

Act No. 287 of December 26, 2006 created a new financing conduit for PRIDCO-sponsored economic development activity, to be known as the Puerto Rico Investment Development Initiative. The interest paid on debt securities issued by companies operating under the Puerto Rico Industrial Incentives Act of 1998 is exempt from Puerto Rico income taxes for *bona fide* residents of Puerto Rico and local corporations. The proceeds of such debt can be used for general business purposes, such as raw materials and machinery acquisition, construction, general business expenses, intellectual property and research and development, among others, but 80% of the proceeds must be used within Puerto Rico by the benefited company.

Tax and other incentives have also been established to promote the development of the tourism industry. The Tourism Incentives Act of 1993 (the "Tourism Incentives Act"), provides partial exemptions from income, property, and municipal license taxes for a period of up to ten years. The Tourism Incentives Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. Recently enacted legislation provides further tourism incentives by granting certain tax exemptions on interest income received from permanent or interim financing of tourism development projects and fees derived from credit enhancements provided to the financing of such projects.

*Incentives under the U.S. Code*

United States corporations operating in Puerto Rico have been subject to special tax provisions since the Revenue Act of 1921. Recently, many United States corporations operating in Puerto Rico are organized as controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from numerous corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income. In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. CFCs are subject to a fifteen percent (15%) Puerto Rico withholding tax on royalty payments.

Recently, the United States Congress approved legislation that would extend the benefit of Section 199 of the U.S. Code to production activities that take place in Puerto Rico. Section 199 provides a three-point reduction in the federal income tax rate, phased in over five years (from 35% to 31.85% after 2009). This extension applies to the U.S. branch activities located on the island and are not controlled foreign corporations.

Exhibit B

[THIS PAGE INTENTIONALLY LEFT BLANK]

APPENDIX B

## SUMMARY OF CERTAIN DEFINITIONS AND PROVISIONS OF THE RESOLUTION

### Summary of Certain Definitions

The following terms shall have the following meanings in the Resolution and for all purposes of this Official Statement.

**Account** or **Accounts** shall mean any account or accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Accrued Payment Obligation** shall mean, for the purposes of transfer from the Revenue Account on each Revenue Account Monthly Disbursement Date, for the related Class of Bonds of a Series and related Parity Obligations or Subordinate Obligations of such Class, and as of any particular Revenue Account Monthly Disbursement Date, (i) the aggregate of the Principal Installments of such Bonds, and principal component of Parity Obligations or Subordinate Obligations, as applicable, due during the next ensuing twelve-month period, plus (ii) the aggregate of the interest due on such Bonds, and interest component of Parity Obligations or Subordinate Obligations, as applicable, due during the next ensuing twelve-month period and, for Adjustable Rate Bonds, based on the Assumed Interest Rate; provided, that in the case of clauses (i) and (ii) above for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than semi-annually, the amounts described in clauses (i) and (ii) hereof shall be the amounts due during the next ensuing fifteen-month period.  The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued Payment Obligation applicable to any particular Revenue Account Monthly Disbursement Date.

**Act** shall mean Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended and supplemented.

**Adjustable Rate** means a variable, adjustable or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; provided, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Contractual Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; provided further, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the Corporation and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the Corporation in the related Supplemental Resolution or any combination of the foregoing; and provided further, that the Adjustable Rate may never exceed any Contractual Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate (the "rate cap"), but the excess of interest on any Adjustable Rate Bond calculated at the rate (the "stated rate") set forth for such Adjustable Rate Bond (without the limitation of the rate cap) over interest on the Adjustable Rate Bond calculated at the rate cap shall constitute a debt of the Corporation owed to

the owner of the related Adjustable Rate Bond but solely during periods when the rate cap shall exceed the stated rate.

**Adjustable Rate Bond** means any Bond which bears an Adjustable Rate, provided that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be an Adjustable Rate Bond.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Article 5(e) Amount** shall mean, as described in the first sentence of Article 5(e) of the Act, any amount which represents an insufficiency of Pledged Sales Tax receipts to fully pay, when due, principal of and interest on Bonds or to make any other payment related to other obligations incurred hereunder, including payments pursuant to interest rate swap agreements, and also including any application of funds in any Debt Service Reserve Account made for the purpose of meeting any such insufficiency.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the Corporation under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the Corporation that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Contractual Maximum Interest Rate established therefor and the Legal Maximum Interest Rate.

**Authorized Officer** shall mean (i) in the case of the Corporation, the Executive Director and any Assistant Executive Director, and when used with reference to any act or document, any other person authorized by resolution of the Corporation to perform such act or sign such document (the Trustee may request that the Corporation deliver an officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Resolution), and (ii) in the case of the Trustee, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the Trustee located at the Corporate Trust Office, or such other address as the Trustee may designate from time to time by notice to the Corporation, who shall have direct responsibility for the administration of the Resolution, and for the purposes of the eleventh sentence of Section 802 of the Resolution shall also include any other officer of the Trustee to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds, all Series of Bonds issued simultaneously with the initial Series, and any additional Bonds authorized to be issued on a parity therewith pursuant to the Resolution.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the Corporation.

**Bond Year** shall mean a twelve-month period commencing on the first day of August in any calendar year and ending on the last day of July in the immediately succeeding calendar year.

**Business Day** shall mean any day other than (i) a Saturday or Sunday, (ii) a day on which the Corporation is authorized to close, or (iii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Trustee, any Credit Facility Provider (if applicable) or any Liquidity Facility Provider (if applicable) is located are authorized or required by law or executive order to remain closed, or (iii) during any period that a Qualified Hedge is applicable to the Bonds, a day on which commercial banks and foreign exchange markets are not open for business (including dealings in foreign exchange and foreign currency deposits) in the City of New York and do not settle payments.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Series Resolution and including all Convertible Capital Appreciation Bonds; provided, however, that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity (with respect to Convertible Capital Appreciation Bonds, on the related Current Interest Commencement Date rather than at maturity) or earlier redemption or acceleration of maturity in amounts determined by reference to the Compounded Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to the Resolution.

**Class** shall mean the delineation of Bonds by whether they are Senior Bonds or Subordinate Bonds (or more than one Class of Subordinate Bonds).

**Class Priority** shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds of lower payment priorities.

**Code** shall mean the Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Compounded Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Compounding Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compound amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; provided, that Compounded Amount on any day which is not a Compounding Date shall be determined on the assumption that the Compounded Amount accrues in equal daily amounts between Compounding Dates.

**Compounding Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Compounded Amount, as set forth in the related Series Resolution.

**Contractual Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at which such Bond may bear interest at any time; provided, that the Contractual Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporation** shall mean the Puerto Rico Sales Tax Financing Corporation, an independent governmental instrumentality of the Commonwealth of Puerto Rico, and its successors and permitted assigns, organized pursuant to the Act.

**Costs of Issuance** shall mean any item of expense directly or indirectly payable or reimbursable by the Corporation and related to the authorization, sale, or issuance of Bonds, including, but not limited to, capitalized interest, underwriting fees, underwriters' or original issue discount and fees and expenses of professional consultants and fiduciaries.

**Costs of Issuance Account** shall mean the Costs of Issuance Account established pursuant to the Resolution.

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys to pay, in the Currency in which the bonds of such Series are payable, the principal or Redemption Price of Bonds due in accordance with their terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the Corporation is in default under the Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the rating of any Bonds Outstanding; and provided further, that a substitute Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a rating of the related Bonds lower than those which then prevailed.

**Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any croup of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is payable semiannually (except for the initial and/or final interest rate periods) or more often.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the semiannual compounding of interest ceases and on and after such date interest is payable currently on the Compounded Amounts on the next ensuing interest payment dates.

**Debt Service Account** shall mean the Account by that name established by the Resolution.

**Debt Service Reserve Account** shall mean the Account by that name established by the Resolution.

**Debt Service Reserve Requirement** shall be determined as of the date of authentication and delivery of each Series of Bonds and from time to time thereafter as may be required or permitted by the Resolution and shall mean, as of any date of calculation, an amount equal to the aggregate of the Debt Service Reserve Requirements established in Series Resolutions for each Series of Bonds Outstanding.

**Dedicated Sales Tax** shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund created by Article 2 of the Act, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the Corporation's funds:

      (i)      Government Obligations;

      (ii)      Defeased Municipal Obligations;

      (iii)      any other investment designated in a Supplemental Resolution as a Defeasance Obligation for purposes of defeasing the Bonds authorized by such Supplemental Resolution or Bonds authorized thereafter; provided that each Rating Agency has confirmed in writing to the Trustee that the use of such other investment will not, by itself, result in the withdrawal, suspension or downgrade of any rating issued by such Rating Agency with respect to any such Bonds to be defeased;

      (iv)      an obligation of Fannie Mae, the Federal Home Loan Mortgage Corporation or any other government sponsored enterprise or federal agency or instrumentality rated in the highest Ratings Category by each Rating Agency, if and to the extent approved by the Corporation;

(v)    certificates, depository receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) through (iv) above or in any specific interest or principal payments due in respect thereof; provided, however, that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America or of any state or territory thereof or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of the United States of America; and provided further, however, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depository receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

(vi)    a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(i)    which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest rating category of any Rating Agency; or

(ii)    (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent, to pay principal and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Event of Default** shall have the meaning specified in the Resolution.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing Bonds, including, without limitation, redemption premiums and other costs of redemption.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

**Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the Corporation prior to the stated maturity thereof or for purchase thereof.

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

**Fund** or **Funds** shall mean the Repayment Project Fund and any fund or funds, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**GDB** shall mean Government Development Bank for Puerto Rico, and it successor and permitted assigns.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

**Interest Subaccount** shall mean the Interest Subaccount established in the Debt Service Account by the Resolution.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the Corporation's funds:

       (i)     Defeasance Obligations;

       (ii)    Defeased Municipal Obligations;

       (iii)   public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or any public agencies or municipalities which are rated in the highest rating category by a nationally recognized bond rating agency;

       (iv)   direct and general obligations of any state of the United States to the payment of the principal of and interest on which the full faith and credit of such state is pledged which are rated in either of the two highest rating categories by a nationally recognized bond rating agency;

       (v)    direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, Fannie Mae, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

       (vi)   prime commercial paper of a corporation incorporated under the laws of any state of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

(vii)    shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which is a money market fund, which has been rated "A" or better by Moody's, Standard & Poor's or Fitch or money market accounts of the Trustee or any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

(viii)    bank deposits evidenced by certificates of deposit issued by banks (which may include the Trustee) which are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to such bank deposits so secured, including interest;

(ix)    repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, provided that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to the account of the Trustee to be held therein during the term of the agreements;

(x)    investment agreements, secured or unsecured, with any institutions whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

(xi)    any other obligations conforming to the Corporation's guidelines for investment, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean, if and to the extent constituting an Ancillary Bond Facility, an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bond; provided, that the use of the Liquidity Facility shall not result, at the time of delivery of the Liquidity Facility, in a reduction in the rating of any Bonds Outstanding; and provided further that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is made, and (ii) will not, in and of itself, result in a rating of the related Bonds lower than those which then prevailed.

**Liquidity Facility Provider** shall mean the Person that has executed a Liquidity Facility with the Corporation, or otherwise has provided a Liquidity Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the stated maturity thereof.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Operating Cap** shall mean $200,000 in the Fiscal Year ending June 30, 2008 and, in each following Fiscal Year, the prior year's Operating Cap inflated by 2%.

**Operating Expenses** shall mean the reasonable operating and administrative expenses of the Corporation (including, without limitation, the cost of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, insurance premiums, deductibles and retention payments, and costs of meetings or other required activities of the Corporation), legal fees and expenses of the Corporation, fee and expenses incurred for professional consultants and fiduciaries, including the Trustee, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility. Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505.1 FIRST of the Resolution, a certificate of an Authorized Officer of the Corporation, stating that such amount constitutes "Operating Expense" as defined in the Resolution, shall be delivered to the Trustee.

**Opinion of Bond Counsel** shall mean an opinion signed by Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, or any other attorney or firm of attorneys of recognized standing in the field of law relating to municipal bonds selected by the Corporation and satisfactory to the Trustee.

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the Corporation) selected by the Corporation.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption by the Corporation prior to the stated maturity thereof or for purchase thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the date of original issuance, as set forth in the applicable Series Resolution.

**Outstanding**, when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of the Resolution, except:

(i)    any Bonds canceled by or surrendered for cancellation to the Trustee at or prior to such date;

(ii)    Bonds for the payment or redemption of which moneys or Defeasance Obligations equal to the principal amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or redemption date, shall be held by the Trustee in trust (whether at or prior to the maturity or redemption date), provided that if such Bonds are to be redeemed, notice of such redemption shall have been given as provided in Article IV or provision shall have been made for the giving of such notice, and provided further that if such notice is conditional, it is no longer subject to rescission;

(iii)    Bonds deemed to have been paid as provided in the Section of the Resolution relating to defeasance of Bonds;

(iv)    Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to the Resolution;

(v)    Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the Corporation or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

(vi)    as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

provided, however, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver, Bonds owned by the Corporation shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded.  Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes the pledgee's right so to act with respect to such Bonds and that the pledgee is not the Corporation.

In determining whether Owners of the requisite principal amount of Outstanding Bonds have given any requisite demand, authorization, direction, notice, consent or waiver hereunder, the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Compounded Amount thereof except as otherwise provided in the Resolution.

**Owner** or **Owner of Bonds** shall mean Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments by the Corporation under Qualified Hedges.  Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of any thereof.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments due from the Corporation to any Credit Facility Provider, as provided by Section 205 of the Resolution and set forth or provided for in any Supplemental Resolution.  Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

**Person** or **Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

      1.     All Revenues.

      2.     All right, title and interest of the Corporation in and to Revenues, and all rights to receive the same.

      3.     The Funds, Accounts (other than the Costs of Issuance Account, Bond Proceeds Account and Rebate Account) and Subaccounts (other than Subaccounts in the Costs of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held under the terms of the Resolution, subject to the application thereof as provided in the Resolution.

      4.     Any and all other rights and property of every kind and nature from time to time hereafter pledged by the Corporation to the Trustee as and for additional security for the Bonds and Parity Obligations.

      5.     Any an all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

**Pledged Sales Tax** shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and subparagraph (e) of Article 5 of the Act.

**Pledged Sales Tax Base Amount** means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Base Amount, subject to modifications made thereto after the date hereof, if any, by the Legislature of Puerto Rico.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Compounded Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in the Resolution) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Principal Subaccount** shall mean the Principal Subaccount established in the Debt Service Account by the Resolution.

**Qualified Hedge** shall mean, if and to the extent from time to time permitted by law, with respect to Bonds, (i) any financial arrangement (a) which is entered into by the Corporation with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap,

floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by the Corporation, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer of the Corporation and delivered to the Trustee, and (ii) any letter of credit, line of credit, policy of insurance, surety bond, guarantee or similar instrument securing the obligations of the Corporation under any financial arrangement described in clause (i) above; provided, that with respect to any variable rate Bonds that are to be covered by a Qualified Hedge constituting an interest rate exchange agreement, scheduled amounts payable by the Qualified Hedge Provider under such Qualified Hedge shall exactly match the scheduled interest payable on the Bonds covered by the Qualified Hedge, without "basis risk" and without allowance for adjustment thereto except to match any adjustment in the scheduled interest payable on such Bonds.

**Qualified Hedge Provider** means (i) each Series 2007 Qualified Hedge Provider, (ii) a Person whose long term obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability are rated, or whose payment obligations under an interest rate exchange agreement are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, at the time of the execution of such Qualified Hedge, either (a) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds, subject to such Qualified Hedge (without reference to bond insurance, if any), or (b) any such lower Rating Categories which each such Rating Agency indicates in writing to the Corporation and the Trustee will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the Corporation and the Trustee by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the Corporation.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating by a numerical modifier or otherwise.

**Rebate Account** shall mean the Account by that name established by the Resolution.

**Rebate Amount** shall mean with respect to the Bonds, the amount computed as described in the Tax Certificate.

**Record Date** shall mean, with respect to each payment of principal and premium of and interest on each Bond, the date specified as the "record date" therefor in the Supplemental Resolution authorizing such Bond.

**Redemption Account** shall mean the Account by that name established by the Resolution.

**Redemption Price** shall mean, when used with respect to a Bond (other than a Convertible Capital Appreciation Bond or a Capital Appreciation Bond), or a portion thereof to be

redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, payable upon redemption thereof, pursuant to the Resolution and the applicable Supplemental Resolution, but, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond, "Redemption Price" shall mean the Compounded Amount on the date of redemption of such Bond or portion thereof plus the applicable premium, if any.

**Refunding Bonds** shall mean all Bonds authenticated and delivered on original issuance pursuant to the Resolution or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to the Resolution and the applicable Series Resolution.

**Repayment Project** shall mean the repayment or refinancing or defeasance of all or any portion of the "extraconstitutional debt" of the Commonwealth outstanding as of June 30, 2006, as contemplated by the Act, and any similar repayment or refinancing program authorized by law which is to be supported by the Pledged Sales Tax.

**Reserve Account Cash Equivalent** shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Trustee as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to the Resolution. Each such arrangement shall be provided by a Person which has received a rating of its claims paying ability from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured long-term debt securities are rated by each Rating Agency at least equal to the then existing rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term at the time of acquisition not exceeding one year); provided, however, that a Reserve Account Cash Equivalent may be provided by a Person who has received a rating of its claims paying ability which is lower than that set forth above or whose unsecured long-term (or short-term) debt securities are rated lower than that set forth above, so long as the providing of such Reserve Account Cash Equivalent does not, as of the date it is provided, in and of itself, result in the reduction or withdrawal of the then existing rating assigned to any of the Bonds by any of the Rating Agencies.

**Resolution** shall mean the Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

**Revenue Account** shall mean the Account by that name established by the Resolution.

**Revenue Account Monthly Disbursement Date** shall mean the last Business Day of each calendar month.

**Revenues** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

1.    All Pledged Sales Tax received by the Corporation or the Trustee.

2.    With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for purposes of the additional Bonds test or other purposes of the Resolution.

3.    Any amounts received by the Corporation pursuant to a Qualified Hedge after giving effect to any netting of amounts payable by the parties thereunder.

4.    Income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Costs of Issuance Account, Bond Proceeds Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account, Bond Proceeds Account or Rebate Account) held by the Trustee under the terms of the Resolution.

5.    Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account or Rebate Account) held by the Trustee under the terms of the Resolution, including any available funds not constituting Pledged Sales Tax appropriated by the Legislature of Puerto Rico for the purposes stated in subparagraph (a) of Article 5 of the Act and the second sentence of subparagraph (e) of Article 5 of the Act, subject to the provisions of Sections 1201 and 1203 of the Resolution.

**Security Agreement** means the Security Agreement dated as of July 31, 2007 between the Corporation and the Trustee.

**Senior Bonds** means the Series 2007 Bonds of the Series designated as "Series 2007A" and "Series 2007B," and any Bonds of a Class the priority of payment of which under the Resolution is equal with that of the Series 2007A Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installments.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance identified pursuant to the Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to the Resolution, regardless of variations in maturities, principal amount, interest rate or other provisions.

**Series 2007 Bonds** shall mean the Corporation's Sales Tax Revenue Bonds, Series 2007A and Series 2007B, the initial Series of Bonds to be issued under the Resolution.

**Series 2007 Qualified Hedge Provider** shall mean the Qualified Hedge Provider or Providers named in the Series Resolution applicable to the Series 2007 Bonds.

**Series Resolution** shall mean a Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds pursuant to Section 202(2) of the Resolution.

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Compounded Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

**Standby Purchase Agreement** means, if and to the extent constituting an Ancillary Bond Facility, an agreement by and between the Corporation and another person pursuant to which such person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, established or created pursuant to the Resolution, including but not limited to any subaccount of a subaccount, that does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Subordinate Bonds** shall mean Bonds of a Series, and consisting of one or more Classes, the priority of payment of which under the Resolution is subordinate to payment of the Senior Bonds (and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds).

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Series Resolution, payment obligations to Persons of the type that otherwise would be classified under the Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Series Resolutions, to subordination to Parity Obligations under the Resolution on the terms and conditions set forth in such Series Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of the Resolution or any Supplemental Resolution, adopted by the Corporation in accordance with the Resolution.

**Taxable Bonds** shall mean Bonds of a Series which are not Tax Exempt Bonds.

**Tax Certificate** shall mean the document executed by the Corporation with respect to each Series of Bonds containing representations and certifications to support the exclusion of the interest on such Bonds under the Code.

**Tax Exempt Bonds** shall mean Bonds of a Series the interest on which, in the opinion of Bond Counsel, on the date of original issuance thereof, is excluded from gross income for federal income tax purposes.

**Term Bonds** shall mean Bonds having a single stated maturity date for which Sinking Fund Installments are specified in a Supplemental Resolution.

**Trustee** shall mean the bank, trust company or national banking association appointed pursuant to the Resolution to act as trustee hereunder, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

## Summary of Certain Provisions of the Resolution

*The following is a general summary of certain provisions of the Resolution as presently in effect. The summary does not purport to be comprehensive or definitive and is subject to all of the terms and provisions of the Resolution, to which reference is hereby made.*

**Resolution to Constitute Contract (Section 103)**

The Resolution shall be deemed to be and shall constitute a contract between the Corporation, the Owners from time to time of the Bonds and the Credit Facility Providers; and the pledge made in the Resolution and the covenants and agreements therein set forth to be performed on behalf of the Corporation shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and the Credit Facility Providers, all of which, regardless of the time or times of their authentication and delivery or maturity, shall be of equal rank without preference, priority or distinction of any of the Bonds and Credit Facility Providers over any other thereof, except as expressly provided in or permitted by the Resolution.

**Authorization of Bonds (Section 201)**

The Resolution creates, in the manner and to the extent provided therein, a continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to the Resolution. The Bonds shall be special obligations of the Corporation payable from the Pledged Property without recourse against other assets of the Corporation. The Commonwealth shall not be liable on the Bonds. No Bond shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond be payable out of any funds or assets other than the Dedicated Sales Tax Fund and other funds and assets of or available to the Corporation and pledged therefor.

**Special Provisions for Refunding Bonds (Section 203)**

Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of the Resolution, for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid corporate purpose of the Corporation. Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

The Refunding Bonds of such Series shall be authenticated and delivered by the Trustee upon receipt by the Trustee (in addition to the general provisions set forth in the Resolution for the issuance of Bonds) of:

        (i)     irrevocable instructions to the Trustee to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

        (ii)    if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication,

irrevocable instructions to the Trustee, to provide notice in the manner provided in the Section entitled "Defeasance" below with respect to the payment of such Bonds pursuant to such Section;

(iii)    either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of the second paragraph of the Section entitled "Defeasance," which moneys and Defeasance Securities shall be held in trust and used only as provided in said paragraph.

(iv)    a certificate of an independent certified public accountant, or other nationally recognized verification agent, that the amounts described in paragraph (iii) above are sufficient to pay or redeem all of the Bonds to be refunded;

Refunding Bonds may be issued upon compliance with the Section entitled "Issuance of Additional Bonds," below, in lieu of compliance with the second paragraph of this Section.

**Credit and Liquidity Facilities; Rights of Credit Facility Providers (Section 205)**

In connection with any Bonds, the Corporation may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of the Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

Any Supplemental Resolution may provide that (i) so long as a Credit Facility providing security is in full force and effect, and payment on the Credit Facility is not in default and the Credit Facility Provider is qualified to do business in the Commonwealth, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under the Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by the Section entitled "Powers of Amendment" below and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of the Section entitled "Powers of Amendment," and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid under the provisions of a Credit Facility, all covenants, agreements and other obligations of the Corporation to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such Owners in accordance with the terms of such Credit Facility.

**Qualified Hedges (Section 206)**

The Corporation may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, provided such Bonds have been authorized by the Corporation and payments by the Corporation under the Qualified Hedges do not commence until the date such Bonds are expected to be issued or (iii) after the issuance of such Bonds.

**Privilege of Redemption and Redemption Price (Section 401)**

Bonds subject to redemption prior to maturity pursuant to a Supplemental Resolution shall be redeemable, upon notice as provided in the Resolution, at such times, at such Redemption Prices, in such Currencies and upon such terms in addition to and consistent with the terms contained in the Resolution as may be specified in the Supplemental Resolution authorizing such Series.

**Redemption at the Election of the Corporation (Section 402)**

In the case of any redemption of Bonds otherwise than as provided in the Section entitled "Redemption out of Sinking Fund Installments" below, the Corporation shall give written notice to the Trustee of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the Corporation and the Trustee shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed which principal amount (or Compounded Amount, if applicable) shall be determined by the Corporation in its sole discretion subject to any limitations with respect thereto contained in any Supplemental Resolution and of the moneys to be applied to the payment of the Redemption Price. Such notice shall be given at least thirty (30) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee. In the event notice of redemption shall have been given as provided in the Resolution, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Trustee of moneys sufficient to pay the Redemption Price in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event as shall be stated in such notice, the Corporation shall, prior to the redemption date, pay or cause to be paid to the Trustee an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds to be redeemed.

**Redemption out of Sinking Fund Installments (Section 403)**

In addition to the redemption of Bonds pursuant to the Sections entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation" above, Term Bonds issued pursuant to the Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Compounded Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

In the case of any redemption of Bonds out of Sinking Fund Installments, the Corporation shall, in the case of each Sinking Fund Installment, give written notice to the Trustee of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in the Section entitled "Satisfaction of Sinking Fund Installments" and (iii) the particular Series and maturity of the Bonds to be redeemed from such Sinking Fund Installment. Such notice shall be given at least forty (40) days prior to the date of such Sinking Fund Installment, or such shorter period as shall be acceptable to the Trustee.

The Corporation shall, and covenants that it will, prior to the date of such Sinking Fund Installment, pay to the Trustee an amount in cash which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem at the date of such Sinking Fund Installment, at

the Redemption Price thereof, plus interest accrued and unpaid to the date of the Sinking Fund Installment, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

**Selection of Bonds to be Redeemed in Partial Redemption (Section 404)**

In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to the Section entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation," the Corporation shall designate the maturities of the Bonds to be redeemed.

If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, except to the extent the related Series Resolution shall require that Bonds of such Series and maturity are to be redeemed on a pro rata basis, the Trustee shall assign to each such Outstanding Bond a distinctive number for each amount representing the lowest authorized denomination of the principal amount of such Bond and shall select by lot, using such method of lottery selection as it shall deem proper in its discretion, as many numbers as shall equal the principal amount (or Compounded Amount, if applicable) of such Bonds to be redeemed.  For purposes of this Section, Bonds or portions thereof which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

**The Pledge (Section 501)**

The Pledged Property, subject to the Section of the Resolution relating to compensating and indemnifying the Trustee, is pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges to the extent provided by a Supplemental Resolution, in each case in accordance with their terms and the provisions of the Resolution and subject to the provisions of the Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in the Resolution and in each case subject to the provisions regarding priority of payment as between Classes of Senior Bonds and Subordinate Bonds.  Nothing contained in the Resolution shall prevent (i) a Credit Facility, Liquidity Facility, or Qualified Hedge from being provided with respect to any particular Bonds and not others, (ii) different reserves being provided pursuant to the Resolution with respect to Bonds than are provided for Parity Obligations or with respect to particular Bonds than are provided for other Bonds, or (iii) different reserves being provided with respect to particular Parity Obligations than are provided for other Parity Obligations.

To the fullest extent provided by the Act and other applicable law, the pledge provided by the preceding paragraph shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Corporation, irrespective of whether such parties have notice thereof.  Notwithstanding the foregoing, the Trustee and the Corporation shall execute the Security Agreement and the Corporation shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

**Establishment of Fund and Accounts (Section 502)**

Pursuant to the Resolution, the "Repayment Project Fund" is created and the following special Accounts and Subaccounts are created and established within the Repayment Project Fund, each of which shall have as a prefix "COFINA" and shall be held by the Trustee:

Upon written direction from the Corporation to establish such an account, a Costs of Issuance Account,

Capitalized Interest Account,

Bond Proceeds Account,

Revenue Account,

Debt Service Account, which shall contain therein a Principal Subaccount and an Interest Subaccount, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Debt Service Reserve Account, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Redemption Account, and

Rebate Account, which shall contain therein a Subaccount for each Series of Bonds or for more than one Series of Bonds that are treated as a single issue of bonds under the Code as specified in the applicable Tax Certificate.

The Corporation may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

Amounts held by the Corporation or by the Trustee at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate accounts and subaccounts of the Corporation and shall be applied only in accordance with the provisions of the Resolution and the Act.

**Costs of Issuance Account and Capitalized Interest Account (Section 503)**

If the Corporation shall have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, there shall be deposited in the Costs of Issuance Account amounts, if any, determined to be deposited therein pursuant to a Supplemental Resolution containing the information required to be set forth by the Resolution.  If the Corporation shall not have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, such amounts if any, determined to be disbursed for Costs of Issuance pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds shall be disbursed upon issuance of a Series of Bonds to such Person as directed in writing to the Trustee by the Corporation.

There shall be deposited in the Capitalized Interest Account amounts, if any, determined to be deposited therein pursuant to the requirements of a Supplemental Resolution containing the information required to be set forth by the Resolution and authorizing the issuance of a Series of Bonds.

If amounts are on deposit in the Capitalized Interest Account or any Subaccount thereof, such amounts shall be transferred to the Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment Date in accordance with the requirements of the

Supplemental Resolution or Supplemental Resolutions authorizing such deposits to be made and providing for the application of such deposits.

Amounts on deposit in the Costs of Issuance Account or any Subaccount thereof, shall be applied to the payment of Costs of Issuance of Bonds, but only upon written certification by an Authorized Officer of the Corporation:

(i)    setting forth the amount to be paid, the person or persons to whom such payment is to be made (which may be or include the Corporation) and, in reasonable detail, the purpose of such withdrawal; and

(ii)    stating that the amount to be withdrawn from the Costs of Issuance Account or any Subaccount thereof is a proper charge thereon and that such charge has not been the basis of any previous withdrawal.

Any amounts on deposit (i) in the Costs of Issuance Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay Costs of Issuance of a Series of Bonds, and (ii) in the Capitalized Interest Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay interest on a Series of Bonds, shall be deposited as provided for in the immediately succeeding paragraph of this Section.

The Trustee shall deposit any funds described in the preceding paragraph in (i) the Bond Proceeds Account, (ii) the Revenue Account and/or (iii) the Redemption Account, in each case as shall be directed in writing by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that prior to any deposit to the Revenue Account or the Redemption Account the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted to be made pursuant to the Resolution and that such deposit will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

In the event of the refunding of any Bonds, the Corporation may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction specified in subsection 6 of this Section 503 of the Resolution; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Bond Proceeds Account (Section 504)**

There shall be deposited in the Bond Proceeds Account any amounts which are required to be deposited therein pursuant to the Resolution, any Supplemental Resolution and any other amounts available therefor and determined by the Corporation to be deposited therein from time to time. Amounts in the Bond Proceeds Account shall be invested as directed in writing by the Corporation to the Trustee.

Except as otherwise provided in the applicable Supplemental Resolution, amounts deposited in the Bond Proceeds Account from the proceeds of sale of a Series of Bonds shall be applied (a) to pay, or reimburse the Commonwealth or any agency, instrumentality or public benefit corporation thereof, including the Corporation, for the prior payment by any such entity for, costs of the Repayment Project, and (b) for any Costs of Issuance of such Bonds the payment of which has not otherwise been provided for.

The Trustee shall apply amounts on deposit in the Bond Proceeds Account at any time for the purpose of making payments pursuant to this Section, but only upon certification by an Authorized Officer of the Corporation:

(i)    setting forth the amount to be paid, the person or persons to whom such payment is to be made and, in reasonable detail, the purpose of such withdrawal; and

(ii)    stating that the amount to be withdrawn from the Bond Proceeds Account is a proper charge thereon, and that such charge has not been the basis of any previous withdrawal.

Any amount remaining in the Bond Proceeds Account and not set aside by the Corporation for application in accordance with the applicable Supplemental Resolution shall be deposited in (i) the Revenue Account and/or (ii) the Redemption Account, in each case as may be directed by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted by the Resolution and will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

**Revenue Account (Section 505)**

All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST: to the payment of (i) regularly scheduled fees of the Trustee and (ii) upon requisition in writing by the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND: to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount and the Interest Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts shall equal the Accrued Payment Obligation related to all Senior Bonds and Parity Obligations;

THIRD: to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

FOURTH: to each Debt Service Account established for the Subordinate Bonds and Subordinate Obligations, in order of Class Priority, allocated on a pro rata basis between the Principal Subaccount and the Interest Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts shall equal the Accrued Payment Obligation related to all Subordinate Bonds and Subordinate Obligations;

FIFTH: to any Debt Service Reserve Accounts established for Subordinate Bonds, in order of Class Priority, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirements for such Subordinate Bonds;

SIXTH: the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued Payment Obligation for all Senior Bonds, Subordinate Bonds, Parity Obligations and Subordinate Obligations for the ensuing twelve-month period (fifteen-month period for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than semi-annually) shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND and FOURTH above, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND AND FOURTH above, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then (y) for any of the purposes described in below, and then (z) for release to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, or (iii) may be used for (I) the payment or reimbursement of Financing Costs and for the payment of Operating Expenses in excess of the Operating Cap, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1 of the Resolution or (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Owners of Bonds. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

**Debt Service Account (Section 506)**

There shall be transferred from the Revenue Account and deposited into the Interest Subaccount and the Principal Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs SECOND and FOURTH under "Revenue Account" above.

There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

(i)    Such amount determined by the applicable Series Resolution representing accrued interest received upon the sale of a Series of Bonds.

(ii)    Amounts transferred from the Capitalized Interest Account for the payment of interest on the Bonds of such Series.

(iii)    Amounts transferred from the Debt Service Reserve Account for the payment of interest on the Bonds and the interest component of Parity Obligations.

There also shall be deposited into the Principal Subaccount of a Debt Service Account, if necessary, the following:

(i)    Amounts transferred from the Debt Service Reserve Account for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations.

(ii)    Amounts transferred from the Redemption Account for the payment of Principal Installments of any Bonds.

The Trustee shall pay out of the Interest Subaccount, to the Persons entitled thereto, (i) the interest on Bonds as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the interest component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Interest Account pursuant to clause (i) or (ii) of the second paragraph of this Section shall not be used to pay the interest component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Party Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

The Trustee shall pay out of the Principal Account, to the Persons entitled thereto, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the principal component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Principal Account pursuant to clause (ii) of the third paragraph of this Section shall not be used to pay the principal component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation delivered to the Trustee, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Debt Service Reserve Account (Section 507)**

At the time any Series of Bonds is delivered pursuant to the Resolution, the Corporation shall pay into a Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal

the Debt Service Reserve Requirement applicable to Bonds of such Series and Class, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Series of Bonds.

Except as otherwise provided by Supplemental Resolutions, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds are not available therefor pursuant to the Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer to the Debt Service Account or the Redemption Account, as applicable.

Whenever the amount in a Debt Service Reserve Account exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Trustee shall, if so directed in writing by an Authorized Officer of the Corporation, withdraw from such Debt Service Reserve Account the amount of any excess therein over the Debt Service Reserve Requirement as of the date of such withdrawal and deposit the moneys so withdrawn into the Revenue Account.

Moneys in a Debt Service Reserve Account may and, at the written direction of an Authorized Officer of the Corporation, shall be withdrawn from the Debt Service Reserve Account by the Trustee and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, provided that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement.  In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such amounts in accordance with such direction; provided, however, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

If a deficiency exists in a Debt Service Reserve Account, no later than the last Business Day of each calendar month the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Revenue Account, in accordance with the priorities set forth in of Section 505.1, and deposit in the Debt Service Reserve Account the amount, if any, required for the amount on deposit in the Debt Service Reserve Account to equal the related Debt Service Reserve Requirement as of the last day of such calendar month, after giving effect to any Reserve Account Cash Equivalent.  Upon any withdrawal of amounts from the Debt Service Reserve Account, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget.  Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds for reimbursement of such withdrawal from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required under Article 3(a) of the Act.

Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts.  Prior to said transfer, all

B-25

investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

Reserve Account Cash Equivalents may be deposited in the Debt Service Reserve Account as provided in this paragraph. In lieu of any required transfers of moneys to the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any. In lieu of retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to the third paragraph of this Section. Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account. If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the Corporation shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account funds in the amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section. In the event that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the Corporation shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient funds, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section.

Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied to reimburse the Credit Facility Provider for the amounts so obtained.

**Satisfaction of Sinking Fund Installments (Section 508)**

Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the Corporation, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Trustee prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows: (i) to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Trustee shall determine; or (ii) to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

Upon the purchase or redemption of any Bond pursuant to the preceding paragraph, an amount equal to the principal amount (or Compounded Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer

of the Corporation at the time of such purchase or redemption. Concurrently with the delivery of such Bonds, the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In satisfaction, in whole or in part, of any Sinking Fund Installment, the Corporation may deliver to the Trustee at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment. All Bonds so delivered to the Trustee in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Compounded Amount, if applicable) of such Bonds. Concurrently with such delivery of such Bonds the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, there shall be credited the principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; provided, however, that the Corporation shall have delivered to the Trustee, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

The Trustee shall, upon receipt of the notice specified by the Section entitled "Redemption out of Sinking Fund Installments" above and in the manner provided in the Resolution, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Compounded Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment. The Trustee shall redeem such Bonds with moneys as set forth in the Section entitled "Redemption out of Sinking Fund Installments" above.

**Redemption Account; Amounts to be Deposited Therein (Section 509)**

The following, upon receipt thereof, shall be deposited into the Redemption Account:

(i)    amounts determined pursuant to the sixth paragraph of the Section entitled "Costs of Issuance Account and Capitalized Interest Account" above;

(ii)    amounts determined pursuant to the fourth paragraph of the Section entitled "Bond Proceeds Account" above;

(iii)    amounts determined pursuant to the second paragraph of the Section entitled "Revenue Account" above; and

(iv)    amounts transferred from the Debt Service Reserve Account for the payment of the Redemption Price of Bonds.

Subject to the limitations contained in the final paragraph of this Section, if, on the last Business Day preceding any interest payment date for Bonds, Principal Installment due date for Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Debt Service Account shall be less than the interest on Bonds due on such interest payment date, the Principal Installment for Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on the due date thereof, and after giving effect to any amounts available therefor in the Debt Service Reserve Account, then the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Redemption Account to the Debt Service Account an amount (or all of the moneys in the Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Debt Service Account.

To the extent not required to make up a deficiency as required in the second paragraph of this Section, amounts in the Redemption Account shall be applied by the Trustee, as promptly as practicable after delivery to it of written instructions from an Authorized Officer of the Corporation, to the purchase or redemption (including the payment of redemption premium, if any) of Bonds.  Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the Corporation from moneys held in the Revenue Account pursuant to the second paragraph of the Section entitled "Revenue Account" above.

The transfers required by the second paragraph of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to the Resolution, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

**Rebate Account (Section 510)**

The Rebate Account and the amounts deposited therein shall not be subject to a security interest, pledge, assignment, lien or charge in favor of the Trustee, any Owner of any Bond, any other Beneficiary or any other Person.

The Trustee shall deposit in the Rebate Account such amounts and at such times as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall withdraw from the Rebate Account such amounts and at such times, and deposit such amounts in the Revenue Account, as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall have no responsibility or liability for the calculation of amounts required to be deposited in the Rebate Account under federal tax law.

**Investment of Funds, Accounts and Subaccounts Held by the Trustee (Section 602)**

Moneys in any Fund, Account or Subaccount held by the Trustee shall be continuously invested and reinvested or deposited and redeposited by the Trustee upon the written direction of an Authorized Officer of the Corporation. The Corporation shall direct the Trustee to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Trustee in Investment Obligations so that the maturity date or date of redemption at the option of the holders shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended. The Investment Obligations purchased by the Trustee shall be held by it, or for its account as Trustee. The Trustee, at the written direction of the Corporation as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount. The Trustee shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated by the Resolution except upon the written direction of an Authorized Officer of the Corporation as to specific investments. The Trustee shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the Corporation and except that the Trustee shall invest such money as required pursuant to written direction of an Authorized Officer of the Corporation) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the Corporation) incurred on the sale of such investments. The Trustee shall advise the Corporation in writing on or before the 20th day of each calendar month of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Moneys in any Fund, Account or Subaccount held by the Corporation shall be invested in Investment Obligations as determined by the Corporation.

Investment Obligations purchased under the provisions of the Resolution as an investment of moneys in any Fund, Account or Subaccount, whether held by the Trustee or the Corporation, shall be deemed at all times to be a part of such Fund, Account or Subaccount but, unless otherwise expressly provided in the Resolution or any Supplemental Resolution, (i) the income or interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) due to the investment thereof shall be deposited, upon written direction from an Authorized Officer of the Corporation to the Trustee, in the Rebate Account and if not required to be so deposited in the Rebate Account, because no such written direction was received, shall be deposited in the Bond Proceeds Account so long as there are moneys on deposit in the Capitalized Interest Account and, at any time that there are no moneys on deposit in the Capitalized Interest Account, shall be transferred for deposit in the Revenue Account, and (ii) all such income and interest received from any Investment Obligation on deposit in the Rebate Account shall remain in such Account. The Trustee shall keep a record of all such amounts deposited in the Revenue Account to indicate the source of the income or earnings.

The Trustee shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to the Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the Corporation to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another. The Trustee shall advise the Corporation in writing, on or before the twentieth day of each calendar month, of all investments held for the credit of each Fund,

Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Nothing in the Resolution shall prevent any Investment Obligations acquired as investments of or security for Funds, Accounts or Subaccounts held under the Resolution from being issued or held in book-entry form on the books of the Corporation of the Treasury of the United States or any national securities depository.

In the event that the Trustee has not, prior to 11:00 a.m. on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Trustee shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the Corporation.

**Particular Covenants of the Corporation**

*Payment of Obligations (Section 701)*

The Corporation shall duly and punctually pay or cause to be paid the principal and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, at the date(s) and place(s) and in the manner mentioned in the Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201. If, at the end of any Fiscal Year, the amount of Pledged Sales Tax received by the Trustee during such Fiscal Year shall be less than the Article 5(e) Amount applicable to such Fiscal Year, the Corporation shall take such actions as necessary to invoke the provisions of Section 5(e) of the Act to increase the amount of Pledged Sales Tax to cover such insufficiency in the next ensuing Fiscal Year. In addition, if the amount of Pledged Sales Tax applicable to a Fiscal Year shall be less than the Pledged Sales Tax Base Amount for such Fiscal Year, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Such notice shall include the instruction to the Secretary of the Treasury to provide available funds to make up the shortfall, and to the Director of the Office of Management and Budget to include in the recommended budget for the current Fiscal Year or the next Fiscal Year the appropriations necessary to cover such shortfall, in each case as provided in paragraph (a) of Article 45 of the Act and the second sentence of paragraph (e) of Article 5 of the Act.

*Further Assurance (Section 704)*

At any and all times the Corporation shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other moneys, securities and funds pledged or assigned by the Resolution, or intended so to be, or which the Corporation may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

*Agreement of the Commonwealth (Section 706)*

Pursuant to the Act, the Corporation includes in the Resolution, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that it will not limit or restrain the rights or powers conferred by the Act or the right of the Corporation to meet its agreements with Bondowners, until the Bonds, irrespective of their maturity, together with the interest on the same, are

completely paid and redeemed and that no amendment to the Act shall undermine any obligation or commitment of the Corporation.

*Creation of Liens (Section 707)*

Until the pledge created by Resolution shall be discharged and satisfied as provided in the Section entitled "Defeasance" below, the Corporation shall not (i) issue any bonds or other evidences of indebtedness secured by a pledge of the Pledged Property held or set aside by the Corporation or by the Trustee under the Resolution, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by the Resolution, (ii) at any time when the Corporation is in default in making any payment required to be made under the Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by the Resolution, set apart or appropriate and pay any amount in any Fund, Account or Subaccount except as required by the Resolution, nor (iii) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by a pledge of any revenues, rates, fees, charges, rentals or other earned income or receipts, as derived in cash by or for the account of the Corporation, pledged under the Resolution. The Corporation may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds. The Corporation, in its discretion, may determine to execute and deliver Subordinate Bonds and incur Subordinate Obligations of one or more Classes and payment priorities which are subordinate to the payment priorities accorded to the Senior Bonds under the Resolution.

*Accounts and Reports (Section 708)*

The Corporation shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under the Resolution, and which, together with all books and papers of the Corporation relating to the Repayment Project, shall at all reasonable times during normal business hours be subject to the inspection of the Trustee and the Owners of an aggregate of not less than 25% in principal amount of the Bonds then Outstanding or their representatives duly authorized in writing (it being understood that the Trustee shall have to duty to inspect).

The Corporation shall file with the Trustee and each Credit Facility Provider, Liquidity Facility Provider and Qualified Hedge Provider forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, a certificate signed by an Authorized Officer of the Corporation specifying any Event of Default or other event as described in this paragraph, and specifying the nature and status of such Event of Default or other such event.

*Tax Matters (Section 709)*

The covenants of this Section are made solely for the benefit of the Owners of, and shall be applicable solely to, all Bonds except Bonds to which the Corporation determines in a Supplemental Resolution that this Section shall not apply.

The Corporation will not make, or give its consent to the Trustee or any other Person to make, any use of the proceeds of the Bonds or of any moneys which may be deemed to be the proceeds of the Bonds pursuant to Section 148 of the Code which, if reasonably expected to have been so used on the date of issuance of the Bonds would have caused any of the Bonds to have been "arbitrage bonds" within the meaning of said Section 148 and the regulations in effect thereunder at the time of such use and applicable to obligations issued on the date of issuance of the Bonds.

The Corporation shall at all times do and perform all acts and things necessary or desirable and within its power in order to assure that interest paid on the Bonds shall be excluded from gross income for Federal income tax purposes.

Notwithstanding any other provision of the Resolution, including in particular the Section entitled "Defeasance" below, the obligation to comply with the requirements of this Section shall survive the defeasance or payment in full of the Bonds.

*Issuance of Additional Bonds; Incurrence of Additional Parity Obligations and Subordinate Obligations; Payment of Obligations (Section 710)*

No Series of Bonds in addition to the Series 2007 Bonds may be issued without compliance with Section 202 and no Series of Senior Bonds may be issued in addition to the Series 2007 Bonds, and no Parity Obligations in addition to Parity Obligations incurred on the date of issuance of the Series 2007 Bonds may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting:

A.    (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued Payment Obligation due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in such Fiscal Year, (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the four percent (4%) minimum adjustment thereto provided in the Act and applicable to each Fiscal Year beginning July 1, 2008, and (iv) the Accrued Payment Obligation that will be due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in each subsequent Fiscal Year, and showing that the amount in clause (i) at least equals the amount in clause (ii) and the amount for each subsequent Fiscal Year in clause (iii) at least equals the amount for such Fiscal Year in clause (iv).

B.    (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by 4%, and (ii) the total Accrued Payment Obligation scheduled for all Outstanding Senior Bonds and amounts due on all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year, and showing, for each such Fiscal Year, that the related amount shown in (B)(i) is at least 3 times the related amount shown in (B)(ii).

In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of the Act and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated

Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of the Act. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

The Corporation may issue Subordinate Bonds or incur Subordinate Obligations at any time subject to the requirements of the related Series Resolution and without compliance with the requirements of the Resolution.

*General (Section 711)*

The Corporation shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Corporation under the provisions of the Act and the Resolution.

Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the Corporation, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

**Responsibilities of Trustee (Section 802)**

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Resolution, and no implied covenants or obligations shall be read into the Resolution against the Trustee. The recitals of fact herein and in the Bonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of the Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by the Resolution or any Supplemental Resolution, and the Trustee shall incur no liability in respect thereof. The Trustee makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the Corporation therein, the security provided thereby or by the Resolution, the feasibility of the Repayment Project, the compliance by the Repayment Project with the Act, or the tax-exempt status of Bonds. The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Trustee shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the Corporation. The Trustee shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by the Resolution, whether or not impaired by operation of law. No provision of the Resolution shall be deemed to impose any duty or obligation on the Trustee to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Trustee shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Trustee shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by the Resolution at the request or direction of any of the Owners pursuant to the Resolution, unless such Owners shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Trustee to take actions enumerated in the Resolution shall not be construed as a duty. The Trustee shall not be liable in connection with the performance of its duties under the

Resolution except for its own gross negligence or willful misconduct. The Trustee shall not be liable for any error of judgment made in good faith by an Authorized Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts. The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee under the Resolution. The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Resolution. Anything in the Resolution notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of the Resolution relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of the Resolution.

**Evidence on Which Trustee May Act (Section 803)**

The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Trustee may consult with counsel, who may or may not be of counsel to the Corporation, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under the Resolution in the absence of bad faith and in reliance thereon; provided, however, that such opinion of counsel shall not relieve the Trustee from obtaining an Opinion of Bond Counsel when and if required under the Resolution.

Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under the Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the Corporation, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of the Resolution in reliance thereon.

Except as otherwise expressly provided in the Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the Corporation to the Trustee shall be sufficiently evidenced if executed in the name of the Corporation by an Authorized Officer of the Corporation.

**Compensation and Indemnification (Section 804)**

The Corporation shall pay to the Trustee from time to time reasonable compensation for all services rendered under the Resolution (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution. The Corporation further agrees to indemnify and save the Trustee harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of

defending itself against any claim (whether asserted by the Corporation or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct.  In addition to, but without prejudice to its other rights under the Resolution, when the Trustee incurs expenses or renders services in connection with an a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law.  "Trustee" for purposes of Section 804 of the Resolution shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder.  The obligations of the Corporation and the lien provided for under the Resolution shall survive the satisfaction and discharge of the Bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee.  The Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution.

**Certain Permitted Acts (Section 805)**

The Trustee may become the owner of any Bonds, with the same rights it would have if it were not the Trustee.  To the extent permitted by law, the Trustee may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or the Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding.

**Resignation of Trustee (Section 806)**

The Trustee may at any time resign and be discharged of the duties and obligations created by the Resolution by giving not less than 30 days' written notice to the Corporation (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the Corporation or the Bondowners as provided in the Section entitled "Appointment of Successor Trustee" below, in which event such resignation shall take effect immediately on the appointment of such successor.

**Removal of Trustee (Section 807)**

The Trustee may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to the Trustee, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the Corporation, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Trustee and signed by an Authorized Officer of the Corporation; provided, however, that in each case that a successor Trustee shall be simultaneously appointed with the filing of such instrument.

**Appointment of Successor Trustee (Section 808)**

In case at any time the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor may be appointed by the Owners of a majority in principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the Corporation, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Trustee, notification thereof being given to the Corporation and the predecessor Trustee; provided, nevertheless, that unless a successor Trustee shall have been appointed by the Bondowners as aforesaid, the Corporation by a duly executed written instrument signed by an Authorized Officer of the Corporation shall forthwith appoint a Trustee to fill such vacancy until a successor Trustee shall be appointed by the Bondowners as authorized in this Section. The Trustee shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books. Any successor Trustee appointed by the Corporation shall, immediately and without further act, be superseded by a Trustee appointed by the Bondowners.

If in a proper case no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within 30 days after the Trustee shall have given to the Corporation written notice as provided in the Section entitled "Removal of Trustee" above or after a vacancy in the office of the Trustee shall have occurred by reason of its inability to act or its removal under this Section, the Trustee or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Trustee. Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

Any Trustee appointed under the provisions of this Section in succession to the Trustee shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth, or a national banking association, and having a capital and surplus aggregating at least $50,000,000, if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by the Resolution.

**Supplemental Resolutions (Article IX)**

*Supplemental Resolutions Effective upon Filing with the Trustee (Section 901)*

For any one or more of the following purposes and at any time or from time to time, the Corporation may adopt a Supplemental Resolution which, upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, shall be fully effective in accordance with its terms:

(i)    to close the Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in the Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

(ii)    to add to the covenants and agreements of the Corporation in the Resolution, other covenants and agreements to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

(iii)    to add to the limitations and restrictions in the Resolution, other limitations and restrictions to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

(iv)    to surrender any right, power or privilege reserved to or conferred upon the Corporation by the Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

(v)    to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in the Section of the Resolution relating to the general provisions for the issuance of Bonds, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with the Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

(vi)    to confirm, as further assurance, any pledge under, and the subjection to any lien or pledge created or to be created by, the Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

(vii)    to modify any of the provisions of the Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to the Resolution;

(viii)    to cure any ambiguity, defect or inconsistent provision in the Resolution;

(ix) to provide such provisions with respect to Subordinate Bonds as are necessary and desirable, provided, that no such provisions shall adversely affect the payment priorities under the Resolution of any Bonds then Outstanding;

(x)    to provide for a pledge of Pledged Property for the payment and as security for Liquidity Facilities and Qualified Hedges as permitted by the Section entitled "Pledge" above.

(xi)    as permitted by the Resolution prior to the issuance and delivery of the first series of Bonds under the Resolution; and

(xii)    to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and are not contrary to or inconsistent with the Resolution as theretofore in effect; or

(xiii)    to modify any of the provisions of the Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

*Supplemental Resolutions Effective with Consent of Bondowners (Section 903)*

At any time or from time to time, the Corporation may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Resolution relating to the amendment of the Resolution, which Supplemental Resolution, upon the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, and upon compliance with the provisions of the Section of the Resolution relating to amendment of the Resolution, shall become fully effective in accordance with its terms as provided in said Section.

*General Provisions (Section 904)*

The Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of Resolution relating to Supplemental Resolutions and to amendment of the Resolution. Nothing in the Resolution relating to Supplemental Resolutions and to amendment of the Resolution shall affect or limit the right or obligation of the Corporation to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of the Section entitled "Further Assurances" above or the right or obligation of the Corporation to execute and deliver to the Trustee any instrument which elsewhere in the Resolution it is provided shall be delivered to the Trustee.

Any Supplemental Resolution referred to and permitted or authorized by the Sections entitled "Supplemental Resolutions Effective Upon Filing with the Trustee" or "Supplemental Resolutions Effective Upon Consent of the Trustee" may be adopted by the Corporation without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Sections, respectively. The copy of every Supplemental Resolution when delivered to the Trustee shall be accompanied by an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms.

The Trustee is authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by the Resolution and to make all further agreements and stipulations which may be therein contained, and the Trustee, in taking such action in good faith, shall be fully protected in relying on an Opinion of Bond Counsel that such Supplemental Resolution is authorized or permitted by the provisions of the Resolution.

No Supplemental Resolution shall change or modify any of the rights or obligations of the Trustee without its written assent thereto.

**Powers of Amendment (Section 1002)**

Any modification or amendment of the Resolution and of the rights and obligations of the Corporation and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent given as provided in the Resolution, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section. No such modification or

amendment shall permit a change in the terms of redemption or maturity of the principal (or Compounded Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Trustee without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons.  For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series.  The Trustee may in its discretion determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution and any such determination if reasonable and in good faith shall be binding and conclusive on the corporation and all Owners of Bonds.

## Events of Default and Remedies (Article XI)

*Events of Default (Section 1101)*

Each of the following events shall constitute an Event of Default under the Resolution:

(i)    There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii)    There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this subsection; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee or any Beneficiary; and provided further, however, that if the failure stated in the notice cannot be remedied within the thirty-day period, corrective action has been instituted by the Corporation within such thirty-day period and is being diligently pursued;

*provided,* that Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions hereunder in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due thereunder, until such time that Senior Bonds and all Parity Obligations are fully retired or are defeased in accordance with the provisions of the Resolution, and all references in Article XI of the Resolution to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

The exercise by the Commonwealth of its right to amend, modify, repeal or otherwise alter statutes imposing or relating to the Commonwealth Sales Tax, as described in the Resolution, shall not constitute a default or Event of Default under the Resolution.

In the event that the Corporation shall issue one or more Classes of Subordinate Bonds, or execute Subordinate Obligations, the related Series Resolution shall provide for the determination of Events of Default, and the imposition of remedies contained elsewhere in this Article XI, in accordance with the Class Priority set forth in such Series Resolution, which Class Priority shall in all cases provide that all Senior Bonds and all Parity Obligations related thereto shall be accorded senior status such that no Event of Default may be declared for default related to such Subordinate Bonds or Subordinate Obligations, and no remedy may be invoked under this Article XI for any such default on Subordinate Bonds or Subordinate Obligations, until the Senior and all Parity Obligations related thereto are fully retired or are defeased in accordance with the provisions of the Resolution.

*Remedies (Section 1102)*

Upon the happening and continuance of any Event of Default, then and in each such case the Trustee may proceed, and, upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds shall, shall, declare the principal of and accrued interest on the Bonds to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount on the date of acceleration).  Upon any such declaration, the principal of (Compounded Amount for Capital Appreciation Bonds) and accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon the Corporation in an amount sufficient to pay principal of (Compounded Amount for Capital Appreciation Bonds) and interest accrued on the accelerated Bonds to the date established for payment thereof.  In any such event, any Credit Facility Provider may elect to pay an amount equal to the accelerated principal (Compounded Amount) of and interest accrued on the Bonds covered by its Credit Facility to the date of acceleration and the Trustee shall accept such payment.  In addition, the Trustee may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Trustee, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

      (i)     by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the Corporation to collect Revenues adequate to carry out the covenants, agreements and pledges with respect thereto contained in the Resolution and to require the Corporation to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

      (ii)     by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged under the Resolution;

      (iii)     by action or suit in equity, to require the Corporation to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property and assets pledged under the Resolution as shall be within its control; and

      (iv)     by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

In the enforcement of any remedy under the Resolution, but subject to the Sections entitled "Authorization of Bonds," "The Pledge" and "No Personal Liability," the Trustee shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Corporation for principal, Redemption Price, interest or otherwise for Bonds under any provision of the Resolution or any Supplemental Resolution or of the Bonds, and unpaid, with interest on overdue payments at the rate or rates of interest specified in such

Bonds, together with any and all costs and expenses of collection and of all proceedings under the Resolution and under such Bonds, without prejudice to any other right or remedy of the Trustee or of the Bondowners, and to recover and enforce judgment or decree against the Corporation for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

*Priority of Payments After Event of Default (Section 1103)*

Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Trustee and its agents and attorneys necessary in the opinion of the Trustee to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Trustee and its agents and attorneys in the performance of their duties under the Resolution, in the event that the funds held by the Trustee shall be insufficient for the payment of interest and principal or Compounded Amount or Redemption Price then due on the Bonds and other amounts payable as described in clauses FIRST through FIFTH below, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Trustee and any moneys or other property distributable in respect of the Corporation's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

Unless the principal (or Compounded Amount, if applicable) of all of the Bonds shall have become due and payable,

FIRST:  to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Credit Facility and Liquidity Facility;

SECOND:  to the payment to the Persons entitled thereto of all installments of interest on the Bonds and the interest component of Parity Obligations then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all the Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the Corporation under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

FIFTH:  to the payment to the Persons entitled thereto of amounts payable by the Corporation under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clause FIRST OR FOURTH above;

provided, that if the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied in accordance with the provisions of

SECOND and THIRD above, ratably, without preference or priority of principal (Compounded Amount) over interest or of interest over principal (Compounded Amount) or of any installment of interest over any other installment of interest, and, provided further, in the event of an insufficiency of funds to make all payments required under any of clauses FIRST through FIFTH above, funds shall be applied to the payments required under the relevant clause, without preference or priority, ratably according to the amounts due.

The provisions of this Section are in all respects subject to the provisions of the Resolution relating to extending the payment of Bonds.

Whenever moneys are to be applied by the Trustee pursuant to this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as provided above. The deposit of such moneys with the Trustee, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Trustee and the Trustee shall incur no liability whatsoever to the Corporation, to any Bondowner to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Trustee acts without gross negligence or willful misconduct. Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue. The Trustee shall give such notice as it may deem appropriate for the fixing of any such date. The Trustee shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

*Termination of Proceedings (Section 1104)*

In case any proceeding taken by the Trustee on account of any Event of Default has been discontinued or abandoned for any reason, then in every such case the Corporation, the Trustee, the Beneficiaries and the Bondowners shall be restored to their former positions and rights under the Resolution, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no other such proceeding had been taken.

*Bondowners' Direction of Proceedings (Section 1105)*

Anything in the Resolution to the contrary notwithstanding, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings to be taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law or the provisions of the Resolution, including Section 804 hereof, and that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Trustee in personal liability.

*Limitation on Rights of Bondowners (Section 1106)*

No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law under the Resolution, or for the protection or enforcement of any right under the Resolution unless such Owner shall have given to the Trustee written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Trustee after the right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Trustee a reasonable opportunity either to proceed to

exercise the powers granted in the Resolution or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers under the Resolution or for any other remedy provided under the Resolution or by law.  It is understood and intended that no one or more Owners of the Bonds or other Beneficiary secured by the Resolution shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of the Resolution, or to enforce any right under the Resolution or under law with respect to the Bonds, or the Resolution, except in the manner provided in the Resolution, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner provided in the Resolution and for the benefit of all Owners of the Outstanding Bonds.  Nothing contained in the Resolution relating to defaults and remedies shall affect or impair the right of any Bondowner to enforce the payment of the principal of and interest on such Owner's Bonds or the obligation of the Corporation to pay the principal of (or Compounded Amount, if any) and interest on each Bond issued under the Resolution to the Owner thereof at the time and place in said Bond expressed.

Anything to the contrary in this Section notwithstanding, or any other provision of the Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

*Remedies Not Exclusive (Section 1108)*

No remedy conferred upon or reserved to the Trustee or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given under the Resolution or now or hereafter existing at law or in equity or by statute.

*No Waiver of Default (Section 1109)*

No delay or omission of the Trustee or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein and every power and remedy given by the Resolution to the Trustee and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

*Notice of Event of Default (Section 1110)*

The Trustee shall give to the Bondowners and the Beneficiaries notice of each Event of Default hereunder known to the Trustee within ninety days after actual knowledge by an Authorized Officer of the Trustee of the occurrence thereof, unless such Event of Default shall have been remedied or

cured before the giving of such notice. However, except in the case of default in the payment of the principal (or Compounded Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries. Each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof: (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the books for registration and transfer of Bonds as kept by the Trustee, and (ii) to each of the Rating Agencies.

*Defeasance (Section 1201)*

Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of Section 1201 of the Resolution. Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions contained herein, as affected by the provisions of the related Series Resolution. The Corporation shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Defeasance Securities deposited pursuant as described herein or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in the Resolution, then, at the option of the Corporation, expressed in an instrument in writing signed by an Authorized Officer of the Corporation and delivered to the Trustee, the covenants, agreements and other obligations of the Corporation to the Bondowners shall be discharged and satisfied. In such event, and provided that all amounts owing to the Trustee and all Beneficiaries shall have been fully paid, the Trustee shall, upon the request of the Corporation, execute and deliver to the Corporation such instruments as may be desirable to evidence such discharge and satisfaction and the Trustee shall pay over or deliver to the Corporation all money, securities and funds held by them pursuant to the Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

Bonds or any portion thereof for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Trustee (through deposit by the Corporation of funds for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed herein. Any Outstanding Bonds of any Series or any maturity within a Series or portion thereof shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed herein if (a) in case any of said Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee irrevocable instructions to give, as provided in Article IV of the Resolution, notice of redemption on said date of such Bonds, (b) there shall have been deposited with the Trustee either moneys in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Trustee at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bonds (or portions thereof) are not by their terms subject to redemption or maturity within the next succeeding 60 days, the Corporation shall have given the Trustee irrevocable instructions to mail, not less than seven (7) days after receipt of such instructions, a notice to the Owners of the Bonds (or portion thereof) which are to be deemed to have been paid hereunder that the deposit required by (b) above has been made with the Trustee and that said Bonds or portion thereof are deemed to have been paid in

accordance herein and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, on said Bonds or portion thereof, including the interest accrued thereon. Such notice shall be mailed, postage prepaid, to the Owners of said Bonds or portion thereof at their last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bonds and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bonds as herein provided for.

Neither Defeasance Securities nor moneys deposited with the Trustee as established herein, nor principal or interest payments on any such Defeasance Securities, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, and interest on said Bonds; provided that any cash received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Trustee at the written direction of the Corporation in Defeasance Securities maturing at the time or times and in amounts sufficient to pay when due the principal or Redemption Price, if applicable, and interest to become due on said Bonds on and prior to such redemption date or maturity date thereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, and interest on such Bonds, as realized, shall be deposited by the Trustee in the Revenue Account. To the extent required by the provider of a Credit Facility, the Bonds which are the subject of the enhancement of such Credit Facility shall not be deemed paid hereunder unless there shall have been delivered to the Trustee and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, and interest on such Bonds to the dates scheduled for such payment, and (b) an opinion of Bond Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed defeased under the provisions of the Resolution.

For purposes of determining whether Adjustable Rate Bonds shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Investment Securities and moneys, if any, in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution, the interest to come due on such Adjustable Rate Bonds on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Contractual Maximum Interest Rate permitted by the terms thereof; provided, however, that if on any date, as a result of such Adjustable Rate Bonds having borne interest at less than such Contractual Maximum Interest Rate for any period, the total amount of moneys and Investment Securities on deposit with the Trustee for the payment of interest on such Adjustable Rate Bonds is in excess of the total amount which would have been required to be deposited with the Trustee on such date in respect of such Adjustable Rate Bonds in order to satisfy the second sentence of subsection 2 of Section 1201 of the Resolution, the Trustee shall, if requested by the Corporation, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Option Bonds shall be deemed to have been paid in accordance with the second sentence of subsection 23 of Section 1201 of the Resolution only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Trustee moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bonds which could become payable to the Owners of such Bonds upon the exercise of any options provided to the Owners of such Bonds; provided, however, that if, at the time a deposit is made with the Trustee pursuant to subsection 23 of Section 1201 of the Resolution, the options originally exercisable by the Owner of an Option Bond are no longer exercisable, such Bond shall not be considered an Option Bond for purposes established herein. If any portion of the moneys deposited with

the Trustee for the payment of the principal and premium, if any, and interest on Option Bonds is not required for such purpose, the Trustee shall, if requested by the Corporation in writing, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Anything in the Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Trustee in trust for the payment of the principal of or premium, if any, or interest on any of the Bonds which remain unclaimed for two (2) years after the date when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, if such moneys were held by the Trustee at such date, or for two (2) years after the date of deposit of such moneys if deposited with the Trustee after the said date when such principal, premium, if any, or interest, as the case may be, became due and payable, shall, at the written request of the Corporation, be repaid by the Trustee to the Corporation, as its absolute property and free from trust, and the Trustee shall thereupon be released and discharged with respect thereto and the Bondowners shall look only to the Corporation for the payment of such principal, premium, if any, or interest, as the case may be; provided, however, that before being required to make any such payment to the Corporation, the Trustee shall, at the expense of the Corporation, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the Corporation.

**Moneys Held for Particular Bonds (Section 1203)**

The amounts held by the Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

**Preservation and Inspection of Documents (Section 1204)**

All documents received by the Trustee under the provisions of the Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Corporation, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

**No Personal Liability (Section 1206)**

Neither the members of the Corporation nor any other Person executing the Bonds shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

**Governing Law (Section 1211)**

The Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contain in the Resolution shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Trustee, any Paying Agent and Bond Registrar, shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

APPENDIX C

**PROPOSED FORM OF APPROVING OPINION OF
BOND COUNSEL TO THE CORPORATION**

*Hawkins Delafield & Wood LLP*

_____, 2007

ONE CHASE MANHATTAN PLAZA
NEW YORK, NY 10005
WWW.HAWKINS.COM

Puerto Rico Sales Tax Financing Corporation
Sánchez Vilella Government Center
De Diego Avenue, Stop 22
Santurce, Puerto Rico 00940

Ladies and Gentlemen:

　　We have examined the Constitution and the laws of the Commonwealth of Puerto Rico (the "Commonwealth"), including Act No. 91 of the Legislature of Puerto Rico, approved May 13, 2006, as amended and supplemented (the "Act"), creating the Puerto Rico Sales Tax Financing Corporation (the "Corporation") as an independent governmental instrumentality of the Commonwealth.

　　We have also examined a certified copy of a resolution adopted by the Board of Directors of the Corporation on July 13, 2007 (the "General Resolution") and a supplemental resolution adopted by the Board of Directors on such date (together with the General Resolution, the "Resolution"), and other proofs submitted relative to the following issue of Bonds (collectively, the "Bonds"):

**$2,667,603,572.60 Sales Tax Revenue Bonds, Series 2007A**

| Serial Bond Maturity | Initial Principal Amount | Interest Rate | Initial Principal Amount Per $5,000 |
|---|---|---|---|
| 2040 | $  15,445,848.60 | n/a | $992.60 |
| 2041 | 114,697,901.80 | n/a | 938.90 |
| 2042 | 113,630,448.00 | n/a | 890.80 |
| 2043 | 112,132,508.00 | n/a | 842.00 |
| 2044 | 110,597,947.20 | n/a | 795.60 |
| 2045 | 109,430,361.25 | n/a | 754.25 |
| 2046 | 108,235,860.00 | n/a | 714.90 |
| 2047 | 107,014,744.15 | n/a | 677.45 |
| 2057 | 563,885,000.00 | 5.25% | n/a |
| 2057 | 436,000,000.00 | Adjustable | n/a |

C-1

**$701,475,105.60 Capital Appreciation Term Bonds due August 1, 2054**
**(initial principal amount per $5,000 maturity amount:  $460.30)**

**$175,057,848.00 Capital Appreciation Term Bonds due August 1, 2056**
**(initial principal amount per $5,000 maturity amount:  $378.00)**

The Bonds are issuable as fully registered Bonds, without coupons, in denominations of $5,000 (maturity amount) each or integral multiples thereof.

The Bonds are issued under and pursuant to the Resolution for the purpose of (i) providing funds for the payment or retirement of certain "extraconstitutional" loans owing by the Commonwealth, and (ii) making deposits in various funds and accounts established under the Resolution.

The Bonds are limited obligations of the Corporation payable solely from and secured by a pledge and assignment of undisbursed Bond proceeds, certain funds held under the Resolution, together with income earned thereon, the Pledged Sales Tax receipts and all other Revenues (as defined in the Resolution) derived therefrom (collectively referred to herein as the "Pledged Property") pledged therefor under the Resolution.

The Bonds bear or compound interest and are subject to redemption prior to maturity as set forth in the Resolution.

The principal of the Bonds is payable at the principal corporate trust office of the Trustee in New York, New York. The interest on the Bonds is payable by check mailed to the registered owner at the address appearing on the registration books of the Corporation on the relevant record date or, in certain circumstances set forth in the Resolution, by wire transfer to a designated account.

The Internal Revenue Code of 1986, as amended (the "Code"), establishes requirements that must be met subsequent to the initial issuance and delivery of the Bonds in order that interest on the Bonds not be included, on and after the date of such issuance and delivery, in gross income for Federal income tax purposes under the Code. The Corporation has established procedures in the Resolution to meet the requirements of the Code. The Corporation has also covenanted in the Resolution to comply with the requirements of Sections 141 and 148 through 150 of the Code. In our opinion, the procedures that have been established as of the date hereof in the Resolution are sufficient, if followed by the Corporation, to comply with the requirements of the Code. Our opinion in paragraph 5 below is rendered on the assumption that the Corporation will carry out the aforementioned procedures and comply with the aforementioned covenants.

In rendering the opinion in paragraph 5 below, we also have relied on and assumed compliance by the Government Development Bank for Puerto Rico and by the Commonwealth of Puerto Rico with procedures and covenants set forth in certificates delivered on the date hereof.

From such examination, and having regard to legal questions we deem relevant, we are of the opinion that:

(1)    The Act is valid in all respects material to this opinion and the Corporation is a duly constituted public corporation and governmental instrumentality of the Commonwealth.

(2)    The Resolution has been duly adopted by, and is legal, valid and binding upon, the Corporation, enforceable in accordance with its terms.

(3)     The Bonds have been duly authorized by the Corporation and constitute legal, valid and binding limited obligations of the Corporation payable solely from, and secured by a valid and binding pledge of, the Pledged Property, subject only to the provisions of the Resolution permitting use of such Pledged Property and its application for the purposes and on the terms and conditions provided in the Resolution.

(4)     The Bonds do not constitute a debt, obligation or pledge of the full faith, credit or taxing power of the Commonwealth or any of its municipalities or political subdivisions, or instrumentalities (other than the Corporation), and neither the Commonwealth nor any of its municipalities or political subdivisions, nor instrumentalities (other than the Corporation), shall be liable for the payment thereof.

(5)     Under the provisions of the Acts of Congress now in force and under existing statutes and court decisions, (a) assuming compliance with certain conditions imposed by applicable Federal tax law as described herein, interest on the Bonds is excluded from gross income for Federal income tax purposes pursuant to applicable Federal tax law, and (ii) interest on the Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations; and (b) the Bonds, and the interest thereon, are exempt from state, the Commonwealth of Puerto Rico and local taxation. Additionally, certain provisions of the Code may affect the tax treatment of interest on the Bonds for certain Bondowners, and certain requirements of the Code must be satisfied after the date of issuance of the Bonds in order to maintain the exclusion from gross income of interest thereon under Federal law.

We express no opinion regarding any other Federal, Commonwealth or state tax consequences with respect to the Bonds. We are rendering our opinion under existing statutes and court decisions as of the issue date, and assume no obligation to update our opinion after the issue date to reflect any future action, fact or circumstance, or change in law or interpretation, or otherwise. We express no opinion on the effect of any action hereafter taken or not taken in reliance upon an opinion of other counsel on the exclusion of interest on the Bonds from gross income for Federal income tax purposes, or under state, Commonwealth or local tax law.

In rendering this opinion, we are advising you that the enforceability of the Bonds and the Resolution may be limited by bankruptcy, moratorium, insolvency, or other laws affecting creditors' rights or remedies and is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

We have also examined an executed Bond and in our opinion the form of said Bond and its execution are regular and proper.

Yours very truly,

[THIS PAGE INTENTIONALLY LEFT BLANK]

APPENDIX D

## BOOK-ENTRY SYSTEM

**The Depository Trust Company**

DTC will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee). One fully-registered Bond certificate will be issued for each stated maturity of the Bonds, each in the aggregate principal amount (initial principal amount in the case of the Capital Appreciation Bonds) of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 2.2 million issues of U.S. and non-U.S. equity, corporate and municipal debt issues, and money market instruments from over 100 countries that DTC's Participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation, (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has S&P's highest rating; AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction.

Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will

not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, the Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices shall be sent to DTC. If less than all of the Bonds are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor such other DTC nominee) will consent or vote with respect to Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Corporation as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, distributions, and dividend payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Corporation or the Trustee on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee, or the Corporation, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, distributions, and dividend payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Corporation or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the Bonds at any time by giving reasonable notice to the Corporation or the Trustee. Under such circumstances, in the event that a successor depository is not obtained, Bond certificates are required to be printed and delivered.

The Corporation may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, Bond certificates will be printed and delivered to DTC.

NONE OF THE CORPORATION, THE TRUSTEE OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

[THIS PAGE INTENTIONALLY LEFT BLANK]

APPENDIX E

## TABLE OF COMPOUNDED AMOUNTS FOR
## CAPITAL APPRECIATION BONDS

| Date | 2042 FGIC CABS 8/1/2040 4.96% | 2042 FGIC CABS 8/1/2041 4.98% | 2042 FGIC CABS 8/1/2042 4.99% | 2046 MBIA CABS 8/1/2043 5.01% | 2046 MBIA CABS 8/1/2044 5.03% | 2046 MBIA CABS 8/1/2045 5.04% | 2046 MBIA CABS 8/1/2046 5.05% | 2047 AMBAC CABS 8/1/2047 5.06% | 2054 AMBAC CABS 5.14% | 2056 Uninsured CABS 5.34% |
|---|---|---|---|---|---|---|---|---|---|---|
| 7/31/2007 | 992.60 | 938.90 | 890.80 | 842.00 | 795.60 | 754.25 | 714.90 | 677.45 | 460.30 | 378.00 |
| 2/1/2008 | 1,017.20 | 962.25 | 913.00 | 863.10 | 815.60 | 773.25 | 732.95 | 694.60 | 472.10 | 388.10 |
| 8/1/2008 | 1,042.45 | 986.25 | 935.80 | 884.70 | 836.10 | 792.70 | 751.45 | 712.15 | 484.25 | 398.45 |
| 2/1/2009 | 1,068.30 | 1,010.80 | 959.15 | 906.90 | 857.15 | 812.70 | 770.40 | 730.20 | 496.70 | 409.10 |
| 8/1/2009 | 1,094.80 | 1,035.95 | 983.05 | 929.60 | 878.70 | 833.20 | 789.85 | 748.65 | 509.45 | 420.00 |
| 2/1/2010 | 1,121.95 | 1,061.75 | 1,007.60 | 952.90 | 900.80 | 854.20 | 809.80 | 767.60 | 522.55 | 431.20 |
| 8/1/2010 | 1,149.80 | 1,088.20 | 1,032.75 | 976.75 | 923.45 | 875.70 | 830.25 | 787.00 | 536.00 | 442.75 |
| 2/1/2011 | 1,178.30 | 1,115.30 | 1,058.50 | 1,001.20 | 946.70 | 897.75 | 851.20 | 806.95 | 549.75 | 454.55 |
| 8/1/2011 | 1,207.50 | 1,143.05 | 1,084.90 | 1,026.30 | 970.50 | 920.40 | 872.70 | 827.35 | 563.90 | 466.70 |
| 2/1/2012 | 1,237.45 | 1,171.55 | 1,112.00 | 1,052.00 | 994.90 | 943.60 | 894.75 | 848.30 | 578.40 | 479.15 |
| 8/1/2012 | 1,268.15 | 1,200.70 | 1,139.70 | 1,078.35 | 1,019.90 | 967.35 | 917.35 | 869.75 | 593.25 | 491.95 |
| 2/1/2013 | 1,299.60 | 1,230.60 | 1,168.15 | 1,105.40 | 1,045.55 | 991.75 | 940.50 | 891.75 | 608.50 | 505.10 |
| 8/1/2013 | 1,331.85 | 1,261.25 | 1,197.30 | 1,133.05 | 1,071.85 | 1,016.75 | 964.25 | 914.30 | 624.15 | 518.55 |
| 2/1/2014 | 1,364.85 | 1,292.65 | 1,227.20 | 1,161.45 | 1,098.80 | 1,042.35 | 988.60 | 937.45 | 640.20 | 532.40 |
| 8/1/2014 | 1,398.70 | 1,324.85 | 1,257.80 | 1,190.55 | 1,126.45 | 1,068.65 | 1,013.55 | 961.15 | 656.65 | 546.65 |
| 2/1/2015 | 1,433.40 | 1,357.80 | 1,289.20 | 1,220.35 | 1,154.80 | 1,095.55 | 1,039.15 | 985.50 | 673.50 | 561.20 |
| 8/1/2015 | 1,468.95 | 1,391.65 | 1,321.35 | 1,250.95 | 1,183.85 | 1,123.15 | 1,065.40 | 1,010.40 | 690.80 | 576.20 |
| 2/1/2016 | 1,505.40 | 1,426.30 | 1,354.30 | 1,282.30 | 1,213.60 | 1,151.45 | 1,092.30 | 1,035.95 | 708.60 | 591.60 |
| 8/1/2016 | 1,542.70 | 1,461.80 | 1,388.10 | 1,314.40 | 1,244.15 | 1,180.50 | 1,119.90 | 1,062.20 | 726.80 | 607.40 |
| 2/1/2017 | 1,580.95 | 1,498.20 | 1,422.75 | 1,347.35 | 1,275.40 | 1,210.25 | 1,148.15 | 1,089.05 | 745.45 | 623.60 |
| 8/1/2017 | 1,620.20 | 1,535.50 | 1,458.25 | 1,381.10 | 1,307.50 | 1,240.75 | 1,177.15 | 1,116.60 | 764.65 | 640.25 |
| 2/1/2018 | 1,660.35 | 1,573.75 | 1,494.60 | 1,415.70 | 1,340.40 | 1,272.00 | 1,206.90 | 1,144.85 | 784.30 | 657.35 |
| 8/1/2018 | 1,701.55 | 1,612.95 | 1,531.90 | 1,451.15 | 1,374.10 | 1,304.05 | 1,237.35 | 1,173.85 | 804.45 | 674.90 |
| 2/1/2019 | 1,743.75 | 1,653.10 | 1,570.15 | 1,487.50 | 1,408.65 | 1,336.90 | 1,268.60 | 1,203.55 | 825.10 | 692.95 |
| 8/1/2019 | 1,787.00 | 1,694.25 | 1,609.30 | 1,524.75 | 1,444.10 | 1,370.60 | 1,300.65 | 1,234.00 | 846.30 | 711.45 |
| 2/1/2020 | 1,831.30 | 1,736.45 | 1,649.45 | 1,562.95 | 1,480.40 | 1,405.15 | 1,333.45 | 1,265.20 | 868.05 | 730.40 |
| 8/1/2020 | 1,876.70 | 1,779.70 | 1,690.60 | 1,602.10 | 1,517.65 | 1,440.55 | 1,367.15 | 1,297.20 | 890.40 | 749.95 |
| 2/1/2021 | 1,923.25 | 1,824.00 | 1,732.80 | 1,642.25 | 1,555.80 | 1,476.85 | 1,401.65 | 1,330.05 | 913.25 | 769.95 |
| 8/1/2021 | 1,970.95 | 1,869.40 | 1,776.05 | 1,683.40 | 1,594.95 | 1,514.10 | 1,437.05 | 1,363.70 | 936.75 | 790.50 |
| 2/1/2022 | 2,019.85 | 1,915.95 | 1,820.35 | 1,725.55 | 1,635.05 | 1,552.25 | 1,473.35 | 1,398.20 | 960.80 | 811.60 |
| 8/1/2022 | 2,069.95 | 1,963.65 | 1,865.75 | 1,768.75 | 1,676.15 | 1,591.35 | 1,510.55 | 1,433.55 | 985.50 | 833.30 |
| 2/1/2023 | 2,121.25 | 2,012.55 | 1,912.30 | 1,813.10 | 1,718.30 | 1,631.45 | 1,548.70 | 1,469.85 | 1,010.85 | 855.55 |
| 8/1/2023 | 2,173.90 | 2,062.70 | 1,960.05 | 1,858.50 | 1,761.55 | 1,672.55 | 1,587.80 | 1,507.00 | 1,036.80 | 878.40 |
| 2/1/2024 | 2,227.80 | 2,114.05 | 2,008.95 | 1,905.05 | 1,805.85 | 1,714.70 | 1,627.90 | 1,545.15 | 1,063.45 | 901.85 |
| 8/1/2024 | 2,283.05 | 2,166.70 | 2,059.05 | 1,952.80 | 1,851.25 | 1,757.95 | 1,669.00 | 1,584.25 | 1,090.80 | 925.90 |
| 2/1/2025 | 2,339.65 | 2,220.65 | 2,110.45 | 2,001.70 | 1,897.80 | 1,802.25 | 1,711.15 | 1,624.30 | 1,118.80 | 950.65 |
| 8/1/2025 | 2,397.70 | 2,275.90 | 2,163.10 | 2,051.85 | 1,945.55 | 1,847.65 | 1,754.35 | 1,665.40 | 1,147.55 | 976.00 |
| 2/1/2026 | 2,457.15 | 2,332.60 | 2,217.05 | 2,103.25 | 1,994.50 | 1,894.20 | 1,798.65 | 1,707.55 | 1,177.05 | 1,002.10 |
| 8/1/2026 | 2,518.10 | 2,390.70 | 2,272.35 | 2,155.90 | 2,044.65 | 1,941.95 | 1,844.05 | 1,750.75 | 1,207.30 | 1,028.85 |
| 2/1/2027 | 2,580.55 | 2,450.20 | 2,329.05 | 2,209.95 | 2,096.05 | 1,990.90 | 1,890.60 | 1,795.05 | 1,238.35 | 1,056.30 |
| 8/1/2027 | 2,644.55 | 2,511.20 | 2,387.20 | 2,265.30 | 2,148.80 | 2,041.05 | 1,938.35 | 1,840.45 | 1,270.15 | 1,084.50 |
| 2/1/2028 | 2,710.10 | 2,573.75 | 2,446.75 | 2,322.05 | 2,202.85 | 2,092.50 | 1,987.30 | 1,887.00 | 1,302.80 | 1,113.45 |
| 8/1/2028 | 2,777.35 | 2,637.85 | 2,507.80 | 2,380.20 | 2,258.25 | 2,145.20 | 2,037.50 | 1,934.75 | 1,336.30 | 1,143.20 |
| 2/1/2029 | 2,846.20 | 2,703.50 | 2,570.35 | 2,439.85 | 2,315.00 | 2,199.30 | 2,088.90 | 1,983.70 | 1,370.65 | 1,173.70 |
| 8/1/2029 | 2,916.80 | 2,770.85 | 2,634.50 | 2,500.95 | 2,373.25 | 2,254.70 | 2,141.65 | 2,033.90 | 1,405.85 | 1,205.05 |
| 2/1/2030 | 2,989.15 | 2,839.85 | 2,700.20 | 2,563.60 | 2,432.95 | 2,311.55 | 2,195.75 | 2,085.35 | 1,442.00 | 1,237.25 |
| 8/1/2030 | 3,063.25 | 2,910.55 | 2,767.60 | 2,627.80 | 2,494.10 | 2,369.80 | 2,251.20 | 2,138.10 | 1,479.05 | 1,270.25 |
| 2/1/2031 | 3,139.25 | 2,983.00 | 2,836.65 | 2,693.65 | 2,556.85 | 2,429.50 | 2,308.05 | 2,192.20 | 1,517.05 | 1,304.20 |
| 8/1/2031 | 3,217.10 | 3,057.30 | 2,907.40 | 2,761.10 | 2,621.15 | 2,490.70 | 2,366.30 | 2,247.70 | 1,556.05 | 1,339.00 |
| 2/1/2032 | 3,296.85 | 3,133.40 | 2,979.95 | 2,830.30 | 2,687.10 | 2,553.50 | 2,426.05 | 2,304.55 | 1,596.05 | 1,374.75 |
| 8/1/2032 | 3,378.65 | 3,211.45 | 3,054.30 | 2,901.20 | 2,754.65 | 2,617.85 | 2,487.30 | 2,362.85 | 1,637.05 | 1,411.45 |
| 2/1/2033 | 3,462.40 | 3,291.40 | 3,130.50 | 2,973.85 | 2,823.95 | 2,683.80 | 2,550.15 | 2,422.65 | 1,679.15 | 1,449.15 |
| 8/1/2033 | 3,548.30 | 3,373.35 | 3,208.60 | 3,048.35 | 2,894.95 | 2,751.45 | 2,614.50 | 2,483.95 | 1,722.30 | 1,487.85 |
| 2/1/2034 | 3,636.30 | 3,457.35 | 3,288.70 | 3,124.70 | 2,967.75 | 2,820.75 | 2,680.55 | 2,546.75 | 1,766.55 | 1,527.60 |
| 8/1/2034 | 3,726.45 | 3,543.45 | 3,370.75 | 3,203.00 | 3,042.40 | 2,891.85 | 2,748.20 | 2,611.20 | 1,811.95 | 1,568.35 |

| Date | 2042 FGIC CABS 8/1/2040 4.96% | 2042 FGIC CABS 8/1/2041 4.98% | 2042 FGIC CABS 8/1/2042 4.99% | 2046 MBIA CABS 8/1/2043 5.01% | 2046 MBIA CABS 8/1/2044 5.03% | 2046 MBIA CABS 8/1/2045 5.04% | 2046 MBIA CABS 8/1/2046 5.05% | 2047 AMBAC CABS 8/1/2047 5.06% | 2054 AMBAC CABS 5.14% | 2056 Uninsured CABS 5.34% |
|---|---|---|---|---|---|---|---|---|---|---|
| 2/1/2035 | 3,818.90 | 3,631.70 | 3,454.85 | 3,283.25 | 3,118.95 | 2,964.75 | 2,817.60 | 2,677.25 | 1,858.55 | 1,610.25 |
| 8/1/2035 | 3,913.60 | 3,722.10 | 3,541.05 | 3,365.45 | 3,197.35 | 3,039.45 | 2,888.75 | 2,745.00 | 1,906.30 | 1,653.25 |
| 2/1/2036 | 4,010.65 | 3,814.80 | 3,629.40 | 3,449.80 | 3,277.80 | 3,116.05 | 2,961.70 | 2,814.45 | 1,955.30 | 1,697.35 |
| 8/1/2036 | 4,110.10 | 3,909.80 | 3,719.95 | 3,536.20 | 3,360.20 | 3,194.55 | 3,036.50 | 2,885.65 | 2,005.55 | 1,742.70 |
| 2/1/2037 | 4,212.05 | 4,007.15 | 3,812.75 | 3,624.80 | 3,444.75 | 3,275.05 | 3,113.15 | 2,958.65 | 2,057.10 | 1,789.25 |
| 8/1/2037 | 4,316.50 | 4,106.90 | 3,907.85 | 3,715.60 | 3,531.35 | 3,357.60 | 3,191.75 | 3,033.50 | 2,109.95 | 1,837.00 |
| 2/1/2038 | 4,423.55 | 4,209.15 | 4,005.35 | 3,808.65 | 3,620.20 | 3,442.20 | 3,272.35 | 3,110.25 | 2,164.20 | 1,886.05 |
| 8/1/2038 | 4,533.25 | 4,314.00 | 4,105.30 | 3,904.05 | 3,711.25 | 3,528.95 | 3,355.00 | 3,188.95 | 2,219.80 | 1,936.40 |
| 2/1/2039 | 4,645.70 | 4,421.40 | 4,207.75 | 4,001.85 | 3,804.55 | 3,617.90 | 3,439.70 | 3,269.65 | 2,276.85 | 1,988.10 |
| 8/1/2039 | 4,760.90 | 4,531.50 | 4,312.70 | 4,102.10 | 3,900.25 | 3,709.05 | 3,526.55 | 3,352.35 | 2,335.35 | 2,041.20 |
| 2/1/2040 | 4,879.00 | 4,644.35 | 4,420.30 | 4,204.85 | 3,998.35 | 3,802.55 | 3,615.60 | 3,437.20 | 2,395.40 | 2,095.70 |
| 8/1/2040 | 5,000.00 | 4,760.00 | 4,530.60 | 4,310.20 | 4,098.90 | 3,898.35 | 3,706.90 | 3,524.15 | 2,456.95 | 2,151.65 |
| 2/1/2041 | | 4,878.50 | 4,643.65 | 4,418.15 | 4,202.00 | 3,996.60 | 3,800.50 | 3,613.30 | 2,520.10 | 2,209.10 |
| 8/1/2041 | | 5,000.00 | 4,759.50 | 4,528.85 | 4,307.70 | 4,097.30 | 3,896.45 | 3,704.70 | 2,584.85 | 2,268.10 |
| 2/1/2042 | | | 4,878.25 | 4,642.30 | 4,416.00 | 4,200.55 | 3,994.85 | 3,798.45 | 2,651.30 | 2,328.65 |
| 8/1/2042 | | | 5,000.00 | 4,758.60 | 4,527.10 | 4,306.40 | 4,095.70 | 3,894.55 | 2,719.45 | 2,390.80 |
| 2/1/2043 | | | | 4,877.80 | 4,640.95 | 4,414.95 | 4,199.15 | 3,993.10 | 2,789.30 | 2,454.65 |
| 8/1/2043 | | | | 5,000.00 | 4,757.65 | 4,526.20 | 4,305.15 | 4,094.10 | 2,861.00 | 2,520.20 |
| 2/1/2044 | | | | | 4,877.30 | 4,640.25 | 4,413.85 | 4,197.70 | 2,934.55 | 2,587.50 |
| 8/1/2044 | | | | | 5,000.00 | 4,757.20 | 4,525.30 | 4,303.90 | 3,009.95 | 2,656.55 |
| 2/1/2045 | | | | | | 4,877.05 | 4,639.60 | 4,412.80 | 3,087.30 | 2,727.50 |
| 8/1/2045 | | | | | | 5,000.00 | 4,756.75 | 4,524.45 | 3,166.65 | 2,800.30 |
| 2/1/2046 | | | | | | | 4,876.85 | 4,638.90 | 3,248.05 | 2,875.10 |
| 8/1/2046 | | | | | | | 5,000.00 | 4,756.25 | 3,331.50 | 2,951.85 |
| 2/1/2047 | | | | | | | | 4,876.60 | 3,417.15 | 3,030.65 |
| 8/1/2047 | | | | | | | | 5,000.00 | 3,504.95 | 3,111.60 |
| 2/1/2048 | | | | | | | | | 3,595.05 | 3,194.65 |
| 8/1/2048 | | | | | | | | | 3,687.40 | 3,279.95 |
| 2/1/2049 | | | | | | | | | 3,782.20 | 3,367.55 |
| 8/1/2049 | | | | | | | | | 3,879.40 | 3,457.45 |
| 2/1/2050 | | | | | | | | | 3,979.10 | 3,549.75 |
| 8/1/2050 | | | | | | | | | 4,081.35 | 3,644.55 |
| 2/1/2051 | | | | | | | | | 4,186.25 | 3,741.85 |
| 8/1/2051 | | | | | | | | | 4,293.85 | 3,841.75 |
| 2/1/2052 | | | | | | | | | 4,404.20 | 3,944.35 |
| 8/1/2052 | | | | | | | | | 4,517.40 | 4,049.65 |
| 2/1/2053 | | | | | | | | | 4,633.45 | 4,157.80 |
| 8/1/2053 | | | | | | | | | 4,752.55 | 4,268.80 |
| 2/1/2054 | | | | | | | | | 4,874.70 | 4,382.80 |
| 8/1/2054 | | | | | | | | | 5,000.00 | 4,499.80 |
| 2/1/2055 | | | | | | | | | | 4,619.95 |
| 8/1/2055 | | | | | | | | | | 4,743.30 |
| 2/1/2056 | | | | | | | | | | 4,869.95 |
| 8/1/2056 | | | | | | | | | | 5,000.00 |



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

# Municipal Bond
# New Issue Insurance Policy

| Issuer: | Policy Number: |
| --- | --- |
| | Control Number:    0010001 |
| Bonds: | Premium: |

Financial Guaranty Insurance Company ("Financial Guaranty"), a New York stock insurance company, in consideration of the payment of the premium and subject to the terms of this Policy, hereby unconditionally and irrevocably agrees to pay to U.S. Bank Trust National Association or its successor, as its agent (the "Fiscal Agent"), for the benefit of Bondholders, that portion of the principal and interest on the above-described debt obligations (the "Bonds") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

Financial Guaranty will make such payments to the Fiscal Agent on the date such principal or interest becomes Due for Payment or on the Business Day next following the day on which Financial Guaranty shall have received Notice of Nonpayment, whichever is later.  The Fiscal Agent will disburse to the Bondholder the face amount of principal and interest which is then Due for Payment but is unpaid by reason of Nonpayment by the Issuer but only upon receipt by the Fiscal Agent, in form reasonably satisfactory to it, of (i) evidence of the Bondholder's right to receive payment of the principal or interest Due for Payment and (ii) evidence, including any appropriate instruments of assignment, that all of the Bondholder's rights to payment of such principal or interest Due for Payment shall thereupon vest in Financial Guaranty.  Upon such disbursement, Financial Guaranty shall become the owner of the Bond, appurtenant coupon or right to payment of principal or interest on such Bond and shall be fully subrogated to all of the Bondholder's rights thereunder, including the Bondholder's right to payment thereof.

This Policy is non-cancellable for any reason.  The premium on this Policy is not refundable for any reason, including the payment of the Bonds prior to their maturity.  This Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Bond.

As used herein, the term "Bondholder" means, as to a particular Bond, the person other than the Issuer who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof.  "Due for Payment" means, when referring to the principal of a Bond, the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity and means, when referring to interest on a Bond, the stated date for payment of interest.  "Nonpayment" in respect of a Bond means the failure of the Issuer to have provided sufficient funds to the paying agent for payment in full of all

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.

Form 9000 (10/93)                                                                                                    Page 1 of 2



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

# Municipal Bond
# New Issue Insurance Policy

principal and interest Due for Payment on such Bond. "Notice" means telephonic or telegraphic notice, subsequently confirmed in writing, or written notice by registered or certified mail, from a Bondholder or a paying agent for the Bonds to Financial Guaranty. "Business Day" means any day other than a Saturday, Sunday or a day on which the Fiscal Agent is authorized by law to remain closed.

In Witness Whereof, Financial Guaranty has caused this Policy to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

**President**

**Effective Date:**                                    **Authorized Representative**

U.S. Bank Trust National Association, acknowledges that it has agreed to perform the duties of Fiscal Agent under this Policy.

**Authorized Officer**

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.
Form 9000 (10/93)                                                                                Page 2 of 2



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

# Endorsement
## To Financial Guaranty Insurance Company
## Insurance Policy

| Policy Number: | | Control Number: | 0010001 |
|---|---|---|---|

It is further understood that the term "Nonpayment" in respect of a Bond includes any payment of principal or interest made to a Bondholder by or on behalf of the issuer of such Bond which has been recovered from such Bondholder pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

NOTHING HEREIN SHALL BE CONSTRUED TO WAIVE, ALTER, REDUCE OR AMEND COVERAGE IN ANY OTHER SECTION OF THE POLICY. IF FOUND CONTRARY TO THE POLICY LANGUAGE, THE TERMS OF THIS ENDORSEMENT SUPERSEDE THE POLICY LANGUAGE.

In Witness Whereof, Financial Guaranty has caused this Endorsement to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

**President**

**Effective Date:**                                             **Authorized Representative**

**Acknowledged as of the Effective Date written above:**

**Authorized Officer**
**U.S. Bank Trust National Association, as Fiscal Agent**

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.

Form E-0002 (10/93)                                                                    Page 1 of 1



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

# Endorsement

To Financial Guaranty Insurance Company
Insurance Policy

---

Policy Number:                               Control Number:    0010001

---

It is further understood that with respect to the Bonds maturing on _____, the amount insured under this Policy is that portion of the accreted value (as set forth in the bond documents under which the Bonds are issued) of said Bonds which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

NOTHING HEREIN SHALL BE CONSTRUED TO WAIVE, ALTER, REDUCE OR AMEND COVERAGE IN ANY OTHER SECTION OF THE POLICY. IF FOUND CONTRARY TO THE POLICY LANGUAGE, THE TERMS OF THIS ENDORSEMENT SUPERSEDE THE POLICY LANGUAGE.

In Witness Whereof, Financial Guaranty has caused this Endorsement to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

President

Effective Date:                               Authorized Representative

Acknowledged as of the Effective Date written above:

Authorized Officer
U.S. Bank Trust National Association, as Fiscal Agent

---

F-4

APPENDIX G

# FINANCIAL GUARANTY INSURANCE POLICY

## MBIA Insurance Corporation
## Armonk, New York 10504

Policy No. [NUMBER]

MBIA Insurance Corporation (the "Insurer"), in consideration of the payment of the premium and subject to the terms of this policy, hereby unconditionally and irrevocably guarantees to any owner, as hereinafter defined, of the following described obligations, the full and complete payment required to be made by or on behalf of the Issuer from [PAYING AGENT/TRUSTEE] or its successor (the "Paying Agent") of an amount equal to (i) the principal of (either at the stated maturity or by any advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Obligations (as that term is defined below) as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed hereby shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration, unless the Insurer elects, in its sole discretion, to pay in whole or in part any principal due by reason of such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law. The amounts referred to in clauses (i) and (ii) of the preceding sentence shall be referred to herein collectively as the "Insured Amounts." "Obligations" shall mean:

### [PAR]
### [LEGAL NAME OF ISSUE]

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by the Insurer from the Paying Agent or any owner of an Obligation the payment of an Insured Amount for which is then due, that such required payment has not been made, the Insurer on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with U.S. Bank Trust National Association, in New York, New York, or its successor, sufficient for the payment of any such Insured Amounts which are then due. Upon presentment and surrender of such Obligations or presentment of such other proof of ownership of the Obligations, together with any appropriate instruments of assignment to evidence the assignment of the Insured Amounts due on the Obligations as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for such owners of the Obligations in any legal proceeding related to payment of Insured Amounts on the Obligations, such instruments being in a form satisfactory to U.S. Bank Trust National Association, U.S. Bank Trust National Association shall disburse to such owners, or the Paying Agent payment of the Insured Amounts due on such Obligations, less any amount held by the Paying Agent for the payment of such Insured Amounts and legally available therefor. This policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Obligation.

As used herein, the term "owner" shall mean the registered owner of any Obligation as indicated in the books maintained by the Paying Agent, the Issuer, or any designee of the Issuer for such purpose. The term owner shall not include the Issuer or any party whose agreement with the Issuer constitutes the underlying security for the Obligations.

Any service of process on the Insurer may be made to the Insurer at its offices located at 113 King Street, Armonk, New York 10504 and such service of process shall be valid and binding.

This policy is non-cancellable for any reason. The premium on this policy is not refundable for any reason including the payment prior to maturity of the Obligations.

IN WITNESS WHEREOF, the Insurer has caused this policy to be executed in facsimile on its behalf by its duly authorized officers, this [DAY] day of [MONTH, YEAR].

COUNTERSIGNED:                                             MBIA Insurance Corporation

_____                           _____
Resident Licensed Agent                                   President

                                          Attest: _____
_____                           Assistant Secretary
City, State

STD-RCS-7
01/05

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX H**

# Ambac

**Financial Guaranty Insurance Policy**

Ambac Assurance Corporation
One State Street Plaza, 15th Floor
New York, New York 10004
Telephone: (212) 668-0340

Obligor:

Policy Number:

Obligations:

Premium:

Ambac Assurance Corporation (Ambac), a Wisconsin stock insurance corporation, in consideration of the payment of the premium and subject to the terms of this Policy, hereby agrees to pay to The Bank of New York, as trustee, or its successor (the "Insurance Trustee"), for the benefit of the Holders, that portion of the principal of and interest on the above-described obligations (the "Obligations") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Obligor.

Ambac will make such payments to the Insurance Trustee within one (1) business day following written notification to Ambac of Nonpayment. Upon a Holder's presentation and surrender to the Insurance Trustee of such unpaid Obligations or related coupons, uncanceled and in bearer form and free of any adverse claim, the Insurance Trustee will disburse to the Holder the amount of principal and interest which is then Due for Payment but is unpaid. Upon such disbursement, Ambac shall become the owner of the surrendered Obligations and/or coupons and shall be fully subrogated to all of the Holder's rights to payment thereon.

In cases where the Obligations are issued in registered form, the Insurance Trustee shall disburse principal to a Holder only upon presentation and surrender to the Insurance Trustee of the unpaid Obligation, uncanceled and free of any adverse claim, together with an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee duly executed by the Holder or such Holder's duly authorized representative, so as to permit ownership of such Obligation to be registered in the name of Ambac or its nominee. The Insurance Trustee shall disburse interest to a Holder of a registered Obligation only upon presentation to the Insurance Trustee of proof that the claimant is the person entitled to the payment of interest on the Obligation and delivery to the Insurance Trustee of an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee, duly executed by the Holder or such Holder's duly authorized representative, transferring to Ambac all rights under such Obligation to receive the interest in respect of which the insurance disbursement was made. Ambac shall be subrogated to all of the Holders' rights to payment on registered Obligations to the extent of any insurance disbursements so made.

In the event that a trustee or paying agent for the Obligations has notice that any payment of principal of or interest on an Obligation which has become Due for Payment and which is made to a Holder by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from the Holder pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such Holder will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available.

As used herein, the term "Holder" means any person other than (i) the Obligor or (ii) any person whose obligations constitute the underlying security or source of payment for the Obligations who, at the time of Nonpayment, is the owner of an Obligation or of a coupon relating to an Obligation. As used herein, "Due for Payment", when referring to the principal of Obligations, is when the scheduled maturity date or mandatory redemption date for the application of a required sinking fund installment has been reached and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by application of required sinking fund installments), acceleration or other advancement of maturity; and, when referring to interest on the Obligations, is when the scheduled date for payment of interest has been reached. As used herein, "Nonpayment" means the failure of the Obligor to have provided sufficient funds to the trustee or paying agent for payment in full of all principal of and interest on the Obligations which are Due for Payment.

This Policy is noncancelable. The premium on this Policy is not refundable for any reason, including payment of the Obligations prior to maturity. This Policy does not insure against loss of any prepayment or other accelerated payment which at any time may become due in respect of any Obligation, other than at the sole option of Ambac, nor against any risk other than Nonpayment.

In witness whereof, Ambac has caused this Policy to be affixed with a facsimile of its corporate seal and to be signed by its duly authorized officers in facsimile to become effective as its original seal and signatures and binding upon Ambac by virtue of the countersignature of its duly authorized representative.

President

**SEAL**

Secretary

Effective Date:

Authorized Representative

THE BANK OF NEW YORK acknowledges that it has agreed to perform the duties of Insurance Trustee under this Policy.

Form No.: 2B-0012 (1/01)

Authorized Officer of Insurance Trustee

[THIS PAGE INTENTIONALLY LEFT BLANK]

[THIS PAGE INTENTIONALLY LEFT BLANK]

[THIS PAGE INTENTIONALLY LEFT BLANK]

Printed on Recycled Paper
IMAGEMASTER 800.452.5152